UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METROPOLITAN TAXICAB BOARD OF TRADE; MIDTOWN OPERATING CORP.; SWEET IRENE TRANSPORTATION CO. INC., OSSMAN ALI; and KEVIN HEALY,<br><br>      Plaintiffs,<br><br>  v.<br><br>CITY OF NEW YORK; MICHAEL R. BLOOMBERG, in his official capacity as Mayor of the City of New York; THE NEW YORK CITY TAXICAB & LIMOUSINE COMMISSION ("TLC"); MATTHEW W. DAUS, in his official capacity as Commissioner, Chair, and Chief Executive Officer of the TLC; PETER SCHENKMAN, in his official capacity as Assistant Commissioner of the TLC for Safety & Emissions; and ANDREW SALKIN, in his official capacity as First Deputy Commissioner of the TLC,<br><br>      Defendants. | 08 Civ.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br> |

Plaintiffs, Metropolitan Taxicab Board of Trade, Midtown Operating Corp.,

Sweet Irene Transportation Co. Inc., Ossman Ali, and Kevin Healy for their Complaint, allege as

follows:

### INTRODUCTION

  1.  This case challenges the Bloomberg Administration's misguided and

dangerous decision to accelerate the implementation of its otherwise laudable effort to reduce

emissions and increase the fuel efficiency of yellow taxis. In May 2008, the Bloomberg

Administration made final its decision to jettison its original (and rational) target of 2012 for

beginning the regulation of yellow taxi emissions – a time-table that allowed for appropriate

safety testing of new vehicles and for automakers to produce a purpose-built, fuel-efficient taxi – and replaced it with an *October 1, 2008* twenty-five mile per gallon mandate for *every* new taxicab.

2.      Thus, in one fell swoop, defendants abandoned decades of established piloting and testing procedures for taxis and replaced them with a mandate for new vehicles that have never been meaningfully tested and have no proven record of safety or reliability as commercial vehicles. While a decision to announce the immediate change to "clean" taxis may be politically enticing and expedient, it is also irresponsible, dangerous, and illegal.

3.      As defendant Matthew Daus, the Commissioner, Chair and Chief Executive Officer of the Taxi and Limousine Commission, has acknowledged, the decision to rush new vehicles into service as taxis will endanger the lives of the tens of thousands of New Yorkers who depend upon taxis for transportation and for their livelihood.

4.      Defendants' ill-considered political decision is dangerous, irrational, arbitrary, and capricious. It also violates clearly established federal law because Congress has declared that only the federal government has the power to set fuel efficiency and emissions standards.

5.      Plaintiffs share defendants' desire to increase fuel efficiency and reduce carbon emissions. That desire, however, must not accelerate a process to the point that established safety procedures are abandoned, thus jeopardizing the health and safety of New York taxi riders and drivers. Defendants' time-table must be annulled.

**JURISDICTION AND VENUE**

6.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 28 U.S.C. § 2201.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

8.       Plaintiff Metropolitan Taxicab Board of Trade ("MTBOT") is a 56-year-old trade association comprised of yellow medallion taxi ("yellow taxicab," "taxicab," or "taxi") fleets in NYC.  MTBOT is the largest taxi fleet association in the United States with 27 member fleets and over 3,500 yellow medallion taxis – approximately 25% of the NYC taxi industry.  Most of MTBOT's taxis are double-shifted, that is they are driven two 12-hour shifts a day and are therefore on the road 24 hours a day, 7 days a week, 365 days a year ("24/7").

9.       Plaintiff Midtown Operating Corp. ("Midtown") is a privately owned and operated yellow taxicab garage located in Long Island City in Queens County, New York.  Midtown leases yellow taxicabs to independent contractors on a double-shifted daily basis.  It is a full-service garage, operating 24/7.  Every car leased at Midtown is a Crown Victoria Long Wheel Base ("LWB" or "stretch"), which has been the standard taxi for years but is not approved under the challenged rule.  Midtown has been recognized as an innovator in the industry and is an authorized test center of new and existing products for major manufacturers and oil companies including the Ford Motor Company.  Established in 1981, Midtown employs over 50 mechanics, dispatchers and other personnel and leases taxis to more than 800 independent drivers.

10. Sweet Irene Transportation Co. Inc. is a private New York corporation in the business of owning and leasing NYC yellow taxicabs.

11. Plaintiff Ossman Ali ("Ali") is a self-employed independent contractor who leases and drives NYC yellow taxicabs. Ali resides in Bronx, New York.

12. Plaintiff Kevin Healy has been a regular and frequent passenger in NYC yellow taxicabs for the past thirty years. He lives in Roslyn Hts., N.Y. and works in NYC.

13. Defendant City of New York ("City") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, defendant City, acting through the TLC, was responsible for adopting and attempting to enforce the rules and actions challenged in this case.

14. Defendant New York City Taxicab & Limousine Commission ("TLC") is an administrative agency for the City of New York, created by § 2300 of the NYC Charter. The TLC's purpose is, *inter alia*, to regulate the taxi and limousine industry and to establish "standards for driver safety, standards for equipment safety and design; [and] standards for noise and pollution control." NYC Charter § 2300. At all times relevant hereto, the TLC is responsible for formulating, adopting, and enforcing the rule and actions challenged in this case.

15. Defendant Michael R. Bloomberg ("Bloomberg") is sued in his official capacity as the Mayor of the City of New York. At all times relevant hereto, defendant Bloomberg, acting as Mayor and through the TLC, was responsible for adopting and attempting to enforce the rules and actions challenged in this case.

16. Defendant Matthew W. Daus ("Daus") is sued in his official capacity as the Commissioner, Chair, and Chief Executive Officer of the TLC. At all times relevant hereto,

Daus was responsible for formulating, adopting, and enforcing the rule and actions challenged in this case.

17.     Defendant Peter Schenkman ("Schenkman") is sued in his official capacity as the Assistant Commissioner for Safety & Emissions of the TLC. At all times relevant hereto, Schenkman was responsible for formulating and enforcing the rule and actions challenged in this case.

18.     Defendant Andrew Salkin ("Salkin") is sued in his official capacity as the TLC First Deputy Commissioner. At all times relevant hereto, Salkin was responsible for formulating and enforcing the rule and actions challenged in this case.

## FACTS

### I.     *Summary*

19.     This is an action for declaratory and injunctive relief under the Supremacy Clause (U.S. Const. art. VI, cl. 2) and state administrative law. Plaintiffs seek to annul and/or delay the implementation of a regulation adopted by the New York City Taxi & Limousine Commission ("TLC"), which mandates that all new NYC yellow taxicabs, except those that are wheelchair accessible, have a minimum city rating of 25 miles per gallon ("mpg") by October 1, 2008, and a minimum city rating of 30 mpg by October 1, 2009. TLC Rule § 3.03(c)(10)-(11) ("challenged regulation" or "25/30 mpg Rule").

20.     The TLC's 25/30 mpg Rule is preempted by federal law, specifically 49 U.S.C. § 32919(a), which prohibits states and political subdivisions from "adopt[ing] or enforce[ing] a law or regulation related to fuel economy standards." Because the intent and effect of the 25/30 mpg Rule is to regulate emissions, the 25/30 mpg Rule is also preempted by § 209 of the Clean Air Act (CAA), which states: "No State or any political subdivision thereof

shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this Part." 42 U.S.C. § 7543(a).

21.     This is also an action challenging the timing of the 25/30 mpg Rule under state administrative law (N.Y. C.P.L.R. Article 78) as irrational, arbitrary, and capricious based on the TLC's failure to follow its own procedures to ensure that the automobile models approved by the TLC are safe for use as NYC taxis after being modified as required by the TLC. On August 15, 2008, plaintiffs asked the TLC (a) to defer implementation of the 25/30 mpg until the manufacturers explicitly warrant that their cars may be safely modified as required by the TLC and run 24/7 on NYC streets; and (b) to follow its own standard pilot program procedures before finally approving any model for use as a taxi.

22.     If the 25/30 mpg Rule is implemented, the lives of NYC taxi drivers and passengers will be endangered because the vehicles approved by the TLC are untested and have serious safety problems. The TLC mandated and approved vehicles that meet the 25/30 mpg Rule are unsafe as taxis because they were not built to withstand the rigorous demands of NYC taxi cabs that operate 24/7, or to allow for after-manufacture modifications such as the TLC-mandated vinyl seats and partitions.

23.     The TLC's long established protocol has been to carefully test all vehicles before approving them as taxis. The TLC as a matter of policy and procedure first conducts a pilot program to ensure (a) that the vehicle is safe despite the significant modifications that the TLC requires, and (b) that the vehicle can withstand the demands of the 24/7 NYC taxi duty cycle.

24.     The TLC has failed to test the cars that it has mandated for use as of October 1, 2008, despite its long standing procedures, which require it to conduct such testing,

and despite the serious safety concerns raised by plaintiffs and others. In order to approve these more fuel-efficient cars, the TLC has also greatly reduced its normal safety specifications. (Because all but one of the non-accessible cars on the TLC's approved list have hybrid engines, plaintiffs will refer to the approved cars that meet the 25/30 mpg Rule as "hybrid" or "hybrids." The one car recently approved that is not a hybrid is a clean diesel. There are currently no clean diesel vehicles used as NYC taxis.)

25.     The lack of adequate safety testing is reflected in various *ad hoc* measures being implemented by the TLC to respond to the myriad safety issues that arise from the decision to mandate new untested vehicles. For example, just weeks ago, the TLC was forced to issue a warning and directive stating that one of its mandated after-manufacturer vehicle alterations – the addition of vinyl seat coverings – hinder the deployment of side curtain and front seat air bags in the hybrids. Had the TLC taken the time to read the owners manuals of the approved vehicles, it would have seen that they explicitly warn against the installation of vinyl seat coverings. The TLC, however, ignored this safety warning and many others in its rush to mandate hybrid taxis.

26.     Fearful of placing its drivers and NYC passengers in untested and unsafe taxicabs, plaintiff MTBOT hired an engineer with expertise in accident reconstruction to determine whether the taxicabs mandated as of October 1, 2008 are safe. After extensive tests, as well as an analysis of publicly available safety information, that engineer determined that the cars approved by the TLC for purchase as of October 1, 2008 were unsafe, and, even without the required TLC modifications, far below the standard of the Ford Crown Victoria – the taxicab that most of the NYC taxi industry has used for years.

27.     The Crown Victoria LWB is a large, heavy-duty commercial vehicle that is produced exclusively for the police and taxi market and therefore engineered to withstand serious collisions and 24/7 commercial usage and has appropriate space and structural components for required partitions.  The Ford Crown Victoria meets all of the TLC's safety criteria and has been operating for 25 years as a New York City taxicab and 6 years as a purpose-built LWB that provides 6 additional inches of rear occupant space.  This additional six inches of rear space was added in 2001, in part, because doctors testified at TLC hearings that passengers were receiving severe facial injuries in minor crashes due to the close proximity of the partition to the rear-seat occupant.

28.     The hybrids, on the other hand, are small passenger vehicles that are not designed for commercial use and are less likely to withstand a serious collision than the Crown Victoria.  Moreover, the manufacturers of the hybrids explicitly warn in their owners manuals against modifications like the ones mandated by the TLC.  Plaintiff's engineer found that these manufacturers' warnings should not be ignored and that, due to the required TLC modifications, the hybrid cars mandated for purchase as of October 1, 2008 are unsafe.

29.     The engineer found a number of serious safety concerns regarding the hybrid taxicabs.  Some of these concerns relate to the TLC-mandated partition, which separates the driver from the passengers in order to protect the driver from injury and death.  Normally, the partition in NYC taxis runs straight across behind the front seat.  The TLC determined that these straight across partitions cannot be used in the hybrids because the partitions restrict the space in the back seat too much.  For hybrids, the TLC approved the use of L-shaped partitions, which are in the shape of an "L" and surround the driver, separating the driver from the front seat passenger and the back seat passengers.

30.     The engineer found, *inter alia*, that: (a) curtain side airbags may not properly deploy in hybrid taxis due to the partition (whether L-shaped or straight across) and other modifications required by the TLC; (b) passengers will be seriously injured during accidents in hybrids because they will hit their heads on the partitions (whether L-shaped or straight across) due to the reduced distance (up to ten inches less) in hybrids between the backseat and the partition; (c) the L-shaped partition commonly used in hybrids will cause particularly serious injury to drivers and passengers in the event of an accident, particularly due to the sharp edges on the partition; and (d) the Ford Escape Hybrid, which is the most common hybrid in the taxi industry, is more likely to flip over causing serious injury.

31.     Furthermore, as reported in the New York Times and other major papers, Toyota – who created and licenses the hybrid technology – refuses to support the use of its cars as taxis due to its engineers' concerns.  A Toyota spokesman said: "Our engineers are nervous about it because they were not designed for commercial use."  N.Y. Times, April 27, 2008.  Another Toyota representative explained that the hybrids "have not been designed to withstand the rigors of 24/7 commercial use."  E-mail from Thomas Voll, Toyota Fleet Field Manager, May 2, 2008.

32.     The TLC has endangered the safety of taxi drivers and passengers by mandating unproven and untested cars without conducting safety testing, as required by its long standing policy, practice, and custom.

33.     Plaintiffs are in favor of the use of fuel-efficient vehicles as taxis and drivers stand to save a significant amount of money on fuel if a viable, safe, fuel-efficient car is developed.  Indeed, the TLC and plaintiffs have spent a significant amount of time, effort, and money working closely together over the last few years in order to find the perfect "Taxi of

Tomorrow" that is safe, accessible, and fuel-efficient. Several manufacturers already have cars in the late stages of development that would meet these requirements, and two – the Ford Transit Connect and the Standard Taxi – will be available for purchase next summer. As the MTBOT's engineer concluded, "It would be nothing less than a tragedy if we did not keep the proven Crown Victoria until the 'Taxi of Tomorrow' is rolled out and thoroughly tested. We should not hastily switch to hybrids that will endanger New York City taxicab drivers and the riding public." Engineer Gambardella Report at 13.

## II.     *The TLC*

### A.     *Structure and Powers*

34.     Defendant TLC, an administrative agency of defendant City, was created in 1971 and is governed by § 2300 *et seq*. of the NYC Charter, as well as by local laws passed by the New York City Council ("NYC Council" or "Council"). The TLC has nine members (known as "Commissioners"), all of whom are appointed by the mayor with the advice and consent of the Council. The commission has the power to act by majority vote. *Id*. at § 2301.

35.     The mayor designates one of the nine members as the chairman and chief executive officer ("Chair"). NYC Charter § 2301. For all times relevant, the Chair of the TLC has been defendant Matthew W. Daus ("Daus").

36.     The TLC's purpose is, *inter alia*, to regulate the taxi and limousine industry and to establish "standards for driver safety, standards for equipment safety and design; standards for noise and pollution control." NYC Charter § 2300. The TLC is responsible for licensing and regulating NYC's medallion yellow taxicabs, for-hire vehicles (community-based liveries and black cars), commuter vans, paratransit vehicles (ambulettes), and certain luxury limousines. This action concerns only NYC's medallion yellow taxicabs, which are the most

heavily regulated cars in NYC and are the only for-hire cars permitted to accept hails from passengers in the street, N.Y.C. Admin. Code § 19-502(l).

37.     The TLC is controlled by the mayor.  The 25/30 mpg Rule is one of the many regulations that defendant Bloomberg initiated and pushed the TLC to adopt.

**B.     *The TLC's Procedures for Approving Car Models for Taxi Service***

38.     The TLC regulates everything from the number of taxis, rates that must be charged, the lease rates paid by drivers, the qualifications and character of drivers and owners, the hours a driver may work, how many years a car may be driven, and the precise specifications the cars driven as taxis must meet.  *See* TLC Rules.

39.     Pursuant to the TLC Rules, cars used as taxis must be purchased new and retired after three years if the car is double-shifted and not driven by a long-term driver.  If the car is not double-shifted or is driven by a long-term driver then the car must be retired after five years.  *Id*. at 3-02.  Moreover, taxis that meet strict emission standards are considered "clean air" taxis and are eligible for one or two year extensions of the three year retirement period.  N.Y.C. Admin. Code § 19-535.

40.     The taxicab specifications set forth by the TLC are particularly detailed. *See* TLC Rules, Ch. 3: Taxicab Specifications.  The TLC mandates everything from the color the car must be painted (yellow) to the position of the air conditioner.  As relevant for this action, the TLC requires all cars to be manufactured with heavy-duty equipment for a taxicab, police, or fleet package; have a particular minimum passenger compartment volume, minimum legroom, minimum headroom, and minimum seat depth; have a partition installed that isolates the driver from rear seat passengers or all passengers; and have vinyl seats.  TLC Rules § 3.03.  As

discussed below, most of these safety rules have been abandoned in order to approve hybrid taxicabs.

41.     To ensure that taxicabs meet these specifications and are durable enough for NYC taxi service, the TLC must approve and road test every car model before the car model is placed into service. The TLC maintains a list of all approved taxi models.

42.     The TLC, however, "reserves the right to approve *limited* quantities of vehicles which fail any of these specific rules provided only that the sponsor's vehicle is already *purpose-built for taxi service*, and therefore, substantially exceeds other criteria, or in the case where the sponsor wishes to demonstrate certain outstanding virtues that deserve to be tested in actual taxi service." *Id*. at § 3-03(b)(7) (emphasis added).

43.     The TLC has detailed rules that govern the pilot programs that must be conducted before a car model or a car modification is approved. *Id*. at Ch. 4: Pilot Program Rules. Piloting a vehicle as a taxi on the NYC streets is critical because NYC taxis are highly modified vehicles and many are run 24/7. Simply meeting federal safety standards and requirements for passenger vehicles, while important, is not sufficient.

44.     As defendant TLC Chair Daus has repeatedly testified: "A successful pilot program is the first step in obtaining approval for new vehicles as taxicabs and could lead to modifications by manufacturers where issues surface during the testing phase." TLC Chair Daus, Written Testimony to the City Council, July 16, 2005.

**C.     *The Approval of Hybrids***

45.     In 2003, the City enacted a local law providing for the issuance of additional taxi licenses (also known as medallions), provided that at least 9% of the licenses issued be subject to the restriction that the taxicabs operated under those licenses be powered by

compressed natural gas ("CNG") or be a hybrid electrical vehicle. N.Y.C. Admin. Code. § 19-532.

46. In October 2004, the TLC conducted a sealed-bid auction for the CNG or hybrid (collectively "alternative fuel") licenses. The City set the minimum bid price at an amount significantly below the then-prevailing market price for unrestricted licenses because the TLC recognized that alternative fuel vehicles are more costly to own and operate than conventional gasoline-powered vehicles.

47. At the time of the auction, the TLC knew that there were no commercially available alternative fuel vehicles that met TLC specifications for use as a NYC taxi. A CNG-powered version of the Crown Victoria had previously been available, but Ford discontinued sale of the CNG Crown Victoria in 2004.

48. Despite the lack of available alternative fuel vehicles, the TLC went forward with the auction and a number of the alternative-fuel licenses were successfully bid on. Eighteen of the licenses were successfully bid on by Evgeny Friedman, Mamed Dzhanitev, and Vladimir Basin (collectively "bidders"). The bidders proposed the use of hybrid Ford Escapes, but the TLC refused to allow them to use these vehicles because they did not meet the TLC specifications for interior room. The TLC rejected all other vehicles the bidders proposed, and did not offer any other vehicles that could be used with the alternative fuel licenses.

49. Because the TLC refused to issue the bidders' licenses and refused to approve any vehicles for use with the alternative-fuel licenses, on April 21, 2005, the bidders sued the TLC demanding that the TLC close on their licenses. *Friedman v. NYC Taxi & Limousine Comm.*, No. 105550/05 (N.Y. Supreme Ct.).

50.     Intent that alternative-fuel taxis be approved, the City passed a local law, which went into effect on July 20, 2005, mandating that the TLC "approve one or more hybrid electric vehicle models for use as a taxicab within ninety days after the enactment of this law." N.Y.C. Admin. Code § 19-533.  The City did not mandate the approval of a CNG taxi because those CNG vehicles previously approved had been a failure.

51.     At the City Council hearing on this local law, the TLC and others spoke against approving hybrid taxis due to safety concerns.  TLC Chair Daus stated at the June 16, 2005 hearing that no hybrid vehicle met the TLC's safety specifications, which focus on "safety, functionality and comfort."  Daus proposed a pilot program to test the hybrid vehicles on a limited basis to see how they function when driven 24/7 on NYC streets, emphasizing that according to longstanding TLC procedures, no vehicles could be approved until tested through a pilot program.  He strongly opposed any legislation that mandated the approval of a hybrid within a specified amount of time.  He explained:

> *We are concerned that the proposed legislation could put the TLC in the position of authorizing vehicles for use as taxis that have not been properly tested. . .*
>
> [The proposed law] would require the automatic approval of vehicles without the benefit of the TLC's experimental vehicle review and testing program.  I would recommend that the Commission approve a pilot program process for testing these taxicabs to ensure safety, roadworthiness and to receive feedback from the riding public on these new vehicles.  This process would involve the collection and analysis of inspection data, passenger feedback and maintenance records.  *A successful pilot program is the first step in obtaining approval for new vehicles as taxicabs and could lead to modifications by manufacturers where issues surface during the testing phase*.  The pilot program protocol builds confidence with the industry, manufacturers, the riding public and ultimately the Commission before committing to substantial investments in new vehicles. . . .
>
> Furthermore, it is our considered viewpoint *that a pilot program should precede any final approval of vehicles* – which could not possibly be concluded within 30 days.  Despite our mutual intention to move forward as expeditiously as possible, placing unrealistic time restrictions in Local Law upon a matter which is not entirely within the control or jurisdiction of City government is problematic and inconsistent with longstanding TLC regulations and procedures.  *The TLC's taxicab specifications require a process for*

> *vehicle approval* involving a sponsor (such as a vehicle manufacturer) to meet certain requirements. The TLC does not posses [sic] the legal authority under the City Charter to compel manufacturers to submit vehicles for approval, or to otherwise manufacture them according to our requests. We should continue to partner with manufacturers and the industry – as we have successfully done in the past with Ford and the production of the stretch Crown Victoria – rather than impose a mandate.

TLC Chair Daus, Written Testimony to the City Council, June 16, 2005 (emphasis added). Notwithstanding defendant Daus's testimony, the Local Law mandating that the TLC approve a hybrid was passed.

52.     As required by the new law, the TLC adopted new specifications which applied only to hybrid taxis. The new rules provided, *inter alia*, that hybrid taxicabs did not have to be manufactured with heavy-duty equipment; could meet significantly reduced size specifications, including minimum interior volume, minimum legroom, and minimum headroom; and were not required to have a partition. TLC Rule § 3-3.01 (2005 version).

53.     On October 25, 2005, and as a result of the new hybrid specifications, the TLC approved not just one model as mandated by City law but seven different hybrid models. TLC Industry Notice #05-30. The stretch Ford Crown Victoria, as well as an accessible minivan (the Toyota Sienna CE), also remained approved vehicles. None of the hybrid models had been tested through a pilot program.

54.     Since then, the TLC has approved some additional hybrids and removed a couple from the list. On May 10, 2006, two additional hybrids were added to the approved list, without a pilot testing them. TLC Industry Notice #06-09. In July 2008, another hybrid was added to the approved list, again without a pilot testing it. In July 2008, the Honda Civic Hybrid and Honda Accord Hybrid were removed from the list. Plaintiffs were told that the Honda Civic Hybrid was removed due to particularly poor performance. Later in July, however, the Honda Civic was inexplicably added back to the approval list. TLC Industry Notice #08-13. In August

2008, one more hybrid was added to the approved list, along with a clean diesel vehicle. Yet again, this was done without piloting. The Honda Civic was also removed again.

55.     As of the filing of this complaint, there are ten vehicles (excluding wheel chair accessible vans) approved for purchase and use after October 1, 2008: the 2009-Chevrolet Malibu Hybrid; 2009-Volkswagen Jetta Clean Diesel Sedan; 2008-Lexus RX400h; 2008-09-Toyota Camry Hybrid; 2008-09-Toyota Prius-48; 2008-09-Toyota Highlander Hybrid-(4WD); 2008-09-Saturn Vue Greenline; 2008-09-Nissan Altima Hybrid; 2008-09-Ford Escape Hybrid-2wd; and the 2008-09-Mercury Mariner Hybrid-awd.

56.     Due to the extremely high demand for hybrids and alternative fuel vehicles, there is nationwide shortage. Defendant Bloomberg has therefore pressured automakers to commit vehicles. To improve their public image, three struggling automakers promised the City that hybrids would be available for purchase by NYC taxi owners. The vehicles committed are: 50 Chevrolet Malibu Hybrids, 200 Nissan Altima Hybrids, and 50 Ford Escape Hybrids per month. Moreover, those vehicles are only "available" if ordered four months in advance. TLC Industry Notice #8-03, July 16, 2008. This timeframe is unworkable for the taxi industry, which cannot afford to have a car out of service and therefore usually replaces damaged cars within 24 hours.

57.     Most of these hurriedly approved hybrids have little, if any, record on the road as taxis. On May 22, 2007, when the Bloomberg Administration first announced that it was seriously considering implementing the mandate currently at issue, there were only 375 hybrid vehicles out of over 13,000 in the NYC taxi fleet.

58.     In July 2008 when defendant Bloomberg announced the automakers' commitments, the Chevy Malibu Hybrids had only been used as taxis for two weeks. And the

first Nissan Altima Hybrids were not placed into service until October 2007.  The Ford Escape

Hybrid is the only vehicle that has any history as a taxi, and its performance to date has been

poor.  On information and belief, the Escapes used as taxis have needed more repairs, suffered

more damage in accidents, and have rolled over in significant numbers.  Moreover, few if any of

these hybrids have been double-shifted and most have been operated without partitions, which

are now required except in owner-operated vehicles.  There is thus little if any experience with

these hybrids as modified by TLC requirements.

        59.     On November 14, 2005, just two weeks after the first six hybrids were

placed into service, Chair Daus again spoke at the City Council in opposition to laws that further

encouraged the use of hybrids as taxis.  He stated that "[q]uestions about durability and safety"

had to be answered.  He explained:

> On durability and safety – today, the TLC inspects every yellow taxicab at our Central
> Inspection Facility at least 3 times per year.  We see firsthand the tremendous impact that
> driving virtually non-stop in New York City has on a car.  The average yellow taxicab
> travels approximately 175 miles each day, or nearly 65,000 miles per year.  There are
> several vehicles that have been tested and demonstrated to withstand the rigorous
> environment that New York City taxicabs must operate in.  Over many years, the ability
> of such vehicles to perform has been analyzed by both TLC staff and automobile
> manufactures, yielding improvements and vehicle development which has evolved over
> time.  **However, hybrid-electric taxicabs have only been on the road for less than 2
> weeks, and it is much to early to tell how these vehicles will perform.**

TLC Chair Daus, Written Testimony to the City Council, Nov. 14, 2005.

        60.     Dissatisfied with the number of hybrids operating as taxis, the City passed

a local law mandating that 254 of the taxi licenses sold after June 1, 2006, require the owner to

use a car that operates on alternative-fuel.  N.Y.C. Admin. Code § 19-532(b).  At the City

Council hearing on this local law, Chair Daus again spoke against the introduction of more

hybrid vehicles.  He called the hybrid taxis "unproven" and expressed concern with the fact that

"various requirements that apply to all other taxicabs, most notably the safety partition" were

waived in order to approve hybrids. TLC Chair Daus, Written Testimony to the City Council at 2, May 16, 2006. Daus explained that safety partitions, which do not fit in the hybrids due to their size, are an important part of protecting drivers and that adding 254 more taxis without partitions "is simply too great a risk to take." *Id*. at 5-6.

61.     At other City Council hearings in 2006 and 2007, Daus repeatedly spoke against any further incentives for hybrid taxis, describing them as untested and unproven vehicles. For example, on June 14, 2006, Daus stated that hybrids "are still in the earliest stages of developing a track record of success as taxicabs in New York City" and that only a few have logged 70,000 miles. TLC Chair Daus, Written Testimony to the City Council at 9, June 14, 2006. Similarly, when speaking on a bill that proposed giving alternative fuel vehicles a priority queue status, Daus stated: "While there is usually no harm in providing additional incentives, doing so here may create safety-related problems which outweigh any minimal benefits gained by a priority taxicab queue status." TLC Chair Daus, Written Testimony to the City Council at 4, March 26, 2007.

62.     On April 22, 2007, NYC Mayor and defendant Bloomberg announced "PlaNYC 2030," which was Bloomberg's plan for improvements to the NYC environment. In that plan, Bloomberg proposed beginning the process in 2012 to make all taxis hybrids. Defendant Bloomberg explained that:

> **These vehicles are in the first years of use and questions regarding their *durability* as 24-hour, seven-day-a-week vehicles have yet to be fully answered**. We will aim to double the efficiency of new taxis by 2012. *Achieving the stated goal will require aggressive work on the part of the TLC to push the automotive industry and the taxicab industry towards answering these questions and ensuring that the vehicles used as taxicabs meet the high safety, service, and sustainability standards of New Yorkers*. This Plan could result in the entire fleet being converted to more fuel-efficient vehicles within eight to 10 years.

PlaNYC 2030 (emphasis added).

63.     Just one month later, on May 22, 2007, Bloomberg announced on "Today," a major national television program on NBC, that he was drastically accelerating his hybrid taxi plan.  The only explanation for the radical change was political – he wanted the plan in place before he left office.  In that plan, he pushed up by four years the date for converting taxis to hybrids.  Under the Mayor's new plan, after October 2008, all new vehicles (except accessible vehicles) entering the taxi fleet must achieve a minimum of 25 mpg based on EPA city surface street ratings; and after October 2009, all new vehicles must achieve a minimum of 30 mpg city rating.  Due to the mandatory 3-year retirement of taxis, the entire taxi fleet would be hybrid by 2012 according to the mayor's plan.  At the time the mayor announced his plan, there were only 375 hybrid vehicles in the NYC taxi fleet.  "Mayor Bloomberg Announces Taxi Fleet to be Fully Hybrid by 2012," Mayoral Press Release No. 156-07, May 22, 2007.

64.     Defendant Bloomberg stated that the purpose of this plan is to "implement new emissions and mileage standards for yellow taxicabs that will lead to a fully hybrid fleet by 2012 - the largest, cleanest fleet of taxis on the planet.  The new standards will be phased in over a four-year period and will reduce the carbon emissions of New York City's taxicab and for-hire vehicle fleet by 50% during the next decade." *Id*.  While defendant Bloomberg proposed mpg standards, his press statements make it clear that his primary intent was to set emissions standards and to mandate that all taxis be hybrids by 2012.  *See id*.

65.     On information and belief, defendant Bloomberg chose to set mpg standards, instead of mandating hybrid cars, because he knew, due to a recent Supreme Court decision, *Engine Mfrs. Ass'n v. South Coast Air Quality Mang't Dist*., 541 US 246 (2004), that cities and states cannot regulate emission standards or mandate alternative-fuel vehicles due to the broad preemptive scope of the Clean Air Act ("CAA").

66. To implement defendant Bloomberg's initiative, the TLC passed the challenged regulation.

**III.**     *The Challenged Regulation*

67. Despite safety, availability, and cost concerns, on December 11, 2007, the TLC provisionally passed the challenged regulation, subject to hearings scheduled for May 2008. As discussed above, the challenged regulation mandates that all new NYC yellow medallion taxicabs, except those that are wheelchair accessible, have a minimum city rating of 25 mpg by October 1, 2008, and a minimum city rating of 30 mpg by October 1, 2009. TLC Rule § 3.03(c)(10)-(11).

68. Due to serious concerns regarding driver safety, on December 11, 2008, the TLC also removed the exception that hybrids had previously had from the partition requirement. Plaintiffs are not challenging this requirement because partitions are necessary in order to protect drivers. As the TLC Rules explain, "a partition isolates the driver from rear seat passengers or all passengers," and "the purpose of the partition shall be to provide protection to the driver while ensuring passenger safety and enabling rear seat passengers to enjoy a clear and unobstructed view…" *Id*. at 1-17(3)(i). Now all taxis, except those taxis that are driven solely by the taxi owner, must be equipped with a partition. TLC Rules §§ 3-03(e)(3), 1-17. For cars with factory installed side curtain airbags, such as all the hybrids approved, the TLC Rules mandate that the partition allow a six inch space on each side "sufficient to permit proper deployment of the curtain airbags." *Id*. at § 1-17(c). Otherwise, partitions may not have more than a one-inch gap between the partition and the body of the vehicle. *Id*. at § 3-03(e)(3)(i)(C)(5).

69.     In practice, despite the TLC's Rules to the contrary, almost all partitions have less than one inch between the side of the car and the partition because if more space was left then the purpose of the partition would be defeated as passengers could easily fit a gun through a six inch gap.  The partitions in hybrids are almost all L-shaped to allow the air conditioning to reach the back seat and because there is not enough room in the back seat if straight-across partitions are installed.  The L-shaped partition was first approved by the TLC in September 2006, and subsequently incorporated into the TLC rules in April 2007.   As discussed below, the partitions in hybrids interfere with the deployment of the curtain side airbags and, due to the small backseat, result in severe facial injuries because passengers hit the partitions in accidents.

70.     At the December 11, 2007 TLC hearing on the 25/30 mpg mandate, taxi drivers and owners expressed numerous concerns regarding the safety of the unproven and untested taxis mandated by the TLC as of October 1, 2008.  In response to those concerns, the TLC promised to have a public hearing in May 2008 to review safety (and availability) concerns, stating that the October 1, 2008 deadline would be extended if problems arose.

71.     On May 8, 2008, the TLC held a public hearing.  At that hearing, plaintiffs and many others expressed serious safety concerns regarding the TLC-approved hybrids.

72.     Notwithstanding this testimony raising and reinforcing myriad safety concerns, the TLC ruled after the May 8, 2008 hearing that the 25/30 mpg mandate would take effect October 1, 2008.

73.     On June 3, 2008, the New York City Council Transportation Committee, which has jurisdiction over the TLC, held an oversight hearing on the 25/30 mpg Rule.  For the first time in many years, the TLC refused to testify.  At the hearing, C. Bruce Gambardella – a

professional engineer, who has previously been hired by NYC and major automobile manufacturers, and was hired by MTBOT to study the TLC-approved hybrids – submitted testimony setting forth a raft of safety problems with the hybrids. Gambardella analyzed available safety information, including crash tests; inspected and ran tests on the TLC-approved hybrids and the stretch Ford Crown Victoria; and reviewed the owners manuals of these cars.

74.     On July 16, 2008, the TLC sent a directive to all taxicab owners who have cars scheduled for retirement in the months after the October 1, 2008 mandate goes into effect. That directive directed the owners to, within thirty days, provide proof of purchase of a new vehicle or a plan for purchase and delivery of a vehicle that has a city 25 mpg rating and is approved by the TLC. The directive listed nine hybrid vehicles as approved.

75.     The MTBOT member fleets replied to this directive on August 15, 2008. In their response, each member fleet formally requested that the TLC defer implementation of the 25/30 mpg mandate so that the TLC can conduct a pilot program in order to determine the safety of these untested vehicles. The MTBOT member fleets also informed the TLC that they will not endanger the safety of their drivers and passengers by putting unproven and untested cars on the road as taxis until (a) the manufacturers explicitly warrant that their cars may be safely modified as required by the TLC and run 24/7 on NYC streets; and (b) the TLC follows standard pilot program procedures for approving any model the TLC has placed on its approved TLC vehicle list.

76.     On August 29, 2008, MTBOT sent letters to the manufacturers of all the TLC-approved vehicles that meet the 25 mpg mandate. MTBOT requested that the manufacturers certify that their vehicles may be safely modified as required by the TLC and run 24/7 on NYC streets. MTBOT enclosed a copy of the introduction to their engineer's report.

77.     On September 2, 2008, MTBOT sent all the TLC Commissioners and defendants Schenkman and Salkin a copy of one of the letters to the manufacturers and a copy of the introduction to the engineer's report.  In the cover letter to the Commissioners, MTBOT renewed their request that the 25/30 mandate be deferred until adequate safety testing is conducted.  To date, MTBOT has not received a response.

## IV.     *The Federal Fuel Economy Program*

78.     Since the 1970s, the federal government has enforced a comprehensive program to regulate motor vehicle fuel economy.  With very few exceptions, federal law prohibits any state or local regulation of motor vehicle fuel economy.

79.     The TLC's 25/30 mpg Rule is preempted by federal law, specifically 49 U.S.C. § 32919(a), which prohibits states and political subdivisions from "adopt[ing] or enforce[ing] a law or regulation related to fuel economy standards."

80.     The plaintiffs will suffer irreparable financial harm and the physical safety of the taxi riding public and taxi drivers will be jeopardized unless the 25/30 mpg Rule is annulled or enjoined by no later than October 1, 2008.

### A.     *Background of Federal Fuel Economy Program*

81.     Since the 1978 model year, the National Highway Traffic Safety Administration ("NHTSA") has regulated automotive fuel economy, pursuant to the Energy Policy and Conservation Act of 1975 ("EPCA").

82.     To regulate motor vehicle fuel economy, the EPCA statute passed by Congress in 1975 established a program of "corporate average fuel economy," or "CAFE," standards.  Standards for cars are set separately from those for light trucks.  The light-truck category includes most minivans, pickups, and sport-utility vehicles, as well as other vehicles.

83.     The federal CAFE standards do not apply to individual vehicles or models. Rather, they regulate the fuel economy of each manufacturer's entire fleet of cars or trucks, on a fleet average basis.  As a result, a manufacturer can produce and sell any combination of vehicles that the market will bear, so long as the fuel economy of its fleet as a whole meets or exceeds the required average mpg.

84.     In the EPCA statute, Congress established a federal requirement to adopt and enforce what the statute designates as "maximum feasible" average fuel economy levels. The criteria to be used by NHTSA in order to determine "maximum feasible" levels are "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy."  49 U.S.C. § 32902(f).  The federal fuel economy standards reflect the balance that NHTSA strikes among those criteria.  State or local regulations that have the effect of creating more stringent fuel economy standards than those set by federal law interfere with NHTSA's efforts to balance the criteria for fuel economy standards created by Congress.

85.     The federal fuel economy standards today reflect NHTSA's judgment about the appropriate balance between improvements in fuel economy and the burdens that more stringent standards place on the automobile industry, including how fuel economy standards will affect employment in the United States' automobile industry.  NHTSA has understood its standard-setting duties to include an obligation to weigh the difficulties of individual manufacturers.

86.     Maintaining consumer choice is also a fundamental part of EPCA and the federal regulations that implement it.  The authors of the federal fuel economy law emphasized that CAFE standards had to "be carefully drafted" in order to improve fuel economy without

"unduly limiting consumer choice." (*See* H.R. Rep. No. 340, 94th Cong., 1st Sess. 87 (1975).) The averaging of the mpg results for a given manufacturer across its entire vehicle fleet was critical to the goals of EPCA.

87.     When setting mpg standards, the federal government also takes into account how the standards will impact the safety of vehicles. For many years, NHTSA and other safety organizations have recognized that increases in fuel economy standards can result in reductions in the weight of the motor vehicle fleet as a whole because reducing the weight of a given vehicle model can be used to reduce its fuel consumption. Reductions in vehicle weight can also reduce vehicle crashworthiness. For example, the National Academy of Sciences found in one report that the down-weighting and downsizing that occurred in the late 1970's and early 1980's, some of which the Academy attributed to the CAFE standards, probably resulted in an additional 1,300 to 2,600 traffic fatalities in one representative year (1993), and ten times more injuries. *See* 70 Fed. Reg. 51414, at *51419, 2005 WL 207514 (2005) (discussing National Academy of Sciences, *Effectiveness and Impact of Corporate Fuel Economy (CAFE) Standards* (Jan. 2002)).

88.     Increasing fuel economy standards may lead to fleet downsizing, which, without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries.

89.     The effect of fuel economy on safety has therefore always been an important factor to consider in setting fuel economy standards under EPCA. In part for that reason, in its 2005 proposed rulemaking on light trucks, the NHTSA considered revisions to the basic structure of the federal CAFE standards. NHTSA found that its prior rules encouraged

manufacturers to lighten vehicles in order to comply and that this downsizing caused serious

safety problems.  The NHTSA stated:

> Rollovers and crash compatibility.  Both are related to reforming CAFE.

> Pickups and SUVs have a higher center of gravity than passenger cars and thus are more susceptible to rolling over, if all other variables are identical.  Their rate of involvement in fatal rollovers is higher than that for passenger cars – the rate of fatal rollovers for pickups, like the rate for SUVs, is twice that for passenger cars.  Rollovers are a particularly dangerous type of crash.  Overall, rollover affects about three percent of light vehicles involved in crashes, but accounts for 33 percent of light vehicle occupant fatalities.  Single vehicle rollover crashes account for nearly 8,500 fatalities annually.  Rollover crashes involving more than one vehicle account for another 1,900 fatalities, bringing the total annual rollover fatality count to more than 10,000.

> Crash compatibility is the other prominent issue.  Light trucks are involved in about half of all fatal two-vehicle crashes involving passenger cars.  In the crashes between light trucks and passenger cars, over 80 percent of the fatally injured people are occupants of the passenger cars.

> The agency believes that the manner in which fuel economy is regulated can have substantial effects on vehicle design and the composition of the light vehicle fleet.  Reforming CAFE is important for vehicle safety because the current structure of the CAFE system provides an incentive to manufacturers to reduce the weight and size of vehicles, and to increase the production of vehicle types (particularly pickup trucks and SUVs) that are more susceptible to rollover crashes and are less compatible with other light vehicles.  For these reasons, reforming CAFE is a critical part of the agency's effort to address the vehicle rollover and compatibility problems.

70  Fed. Reg. 51414, at *51443, 2005 WL 207514 (2005).

### B.    *Preemption under EPCA*

90.    To ensure that the federal government can maintain control over fuel

economy policy and regulation, EPCA prohibits states from adopting fuel economy standards or

related requirements. The statute provides:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of *a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards* for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919(a) (emphasis added).  This preemption provision in EPCA is in full effect because NHTSA long ago established federal fuel economy standards.

91.     Congress determined that regulation of fuel economy at a sub-national level would have constrained the flexibility that was the hallmark of the CAFE program established by Congress.  The only exception allowed by Congress was that a state and its political subdivisions would be permitted to "prescribe requirements for fuel economy for automobiles obtained for its own use."  *Id*. § 32919(c).

92.     Even if there were no express preemption clause, the 25/30 mpg Rule would be preempted because it interferes with the federal fuel economy program.  The TLC's regulation does not balance the goals of increased fuel economy against the economic consequences of regulation in the same way as the federal regulations.

93.     Congress has long provided for national regulation of the automobile in order to ensure that the nation as a whole shares in the burdens and costs of regulation.  The TLC's new rules single out taxicab drivers and owners in NYC for the sake of a symbolic effort to address global warming.  The TLC regulation will inflict severe financial injury on the plaintiffs and other NYC taxicab drivers and medallion owners, their employees, and their families because the taxicab owners will be forced to purchase vehicles that are not durable enough to run 24/7 and thus will cost significantly more to purchase and repair, and will exact untold costs due to injuries.

94.     As with the consideration of economic factors, TLC's rules do not respect the balance between fuel economy regulation and safety risks that has been struck by NHTSA.  Unlike NHTSA, the TLC decided to increase the fuel economy requirements for NYC taxicabs without any detailed consideration of the trade-offs between fuel economy, vehicle weight, and

safety. The TLC rules, once implemented, will require the NYC taxicab industry to purchase a fleet of smaller, lighter-weight non-commercial vehicles.

95. As a class, the vehicles that the taxicab drivers and owners must purchase pursuant to the 25/30 mpg Rule are lighter and therefore less crashworthy than other vehicles that would be subject to the federal fuel economy standards but not the TLC standards. The result is that the 25/30 mpg Rule will expose the public to risks of injury and death that, but for the TLC's regulations, would not exist.

96. Moreover, the challenged regulation will have minimal effects on the environment. According to the City's own estimates, implementing the 25/30 mpg Rule will only decrease $CO_2$ emissions in the City by less than one-half of a percent. And, even this paltry estimate does not account for the fact that hybrid fuel efficiency slips to as low as 14 mpg whenever the air conditioner is running.

97. Given the minimal impact on the environment, deferring implementation of the challenged regulation for a year or two will have little to no effect on the environment and will by contrast undoubtedly save lives. If implementation is deferred, the TLC will have time to conduct the necessary safety testing. In that time, the TLC and plaintiffs can also continue to work together to develop the "Taxi of Tomorrow," which is safe, accessible, and fuel efficient. Indeed, as early as next summer, the Ford Transit Connect and the Standard Taxi – purpose-built fuel-efficient, safe, and accessible taxicabs – will be available for purchase.

**V.    *The Federal Clean Air Act***

98. Section 209(a) of the Clean Air Act ("CAA") states:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new

motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a).

99.     The CAA preempts not only regulations targeted at the vehicles manufacturers sell but also regulations targeted at the purchase of vehicles.

100.     The 25/30 mpg regulation adopted by the TLC is a "standard relating to the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a), and is therefore preempted by federal law.

101.     While the challenged regulation is drafted as a regulation controlling the mpg of vehicles, as discussed above, the purpose and effect of the challenged regulation is to regulate emissions.  When defendant Bloomberg announced his plan on "Today," he stated: "We are going to have all of our cars be hybrid."  In his press release, he stated that he was implementing fuel efficiency *and* emission standards and that the standards "will lead to a fully hybrid fleet by 2012."  Mayoral Press Release, No. 156-07, May 22, 2007.  The City also readily admitted that it knew that the only cars that met its 25/30 mpg Rule were hybrids.  "Mayor Plans an All-Hybrid Taxi Fleet", N.Y. Times, May 23, 2007.  The TLC also repeatedly stated that the goal was "reducing carbon emissions and increasing air quality" and that "[t]his will result in an all-hybrid taxicab fleet by 2012."  TLC Commissioner's Corner, June 2007; *see also* TLC Press Release, "TLC Unanimously Approves Regulations Leading to a Cleaner, Greener NY Taxi Fleet," Dec. 11, 2007 (new regulation will "result [in] an all hybrid taxicab fleet by 2012").

102.     Moreover, the effect of the challenged regulation is that all the new taxis will be alternative fuel vehicles because the only approved cars for use under the 25/30 mpg regulation are alternative fuel vehicles.  Until very recently, the only approved vehicles were hybrids.  Now one clean diesel vehicle is approved, but none are in use.

103.     The challenged regulation is therefore expressly preempted by section

209(a) of the Clean Air Act, 42 U.S.C. § 7543(a), which states:  "No State or any political

subdivision thereof shall adopt or attempt to enforce any standard relating to the control of

emissions from new motor vehicles or new motor vehicle engines subject to this part."  42

U.S.C. § 7543(a).

104.     Moreover, even if there were no express preemption clause, the 25/30 mpg

Rule would be preempted because it interferes with the federal emissions program.

**VI.     *Untested TLC-Mandated Vehicles***

105.     The TLC-mandated hybrids are not safe for use as NYC taxis, in part, due

to the TLC-mandated modifications.  The hybrids are also not durable enough for use as 24/7

NYC taxis.  If the TLC had conducted adequate testing and a pilot program pursuant to its well

settled policies and procedures, it would have uncovered these serious safety problems.  The

TLC's decision to approve and then mandate these hybrid taxis is arbitrary and capricious

because the TLC failed to follow its own procedures for safety testing, despite the serious safety

concerns raised by plaintiffs and others.

**A.     *Engineer's Report on Safety***

106.     Out of concern for the safety of passengers and drivers, MTBOT

commissioned a study to determine whether hybrid vehicles could be safely used as NYC taxis.

The report, by C. Bruce Gambardella – a professional engineer who has previously been hired by

NYC and major automobile manufacturers – confirms the initial concerns of MTBOT fleets and

several other industry and driver groups.

107.     Mr. Gambardella inspected and ran tests on the Ford Crown Victoria Long

Wheel Base ("LWB" or "stretch") – which has been the standard NYC taxi for years – and TLC-

approved hybrid vehicles. He also analyzed past and current performance of the stretch Ford Crown Victoria and the TLC-mandated hybrids in 24/7 taxi service as well as publicly available safety information, including: (a) the National Highway Traffic Safety Administration ("NHTSA") crash test films and simulations; (b) the NHSTA crash test star ratings; (c) the Insurance Institute for Highway Safety's ("IIHS") safety testing; and (d) the warnings in these vehicles' owners manuals. C. Bruce Gambardella, "Comparative Analysis of Occupant Protection and Overall Passenger and Driver Safety Between Purpose-built Commercial Yellow Taxicabs and Standard Passenger Hybrid Yellow Taxicabs in New York City," at 3 (Sept. 4, 2008) ("Gambardella Report").

108. After conducting this analysis, Mr. Gambardella concluded that "**the Ford Crown Victoria Long Wheel Base (LWB) is the safest taxicab available**." *Id*. at 4 (emphasis in original). Mr. Gambardella explained:

> The Ford Crown Victoria LWB is the only TLC-approved car with across-the-board five-star safety ratings from NHTSA – an important rating, though only one of several metrics required to assess taxicab safety. The Crown Victoria is a big, heavy-duty commercial vehicle with a heavy-duty frame and heavy-duty parts. It is produced exclusively for the police and taxi markets. As purpose-built taxis, Crown Victorias are engineered to withstand serious collisions and 24/7 commercial usage. They also feature large crumple zones that reduce forces on occupants in crashes, appropriate space and structural components for required partitions, abundant rear and front occupant space, and sufficient luggage space. As a result, the Crown Victoria performs very well in crashes, even with a full-width partition – a modification that requires adequate interior space to fully protect rear-seat occupants from impacts with the partition.

*Id*. at 4-5. Therefore it is not surprising that the stretch Ford Crown Victoria has been operating for 25 years as a New York City taxicab and 6 years as a purpose-built LWB that provides 6 additional inches of rear occupant space. As noted earlier, this additional six inches of rear space was added in 2001, in part, because doctors testified at TLC hearings that passengers were

receiving severe facial injuries in minor crashes due to the close proximity of the partition to the rear-seat occupant.

109. In contrast, Mr. Gambardella found that:

> The [TLC-mandated] hybrids – which were designed for private, non-commercial use and are significantly smaller than the Crown Victoria – are not nearly as safe as the Crown Victoria even without the modifications required by the TLC. All other things being equal in a crash, occupants in the lighter hybrids are more likely to suffer from injuries than occupants in the heavier Crown Victoria. The g-load (force or acceleration) that an individual would experience in a collision would be 40% greater in a Ford Escape Hybrid than it would be in a Crown Victoria LWB. A 40% reduction in the peak g-load during a crash is highly significant and will dramatically reduce the potential for injury.

*Id*. at 5 (emphasis added).

110. Moreover, Mr. Gambardella concluded that "**the modifications required by the TLC render these [TLC-mandated] hybrids <u>unsafe</u>.**" *Id*. (emphasis in original). For example,

> Due to the reduced distance in hybrids between the backseat and the TLC-mandated partition, even belted backseat passengers will be seriously injured during accidents in hybrid taxis because they will not have adequate space to allow for occupant excursion (movement) before the occupant's head collides with the hard, unyielding and elastic partition (whether L-shaped or full-width). In contrast, belted passengers in Crown Victorias will not hit the partition because the distance between the backseat and the partition is approximately eight to ten inches greater than the distance available in the Ford Escape Hybrid and other small hybrids. **The significant difference in rear-seat occupant space between a Crown Victoria and a small hybrid vehicle like the Escape, Highlander and Altima is the difference between striking the partition and not striking the partition in an accident**. This can readily have fatal consequences.

*Id*. at 8-9 (emphasis in original).

111. Due to this serious safety concern and numerous others, Mr. Gambardella warned against putting these untested and unproven hybrids on the road as NYC taxis. He urged the TLC to conduct a pilot program and crash tests on these vehicles to determine if they are safe for use as modified by the TLC and durable enough for 24/7 NYC taxi use. Furthermore, he

advised the TLC not to utilize "small cars or cars that are not built for commercial use as New York City taxis." *Id*. at 12. He explained: "From an engineering standpoint, vehicles have to be designed for the duty cycle they are likely to encounter and cannot feature modifications that will compromise their safety systems." *Id*. He recommended that instead of hastily switching to hybrids that may endanger the lives of drivers and the NYC riding public that the TLC should continue working with the plaintiffs and manufacturers to develop the "Taxi of Tomorrow" that is safe, fuel-efficient, *and* accessible.

112.    Mr. Gambardella's key findings are outlined below:

a.   Curtain side airbags will not properly deploy in hybrid taxis due to the partition (whether L-shaped or full-width) and other modifications required by the TLC;

b.   Passengers will be seriously injured during accidents in hybrids because they will hit their faces on the hard and unyielding surface of the partitions (whether L-shaped or full-width) due to the reduced distance in hybrids between the backseat and the partition. Furthermore, partitions on the TLC-approved hybrids are likely to dislodge in accidents because they cannot be securely affixed to the vehicle;

c.   The L-shaped partition commonly used in hybrids is particularly dangerous and will result in serious injuries to drivers and passengers because (i) it has sharp edges; (ii) the driver may become trapped in an accident within the box the L-shaped partition forms; (iii) it causes a distracting glare; and (iv) the driver cannot recline away from the front-seat airbags as recommended by the manufacturers.

d.   Since neither the National Highway Traffic Safety Administration ("NHTSA") nor the Insurance Institute for Highway Safety ("IIHS") publish frontal or rear end crash tests on rear-seated adult occupants – the vast majority of taxi passengers – and since no entity has ever crash tested small, hybrid taxicabs modified with partitions, there is no scientific basis for asserting that these non-commercial hybrid vehicles are safe for use as taxicabs;

e.   The Ford Escape Hybrid, which is the most common hybrid in the taxi industry, is more likely than the stretch Ford Crown Victoria

and other passenger vehicles to roll over, which can cause serious injury;

f.   The owners manuals for the TLC-approved hybrids warn against modifying the vehicles as required by the TLC because doing so can interfere with the deployment of the side air bags and cause other safety problems; and

g.   Small passenger cars and cars that are not designed for commercial use are not suitable for commercial use as NYC taxicabs.  The hybrids, which were designed for non-commercial use and are significantly smaller than the stretch Ford Crown Victoria, are not nearly as safe as the Crown Victoria.  All other things being equal, in a crash, occupants in the lighter hybrids are more likely to be injured than occupants of the heavier Crown Victoria.

**B.**     ***Experience to date with hybrids as taxis***

113.     To date, very few hybrids have been used as modified 24/7 double-shifted NYC taxis.  The first six hybrid taxicabs were placed into service in November 2005.  These taxis have not even completed a three-year cycle.  And on May 22, 2007, when mayor and defendant Bloomberg announced the mandate that is currently at issue, there were only 375 hybrid vehicles in the NYC taxi fleets.  Most of these vehicles have only been on the road a short time.

114.     Moreover, as discussed above, the initial hybrids that were introduced into the NYC taxi market were exempted from the partition requirement.  Hybrids were not required to have partitions until December 2007.  There is therefore very little experience with hybrids modified with a partition.  Given the serious safety problems the partitions cause in small vehicles such as the hybrids, *supra* §§ 106-112, it is imperative that these hybrids are piloted as modified NYC taxis before they are mandated by the TLC.

115.     Finally, the vast majority of the hybrid vehicles available for purchase by taxi owners have virtually no experience as NYC taxicabs.  Recognizing that hybrids are difficult

to buy in the consumer market due to current fuel prices, defendant Bloomberg worked with the automakers to obtain vehicles.  Three hundred vehicles – 50 Chevrolet Malibu Hybrids, 200 Nissan Altima Hybrids, and 50 Ford Escape Hybrids – have been committed to the NYC taxi industry, *if* they are ordered four months in advance.  Only the Ford Escape Hybrid has some experience – albeit poor, *supra* § 58 – as a taxi, but because only 50 are available a month, the vast majority of owners will be forced to purchase vehicles with no track record whatsoever. Not a single Chevy Malibu Hybrid was operating as a taxi until July 2008.  And the first Nissan Altima Hybrids were not placed into service until very late in 2007.  As of May 5, 2008, less than 00.2% of the taxi market (25 vehicles) were Nissan Altima Hybrids.

C.     *The "Taxi of Tomorrow"*

116.     To design "The Taxi of Tomorrow," the TLC met with stakeholders and hired a professional contractor at the cost of $1 million to create the technical specifications necessary for the creation of a taxicab that will be "clean-air fueled, fully accessible, feature a reasonable purchase price, easily maintained, be appropriately proportioned to the city environment, provide a superior riding experience for both passengers and drivers in terms of comfort, and feature an appropriate 'iconic' design in keeping with the New York City cab's ambassadorial role."  TLC Commissioner's Corner, Feb. 2008.

117.     After developing the necessary specifications for the "Taxi of Tomorrow," on February 20, 2008, the TLC sent out a Request for Information to the auto industry to find out the options available.  The TLC stated that they hoped to have a vehicle released by Fall 2009. Numerous manufacturers responded positively, and two vehicles – the Ford Transit Connect and the Standard Taxi – are scheduled for release next summer.

118.    The Ford Transit Connect is a purpose-built small commercial van that is fully accessible and fuel-efficient.  While the Ford Transit Connect's current 19 mpg city rating does not satisfy the TLC's mandate, Ford plans to improve the Transit Connect's fuel efficiency each year and has told the taxi industry that it soon will be 21 mpg.

119.    The TLC should continue to work with Ford and other manufacturers to develop the "Taxi of Tomorrow" instead of forcing the purchase of hybrids that are not safe for use as taxis.

**D.**    *Costs of Untested Hybrids*

120.    The TLC-mandated hybrids will cause owners and drivers severe financial harm.

121.    Hybrid vehicles cost owners approximately 30% more than the traditional Crown Victoria.

122.    Not only are the hybrids more expensive to purchase initially, but they are also more expensive to maintain.  Fleet owners typically keep large volumes of parts in stock to provide them with the ability to repair taxis quickly in-house with their own mechanics.  The parts necessary to repair hybrids, however, are much more expensive than those for the Crown Victoria, and are often in short supply or on backorder.  It is also much more time consuming to repair hybrids because the fleets' engineers often cannot repair the vehicles so they must be sent to the dealer for repair.  As a result, hybrid taxicabs spend less time on the road.  Furthermore, because they are consumer (not commercial) vehicles, the hybrid models change significantly each year.  As a result, the fleets' engineers must be retrained yearly and more parts must be stockpiled.

123. Moreover, because they are not as durable, they cannot be driven as many miles, resulting in significant lost income to both the driver and owner.

124. It is also likely that they will need to be replaced more frequently. As discussed in Mr. Gambardella's report, hybrid taxicabs suffer significantly more damage in accidents than Crown Victorias.

125. Due to the short supply of hybrids, owners will not be able to immediately replace their hybrid vehicle if it is damaged or destroyed. Currently owners can replace their Ford Crown Victoria in less than a day. The hybrids, in contrast, must be ordered four months ahead of time. An owner may therefore be left without a car for up to four months and a driver without an income for that period of time. Passengers are also left without service.

126. Finally, due to safety problems with the hybrids, owners and drivers will face higher insurance costs and/or will be forced to pay more money to passengers and drivers due to injuries suffered in the hybrid taxis.

127. Many of the costs that will be incurred if the 25/30 mpg Rule is not immediately enjoined will not be recoverable. For example, once a hybrid has been purchased, the owner will be forced to utilize that car (with the resulting increased maintenance expenses) for the next three to five years.

128. While the TLC has argued that these costs will be recoverable due to savings on the cost of fuel, this has not borne out in practice. While the TLC-approved hybrids have been rated as 25 mpg in the city by the EPA, these hybrids get as low as 14 mpg when used as taxis, which is only slightly better than what the Ford Crown Victoria gets when used as a taxi, and worse than the anticipated Ford Transit Connect and Standard Taxi. On information

and belief, the hybrids have not been getting 25 mpg because the gas engine must run when the air conditioner is on.

129.    Thus, for little environmental benefit, these TLC-mandated hybrids are endangering drivers and passengers and causing drivers and owners severe financial harm. Moreover, due to the long amount of time hybrids will be out of service due to delays in repairing and replacing them, the public – who depends on taxis to transact business and to go about their daily lives – will suffer a loss of service.

**FIRST CAUSE OF ACTION**
Express and Implied Preemption under the Federal Fuel Economy Laws
(49 U.S.C. § 32901 *et seq.*)

130.    Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

131.    The 25/30 mpg Rule adopted by the TLC will go into effect on October 1, 2008.  That rule is "related to fuel economy standards," and is preempted under 49 U.S.C. § 32919(a).  Federal law prohibits the adoption and implementation of state and local regulations related to such standards.

132.    The 25/30 mpg Rule adopted by the TLC is not identical to the mpg standards set forth by the federal government.  Indeed, the 25/30 Rule adopted by the TLC is significantly more stringent that the standards set forth by the federal government.  Nor is the 25/30 Rule related to the disclosure of information.  The 25/30 Rule is therefore not exempt from preemption under 49 U.S.C. § 32919(b), which explicitly states: "When a requirement under section 32908 of this title is in effect, a State or a political subdivision of a State may adopt or enforce a law or regulation on disclosure of fuel economy or fuel operating costs for an

automobile covered by section 32908 only if the law or regulation is identical to that requirement."

133.     The 25/30 mpg Rule adopted by the TLC is not a regulation that applies to automobiles "obtained" by "a State or a political subdivision of a State . . . for its own use." *See* 49 U.S.C. § 32919(c).  The 25/30 mpg Rule applies to vehicles purchased by private individuals and corporations that own yellow taxicab medallions.  The 25/30 mpg Rule is therefore not exempt from preemption under 49 U.S.C. § 32919(c), which explicitly states:  "A State or a political subdivision of a State may prescribe requirements for fuel economy for automobiles obtained for its own use."

134.     The TLC's 25/30 mpg Rule intrudes upon a field of regulation occupied by the federal government, conflicts with federal law and regulation, and stands as an obstacle to achievement of the objectives of Congress when it established a national program for the regulation of motor vehicle fuel economy.

135.     The regulation adopted by the TLC is inconsistent with NHTSA's determination of the "maximum feasible" corporate average fuel economy standards for cars and light-duty trucks, based upon NHTSA's assessment of technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy, 49 U.S.C. § 32902(f), and thereby frustrates the accomplishment of federal objectives.  The TLC's 25/30 mpg Rule will have an acute, clear, direct and substantial adverse impact on the performance, price, and availability of certain vehicles that will be sold in New York.  The TLC's 25/30 mpg Rule will also have an acute, direct, clear and adverse impact on some manufacturers' efforts to comply with the

national fuel economy standards as efficiently as possible, and in a manner that maximizes consumer choices and minimizes adverse effects on employment.

136.     The United States Constitution makes federal law and regulations "the supreme Law of the Land."  U.S. Const., art. VI, cl. 2.  Plaintiffs have legally protected interests under the Constitution, EPCA, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal fuel economy laws against defendants' implementation of the TLC's 25/30 mpg Rule.  Plaintiffs will be actually and irreparably injured with respect to their federally protected interests if the 25/30 mpg Rule adopted by the TLC is not declared unlawful and if defendants are not enjoined from implementing that regulation.

137.     A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether the 25/30 mpg Rule adopted by the TLC is preempted by the federal fuel economy laws.  Plaintiffs contend that the regulation is preempted by the federal fuel economy laws and cannot be enforced.

138.     To redress the violations of federal law and the interference with plaintiffs' rights, and pursuant to 28 U.S.C. §§ 1331,1343, 2201, and other provisions of law, including the Supremacy Clause and 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that the TLC's regulation is preempted and unenforceable.

139.     Defendants are now implementing and will continue to implement the 25/30 mpg Rule in violation of federal law unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law under 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, and other provisions of law.

## SECOND CAUSE OF ACTION
### Express & Implied Preemption under the Federal Clean Air Act
(42 U.S.C. § 7543(a))

140.    Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.  This count of the complaint avers that defendants are acting in violation of the federal Clean Air Act ("CAA"), and is presented as an alternative ground for relief in the event the Court does not grant the relief sought by plaintiffs under count one of the complaint.

141.    The 25/30 mpg regulation adopted by the TLC is a "standard relating to the control of emissions from new motor vehicles."  *See* 42 U.S.C. § 7543(a).  While the challenged regulation is drafted as a regulation controlling the mpg of vehicles, the intent and effect of the challenged regulation is to regulate emissions.  The only approved cars for use under the 25/30 mpg regulation are alternative fuel vehicles.

142.    The challenged regulation is therefore preempted by section 209(a) of the CAA, 42 U.S.C. § 7543(a), which states:  "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."  42 U.S.C. § 7543(a).

143.    Plaintiffs have legally protected interests under the Constitution, the CAA, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal CAA against the TLC's 25/30 mpg Rule.  Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by the challenged regulation, if the regulation actions are not declared unlawful and if defendants are not enjoined from implementing the regulation.  The public interest will be served by such declaratory and injunctive relief.

144.    A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether the TLC's 25/30 mpg Rule is preempted by the CAA.  Plaintiffs

contend that the regulation is currently preempted and cannot be enforced. Defendants are presently implementing the TLC's regulation and will enforce it to the detriment of plaintiffs. In addition to its prohibition on enforcement of the regulation, the CAA prohibits the adoption of the regulation challenged here, separate and apart from its enforcement.

145. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including the Supremacy Clause and 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that the challenged regulation is preempted by the CAA.

146. Defendants are now implementing and will continue to implement the challenged regulation in violation of the CAA and plaintiffs' rights under federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, and other provisions of law.

### THIRD CAUSE OF ACTION
Administrative Violations
(N.Y. C.P.L.R. Article 78)

147. Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

148. The TLC acted arbitrarily and capriciously when it decided in May 2008 to implement the 25/30 mpg Rule and mandate vehicles for purchase without following its own long established procedures to ensure that the automobile models approved by the TLC are safe for use as NYC taxis after being modified as required by the TLC.

149. The TLC also acted arbitrarily and capriciously when it (a) issued the July 16, 2008 directive requiring all yellow cab owners whose car is scheduled for retirement soon

after October 1, 2008, to submit, within 30 days, proof of purchase or a plan for purchase of a car on the TLC's approved list that gets 25 mpg or higher in the city; and (b) failed to grant the plaintiffs August 15, 2008 request to defer implementation of the 25/30 mpg until (i) the manufacturers explicitly warrant that their cars may be safely modified as required by the TLC and run 24/7 on NYC streets; and (ii) the TLC follows its standard pilot program procedures before finally approving any model the TLC has placed on its approved TLC vehicle list.

150.     Plaintiffs have been harmed by the TLC's arbitrary and capricious actions and will continue to be harmed until the 24/30 mpg Rule is enjoined.

151.     Plaintiffs hereby request this Court enter an order determining that the actions of the TLC were arbitrary and capricious and thereby invalidating the 25/30 mpg Rule.

### **RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

(a)     A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that the TLC's 25/30 mpg Rule violates federal law in the manner alleged above.

(b)     Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendants from implementing or enforcing the TLC's 25/30 mpg Rule;

(c)     A judgment nullifying the TLC's actions implementing the 25/30 mpg Rule as irrational, arbitrary and capricious;

(d)     An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other provisions of federal law.

(e)     Such other relief available under federal, state, and local law that may be

considered appropriate under the circumstances, including other fees and costs of

this action to the extent allowed by federal, state, or local law.


Dated: September 8, 2008
       New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP

                                By:     _____
                                        Richard D. Emery (RE 5181)
                                        Matthew D. Brinckerhoff (MB 3552)
                                        Elizabeth S. Saylor (ESS 8091)

                                        75 Rockefeller Plaza, 20th Floor
                                        New York, New York 10019
                                        (212) 763-5000


                                        *Attorneys for Plaintiffs*