UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TAXICAB BOARD OF
TRADE; MIDTOWN OPERATING CORP.;
SWEET IRENE TRANSPORTATION CO. INC.,
OSSMAN ALI; and KEVIN HEALY,

                            Plaintiffs,

     v.

CITY OF NEW YORK; MICHAEL R.
BLOOMBERG, in his official capacity as Mayor
of the City of New York; THE NEW YORK
CITY TAXICAB & LIMOUSINE
COMMISSION ("TLC"); MATTHEW W.
DAUS, in his official capacity as Commissioner,
Chair, and Chief Executive Officer of the TLC;
PETER SCHENKMAN, in his official capacity as
Assistant Commissioner of the TLC for Safety &
Emissions; and ANDREW SALKIN, in his
official capacity as First Deputy Commissioner of
the TLC,

                            Defendants.

08 Civ. 7837 (PAC)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY OR PERMANENT INJUNCTION OR A SUMMARY DECLARATORY JUDGMENT

Richard D. Emery
Matthew D. Brinckerhoff
Elizabeth S. Saylor
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Tel: (212) 763-5000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (*ii-v*)

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   I.    PLAINTIFFS WILL SUCCEED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.    THE TLC'S REGULATION IS PREEMPTED
           UNDER THE FEDERAL ENERGY POLICY
           AND CONSERVATION ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           1.    EPCA Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           2.    Preemption under the EPCA . . . . . . . . . . . . . . . . . . . . . 10

                 a.    Express Preemption . . . . . . . . . . . . . . . . . . . . . . . 10

                 b.    Implied Preemption . . . . . . . . . . . . . . . . . . . . . . . 15

       B.    THE TLC'S REGULATION IS ALSO
           PREEMPTED UNDER THE FEDERAL CLEAN
           AIR ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   II.    IRREPARABLE HARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       A.    IRREPARABLE FINANCIAL HARM . . . . . . . . . . . . . . . . . . . . . 23

       B.    IRREPARABLE PHYSICAL HARM . . . . . . . . . . . . . . . . . . . . . 25

           1.    The TLC-mandated hybrid taxis are unsafe . . . . . . . . . . . . . . . . 25

           2.    Serious questions regarding the safety of the
                TLC-mandated hybrids remain because the
                TLC failed to conduct adequate testing . . . . . . . . . . . . . . . . . 27

       C.    ANY DELAY WAS REASONABLE UNDER
           THE CIRCUMSTANCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

FEDERAL CASES

*Air Transport Ass'n of Am., Inc. v. Cuomo,*
    520 F.3d 218 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Allway Taxi, Inc. v. City of New York,*
    340 F. Supp. 1120 (S.D.N.Y. 1972), *aff'd per curiam,* 468 F.2d 624 (2d Cir. 1972) 21, 22

*Alvenus Shipping Co. v. Delta Petroleum,*
    876 F.Supp. 482 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Am. Auto. Mfrs. Ass'n v. Cahill,*
    152 F.3d 196 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Am. Auto. Mfrs. Ass'n v. Mass. Dept. of Envtl. Prot.,*
    998 F.Supp. 10 (D.Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ass'n of Intern. Auto. Mfrs., Inc. v. Mass. Dept. of Envtl. Prot.,*
    208 F.3d 1 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*California Division of Labor Standards Enforcement v. Dillingham Constr.,*
    519 U.S. 316 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Center for Auto Safety v. Thomas,*
    793 F.2d 1322 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Center for Auto Safety v. NHTSA,*
    847 F.2d 843 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. Aug. 18, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Central Valley Chrysler-Jeep, Inc. v. Goldstene,*
    529 F.Supp.2d 1151, 1157 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Clark Construction Co. v. Pena,*
    895 F.Supp. 1483 (M.D. Al. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Clifford Ross Co. v. Nelvana, Ltd.,*
    710 F. Supp. 517 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Competitive Enterprise Inst. v. NHTSA,*
    901 F.2d 107, 120 n.11 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.,*
    541 U.S. 246 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Engine Mfrs. Ass'n v. U.S. E.P.A.,*
    88 F.3d 1075 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 25

*Gade v. National Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Golden State Transit Corp. v. City of Los Angeles,*
    475 U.S. 608 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Golden State Transit Corp. v. Los Angelos,*
    493 U.S. 103 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Green Party v. New York State Bd. of Elections,*
    389 F.3d 411 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Harris County v. Gist,*
    976 F.Supp. 601 (S.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC,*
    990 F.Supp. 119 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30, 31

*Million Youth March, Inc. v. Safir,*
    18 F.Supp.2d 334 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dept. of Env't Conservation,*
    17 F.3d 521 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Nicholas v. Goord,*
    430 F.3d 652 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*O'Brien v. Appomattox Co.,*
    213 F.Supp.2d 627 (W.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Playboy Enter. v. Chuckleberry Publ'g, Inc.*,
     486 F.Supp. 414 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Porsche Cars North Am., Inc. v. Manny's Porshop, Inc.*,
     972 F.Supp 1128 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rum Creek Coal Sales v. Caperton*,
     926 F.2d 353 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Shapiro v. Cadman Towers, Inc.*,
     51 F.3d 328 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Shaw v. Delta Air Lines, Inc.*,
     463 U.S. 85 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sims v. State of Fla., Dept. of Highway Safety and Motor Vehicles*,
     862 F.2d 1449 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Tom Doherty Assoc., Inc. v. Saban Entert., Inc.*,
     60 F.3d 27 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


FEDERAL STATUTES

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. § 7543 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 7543(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21, 22

42 U.S.C. § 7543(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

42 U.S.C. § 7550(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

49 U.S.C. § 32901(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18

49 U.S.C. § 32902(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

49 U.S.C. § 32917(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

49 U.S.C. § 32919(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

49 U.S.C. § 32919(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

49 U.S.C. §§ 32901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

N.Y.C. Admin. Code. § 19-532 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. Const. art. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

FEDERAL REGULATIONS

49 C.F.R. § 1.50(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

49 C.F.R. § 523.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

70 Fed. Reg. 51414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Plaintiffs, Metropolitan Taxicab Board of Trade ("MTBOT"), Midtown Operating

Corp. ("Midtown"), Sweet Irene Transportation Co. Inc. ("Sweet Irene"), Ossman Ali ("Ali"),

and Kevin Healy ("Healy"), submit this memorandum of law in support of their motion for a

preliminary or permanent injunction pursuant to Fed. R. Civ. P. 65, and for a summary

declaratory judgment on plaintiffs' preemption claim.

## PRELIMINARY STATEMENT

This motion presents the straightforward legal question of whether a state or local

government can require that vehicles within its jurisdiction meet minimum standards for fuel

efficiency as measured by miles per gallon ("mpg") ratings. The answer is as simple as the

question: no. The answer to this pure legal question mandates the relief plaintiffs seek.

This is a federal preemption case seeking declaratory and injunctive relief under

the Supremacy Clause and state administrative law. Plaintiffs seek to preliminarily or

permanently annul or delay the implementation of a regulation adopted by defendant Taxi and

Limousine Commission ("TLC"), which mandates that all new NYC yellow taxicabs, except

those that are wheelchair accessible, have a minimum city rating of 25 mpg by October 1, 2008,

and a minimum city rating of 30 mpg by October 1, 2009. TLC Rule § 3.03(c)(10)-(11)

("challenged regulation" or "25/30 mpg Rule"), Ex. C.[1]

Plaintiffs will suffer irremediable harm without relief from this Court prohibiting

or delaying implementation (which has been effectively extended by stipulation to November 1,

2008 to allow the Court time to decide this motion). Plaintiff face irreparable financial harm

because the availability of a private right of action for damages to compensate for the substantial

costs they will bear is uncertain at best, and quintessential irreparable harm from the increased

---

[1] All exhibits are attached to the Declaration of Elizabeth Saylor, dated September 17, 2008. Chapter 3 of the TLC Rules are attached as Ex. C. The TLC rules may be viewed at: http://www.nyc.gov/html/tlc/html/rules/rules.shtml.

risk to the health and safety of plaintiff taxicab passengers and drivers that is the inevitable result of the expanded use of untested and unsafe TLC-mandated hybrid taxicabs.

Plaintiffs will succeed on the merits because the 25/30 mpg Rule is unambiguously preempted by the Energy Policy and Conservation Act ("EPCA"), specifically 49 U.S.C. § 32919(a), which prohibits states and political subdivisions from "adopt[ing] or enforce[ing] a law or regulation related to fuel economy standards."

The concerns animating federal policy in this area reinforce why preemption is so important. When setting mpg standards, the federal government specifically considers how the mpg standards will impact the safety of vehicles. The federal government has long recognized that raising mpg mandates too quickly would force automakers to produce vehicles that were substantially lighter and thus less safe to the driving/riding public. But that is exactly what defendants have done here. Defendants rush to convert to more fuel efficient vehicles at the expense of the safety standards mandated by federal law requires the wholesale abandonment of the Ford Crown Victoria as a taxi in favor of far lighter vehicles that are not just unsafe, but untested (which itself violates the TLC's own rules and procedures).

Finally, because the stated intent and effect of the TLC'S 25/30 mpg Rule is to regulate emissions, it is also preempted by § 209 of the Clean Air Act ("CAA"), which provides that: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a).

# FACTS

A detailed description of the pertinent facts, including the substantial safety concerns expressed in the engineer's report, is provided in plaintiffs' complaint, which is incorporated by reference and therefore not repeated in full here.

On April 22, 2007, NYC Mayor and defendant Bloomberg announced "PlaNYC 2030," which was Bloomberg's plan for improvements to the NYC environment. In that plan, Bloomberg proposed beginning the process in 2012 to make all taxis hybrids. He cited concerns about durability and a lack of adequate testing as justification for the slow timetable.[2] Just one month later, on May 22, 2007, Bloomberg announced on "Today," a major national television program on NBC, that he was drastically accelerating his hybrid taxi plan. Apparently, the only explanation for the radical change was political – he wanted the plan in place before he left office. In that plan, he pushed up by four years the date for converting taxis to hybrids.[3] Under the mayor's new plan, after October 2008, all new vehicles (except accessible vehicles) entering the taxi fleet must achieve a minimum of 25 mpg based on EPA city surface street ratings; and after October 2009, all new vehicles must achieve a minimum of 30 mpg city rating. Due to the mandatory three year retirement of most taxis, the entire taxi fleet would be hybrid by 2012 according to the mayor's plan. At the time the mayor announced his plan, there were only 375 hybrid vehicles in the NYC taxi fleet. Ex. E.[4]

Despite safety, availability, and cost concerns, on December 11, 2007, the TLC implemented defendant Bloomberg's mandate and provisionally passed the challenged regulation, subject to hearings scheduled for May 2008. As noted above, the challenged

---

[2] Relevant sections of PlaNYC 2030 are attached as Ex. F. The entire PlaNYC 2030 may be viewed at http://www.nyc.gov/html/planyc2030/html/plan/air_taxis.shtml.

[3] Defendant Bloomberg's statements on "Today" are available at: http://www.msnbc.msn.com/id/18816754/.

[4] Defendant Bloomberg's press releases may also be viewed by clicking on "News and Press Releases" on the right hand side of the page at http://www.nyc.gov.

regulation mandates that all new NYC yellow medallion taxicabs, except those that are wheelchair accessible, have a minimum city rating of 25 mpg by October 1, 2008, and a minimum city rating of 30 mpg by October 1, 2009. TLC Rule § 3.03(c)(10)-(11), Ex. C.

At the December 11, 2007 TLC hearing on the 25/30 mpg mandate, taxi drivers and owners expressed numerous concerns regarding the safety of the unproven and untested taxis mandated by the TLC as of October 1, 2008. In response to those concerns, the TLC promised to have a public hearing in May 2008 to review safety (and availability) concerns, stating that the October 1, 2008 deadline would be extended if problems arose. On May 8, 2008, the TLC held a public hearing. At that hearing, plaintiffs and many others expressed serious safety concerns regarding the TLC-approved hybrids. Notwithstanding this testimony raising and reinforcing myriad safety concerns, the TLC ruled after the May 8, 2008 hearing that the 25/30 mpg mandate would take effect October 1, 2008. Sherman Decl. §§ 27-28.

## ARGUMENT

By this motion, plaintiffs seek: (1) a preliminary injunction delaying implementation of the 25/30 mpg Rule, or a permanent injunction prohibiting implementation, pursuant to Fed. R. Civ. P. 65, which provides for preliminary relief and permits the Court to convert a motion for preliminary injunction to a motion for permanent relief; and (2) a judgment declaring that the 25/30 mpg Rule is preempted by the EPCA pursuant to 28 U.S.C. § 2201 (declaratory judgment act) and Fed. R. Civ. P. 56.

The relief sought by plaintiffs is structured this way because of the undeniable strength of the legal claim for preemption under the EPCA. While plaintiffs are confident that the Court will conclude that plaintiffs will be irreparably harmed absent an injunction,[5] any

---

[5] Aside from the obvious difference in scope between a preliminary and permanent injunction, there is an important distinction between the two for purposes of this motion. Defendants' argument that plaintiffs' alleged delay in

doubt in that regard would in no way affect the merits of plaintiffs' entitlement to a judgment declaring that defendants proposed 25/30 mpg Rule is expressly preempted by the EPCA.

To obtain a preliminary injunction, plaintiff need only "show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." *Green Party v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004).

Plaintiffs' case is strong.[6] The 25/30 mpg Rule is expressly preempted by two federal statutes – the Energy Policy and Conservation Act and the Clean Air Act. If the 25/30 mpg Rule is implemented, plaintiffs will suffer significant financial losses that will be irreparable given the uncertainty of any damage remedy. Plaintiffs will be forced to purchase hybrids that are more expensive initially, more expensive to maintain and repair, and more likely to be out of service due to repair and replacement delays. Plaintiffs will be stuck with these more expensive cars for the life of the taxi – between three and five years. *See infra* Part II.A. The 25/30 mpg Rule will also expose the public – including plaintiff taxicab passengers and drivers – to increased risk of injury and death. *See infra* Part II.B.

Moreover, the challenged regulation will have minimal effects on the environment. According to the City's own estimates, the 25/30 mpg Rule will only reduce citywide $CO_2$ emissions by 0.5% once fully implemented. *See* PlaNYC 2030, Ex. F.[7] If implementation is not permanently enjoined, delaying implementation to allow for a final

---

commencing this action and seeking relief fatally undermines plaintiffs' showing on irreparable harm (an argument we believe fails on the merits for the reasons set forth *infra* in Part II.C), has no application to the whether plaintiffs can establish irreparable harm for the purpose of obtaining a permanent injunction.

[6] Plaintiffs' claim that the 25/30 mpg Rule is preempted by the EPCA is a purely legal issue. The only material fact relevant to resolution of the claim is the text of the 25/30 mpg Rule. There is obviously no dispute that the Rule says what it says. *See* Plaintiffs' Statement Pursuant to Local Civil Rule 56.1. Thus, given the unquestionable lack of any factual issue and the clean presentation of the legal claim, a summary declaratory judgment is warranted.

[7] And, even this paltry estimate does not account for the fact that hybrid fuel efficiency slips below 15 mpg when the air conditioner is on. Rosenzweig § 9.

determination on the merits at a later date will have even less environmental effect since the mandate will not be fully implemented for three years in any event. Only 250 taxis per month reach retirement, and thus, if the mandate goes into effect, only that number must be replaced with a hybrid each month pursuant to the mandate. Sherman Decl. § 5. Given the strength of plaintiffs' legal claims, and the financial and safety concerns which will effect plaintiffs on day one of the implementation of the mandate, the hardships shift decidedly in plaintiffs' favor.

Finally, if implementation is delayed, the TLC will have time to conduct the necessary safety testing and to continue working with manufacturers to develop the "Taxi of Tomorrow," which is safe, accessible, and fuel efficient. Indeed, as early as next summer, the Ford Transit Connect and the Standard Taxi – purpose built, fuel-efficient, safe, and accessible taxicabs – is scheduled to be available for purchase. *Id.* at 46.

## I.  PLAINTIFFS WILL SUCCEED

### A.  THE TLC'S REGULATION IS PREEMPTED UNDER THE FEDERAL ENERGY POLICY AND CONSERVATION ACT

The Energy Policy and Conservation Act of 1975 ("EPCA") establishes a program of "corporate average fuel economy," or "CAFE," standards. To ensure that the federal government can maintain control over fuel economy policy and regulation, EPCA generally prohibits the States from adopting fuel economy standards or related requirements. The preemption provision provides:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or *a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards* for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919(a) (emphasis added) (hereinafter "preemption provision"). This statutory language unambiguously and expressly preempts the 25/30 mpg Rule.

## 1. EPCA Background

A little background demonstrates the importance of the express preemption provision to EPCA's goals and purposes. The statute was originally passed based on foreign-policy concerns, "[i]n the aftermath of the energy crisis created by the 1973 Mideast oil embargo," in order to "decrease dependence on foreign imports, enhance national security, achieve the efficient utilization of scarce resources, and guarantee the availability of domestic energy supplies at prices consumers can afford." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 2008 WL 3822966, at *5 (9th Cir. Aug. 18, 2008) (quoting legislative history).

Under the EPCA, the Department of Transportation ("DOT") is charged with establishing separate CAFE standards for passenger automobiles and light duty trucks. DOT has delegated this responsibility to the National Highway Traffic Safety Administration ("NHTSA"). 49 C.F.R. § 1.50(f). The CAFE standard is "a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year." 49 U.S.C. § 32901(a)(6) (2007).[8] The federal CAFE standards do not apply to individual vehicles or models. Rather, they regulate the fuel economy of each manufacturer's entire fleet of cars or trucks, on a fleet average basis. As a result, a manufacturer can produce and sell any combination of vehicles that the market will bear, so long as the fuel economy of its fleet as a whole meets or exceeds the required average mpg.

NHTSA has understood its standard-setting duties to include an obligation to "weigh the difficulties of individual automobile manufacturers" in meeting specific standards, an

---

[8] While NHTSA has authority to regulate the fuel economy of automobiles up to 10,000 pounds, it currently sets CAFE standards only for automobiles 8,500 pounds or less. 49 U.S.C. §§ 32901, 32902; 49 C.F.R. § 523.3(b). All of the vehicles at issue in this case are automobiles well below 8,500 pounds and therefore covered by an average fuel economy standard.

approach that has been approved by the federal courts reviewing NHTSA's actions. *See Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1339 (D.C. Cir. 1986) (internal quotation marks omitted). Maintaining consumer choice is also a fundamental part of EPCA and the federal regulations that implement it. The authors of the federal fuel economy law emphasized that CAFE standards had to "be carefully drafted" in order to improve fuel economy without "unduly limiting consumer choice." *See* H.R. Rep. No. 94-340, at 87 (1975). The averaging of the mpg results for a given manufacturer across its entire vehicle fleet was critical to the goals of EPCA. As one federal court has explained, this approach has led to "a series of graduated mileage requirements" that "ensure[s] wide consumer choice by leaving maximum flexibility to the manufacturer" in deciding how to meet the specified CAFE levels. *See Ctr. for Auto Safety v. Thomas*, 847 F.2d 864 (D.C. Cir.), *vacated on other grounds*, 856 F.2d 1557 (1988).

When setting mpg standards, the federal government also takes into account how the standards will impact the safety of vehicles. For many years, NHTSA and other safety organizations have recognized that increases in fuel economy standards can result in reductions in the weight of the motor vehicle fleet as a whole because reducing the weight of a given vehicle model can be used to reduce its fuel consumption. Reductions in vehicle weight can also reduce vehicle crashworthiness. For example, the National Academy of Sciences found in one report that the down-weighting and downsizing that occurred in the late 1970's and early 1980's, some of which the Academy attributed to the CAFE standards, probably resulted in an additional 1,300 to 2,600 traffic fatalities in one representative year (1993), and ten times more injuries. *See* 70 Fed. Reg. 51414, at *51419, 2005 WL 207514 (2005) (discussing National Academy of Sciences, *Effectiveness and Impact of Corporate Fuel Economy ("CAFE") Standards* (Jan. 2002)).

The federal courts have also recognized that increasing fuel economy standards may lead to fleet downsizing, which "without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries." *Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 121 n.11 (D.C. Cir. 1990) (referring to conclusions in NHTSA Rule Making, as well as DOT and EPA studies).

The effect of fuel economy on safety has therefore always been an important factor to consider in setting fuel economy standards under EPCA. In part for that reason, in its 2005 proposed rulemaking on light trucks, the NHTSA considered revisions to the basic structure of the federal CAFE standards. NHTSA found that its prior rules encouraged manufacturers to lighten vehicles in order to comply and that this downsizing caused serious safety problems. The NHTSA stated:

> The agency believes that the manner in which fuel economy is regulated
> can have substantial effects on vehicle design and the composition of the
> light vehicle fleet. Reforming CAFE is important for vehicle safety
> because the current structure of the CAFE system provides an incentive to
> manufacturers to reduce the weight and size of vehicles, and to increase
> the production of vehicle types (particularly pickup trucks and SUVs) that
> are more susceptible to rollover crashes and are less compatible with other
> light vehicles. For these reasons, reforming CAFE is a critical part of the
> agency's effort to address the vehicle rollover and compatibility problems.

70 Fed. Reg. 51414, at *51443, 2005 WL 207514 (2005).

The criteria to be used by the NHTSA to determine "maximum feasible" levels are "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f). The federal fuel economy standards reflect NHTSA's judgment about the appropriate balance between improvements in fuel economy and the burdens that more stringent standards place on the automobile industry, including how fuel economy standards will affect

9

employment in the United States' automobile industry. State or local regulations that have the effect of creating more stringent fuel economy standards than those set by federal law interfere with DOT's efforts to balance the criteria for fuel economy standards created by Congress.

### 2.    Preemption under the EPCA

#### a.  Express Preemption

Congress determined that regulation of fuel economy at a sub-national level would constrain the flexibility that was the hallmark of the CAFE program established by Congress. The EPCA's express preemption provision, 49 U.S.C. § 32919(a), preempts the regulation at issue here.[9] As the Second Circuit recently explained,

> The Supremacy Clause, U.S. Const. art. VI, cl. 2, invalidates state laws that interfere with, or are contrary to, federal law. Preemption can be either express or implied. Express preemption arises when a federal statute expressly directs that state law be ousted. Implied preemption arises when, in the absence of explicit statutory language, Congress intended the Federal Government to occupy a field exclusively, or when state law actually conflicts with federal law.

*Air Transport Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220-21 (2d Cir. 2008) (internal citations, quotation marks, and modifications omitted). To determine whether an express preemption provision preempts the regulation at issue here is a question of statutory construction which "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). The "ordinary meaning" of the language employed by Congress in 49 U.S.C. § 32919(a) demonstrates that the regulation at issue in this matter is preempted.

---

[9] Unlike the CAA, the EPCA provides no waiver mechanism for its preemptive effect that would allow California or any other state to adopt a regulation relating to fuel economy standards. *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F.Supp.2d 1151, 1157 (E.D. Cal. 2007).

First, the EPCA is in full effect because, as stated above, the NHTSA long ago established federal fuel economy standards. *See id.* § 32902(b)(4)(A).

Second, the 25/30 mpg Rule is "related to fuel economy standards," 49 U.S.C. § 32919(a). "Fuel economy," as defined in the EPCA "means the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used." *Id.* § 32901(a)(11). The EPCA requires the NHTSA to create testing and calculation procedures to determine the "fuel economy for each model," and then the "average fuel economy for a manufacturer." *Id.* § 32904(c). (The preemption provision specifically preempts *both* laws related to "fuel economy" standards *and* "average fuel economy" standards. *Id.* at 32919(a).) The EPCA further mandates labeling requirements indicating, *inter alia,* the "fuel economy of the automobile," as calculated by the NHTSA. *Id.* § 32908(b)(1)(A).

The 25/30 mpg Rule challenged here *specifically* references those calculations in requiring "a minimum city rating of twenty-five (25) miles per gallon as labeled pursuant to title 49, section 32908 of the United States Code." TLC Rule § 3-02(c)(10). Because the regulation, by its very terms, is enforcing a city fuel economy standard of 25 miles per gallon, it is a regulation related to fuel economy standards and is preempted by the EPCA.

Third, the preemption provision contains a "savings clause," which carves out the *only* state or city regulations that are *not* preempted: Section 32919(c) provides that a "State or political subdivision of a State may prescribe requirements for fuel economy for automobiles obtained for its own use." The Supreme Court has repeatedly held that where Congress includes such a savings clause, "the natural implication of th[e] provision is that state laws regulating the same issue as federal laws are not saved," if they fall outside the express terms of the savings

clause. *See, e.g., Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 100 (1992) (O'Connor, J., plurality opinion). Otherwise the savings clause "would be superfluous." *Id.*

Thus, defendant Bloomberg could prescribe requirements for cars purchased by defendant City. But the express terms of the statute preclude the City from passing the 25/30 mpg Rule. The TLC regulation is therefore not "saved" by 49 U.S.C. § 32919(c).[10]

Furthermore, any argument that the EPCA preempts only standards related to the manufacturer or sale of vehicles, not standards related to the purchase of vehicles, is foreclosed by the Supreme Court's decision in *Engine Mfrs. Ass'n v. South Coast Air Quality Mang't Dist.*, 541 U.S. 246 (2004). In *Engine Mfrs.*, the Supreme Court considered this very issue in the context of an analogous statute, the Clean Air Act ("CAA"), which as explained below also preempts this regulation. The CAA's express preemption provision provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles . . ." 42 U.S.C. § 7543(a). At issue in *Engine Mfrs.* was California's "Fleet Rules," which required operators of public and private fleets of vehicles – such as "fleets of street sweepers . . . [and] of airport passenger transportation vehicles, including shuttles and taxicabs picking up airline passengers" – to purchase or lease certain types of vehicles ("alternative fuel vehicles" or vehicles meeting certain emission specifications). 541 U.S. at 249-50. The Supreme Court rejected the proposition (reached by the district court) that where "a state regulation does not compel manufacturers to meet a new emissions limit, but rather affects the purchase of vehicles, as the Fleet Rules do, that regulation is not a standard." *Id.* at 252 (quoting 158 F.Supp.2d 1107, 1118 (C.D.Cal.2001)). Instead, the

---

[10] The preemption provision also provides that a state or its political subdivision may "enforce a law or regulation on disclosure of fuel economy or fuel operating costs for an automobile only if the law or regulation is identical to that requirement." 49 U.S.C. § 32919(b). Because the challenged regulation is not related to information disclosure and is not identical to those provided under federal law, this provision is irrelevant.

Court explained that "standard" meant only "criteria" regarding the "characteristics of a vehicle or engine," and applied equally to regulations affecting vehicle purchases. *Id.* at 252-253. The Supreme Court even listed regulations of the emission standards of private airport van operators as an example of a preempted regulation. *Id.* at 258. Further, the Court explained that it "would make no sense" to treat "sales restrictions and purchase restrictions differently for pre-emption purposes," even if the purchase restriction is limited to a small class of cars:

> The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them. It is true that the Fleet Rules at issue here cover only certain purchasers and certain federally certified vehicles, and thus do not eliminate all demand for covered vehicles. But if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme.

*Id.* at 255. Similarly, here enforcement of the 25/30 mpg Rule would "undo Congress's carefully calibrated regulatory scheme," as established by the EPCA, because if NYC "may enact such rules, then so may any other."[11] *See id.*

The case for EPCA preemption here is clearer than the CAA preemption in *Engine Mfrs.* because, to a significantly greater extent than the CAA, the text of the EPCA makes it clear that it applies to purchasing decisions, not just to sales by manufacturers. As discussed above, the EPCA provides an express exemption for vehicles *purchased* by a state or political subdivision "for its own use." 49 U.S.C. § 32919(c). The EPCA also mandates that the President "prescribe regulations that require passenger automobiles leased for at least 60 consecutive days or *bought* by [federal] executive agencies in a fiscal year to achieve a fleet average fuel economy standard" equal to 18 miles a gallon, or that mandated for manufacturers,

---

[11] This is not mere conjecture. Just recently Boston, San Francisco, Los Angeles, Seattle, and Phoenix's airport have announced requirements for alternative fuel taxis, fuel efficient taxis, and/or low emission taxis. A number of other cities have voluntary programs and are considering mandatory rules.

whichever is greater. 49 U.S.C. § 32917(b) (emphasis added). Because Congress enacted these two provisions related to the purchase of vehicles but failed to enact a provision that covers the 25/30 mpg Rule at issue here, Congress's intent not to allow for an exemption for the 25/30 mpg Rule is manifest.

Additionally, the statute specifically preempts regulations relating to "fuel economy standards *or* average fuel economy standards." 49 U.S.C. § 32919(a) (emphasis added). While "fuel economy standards" is not defined in the EPCA, "average fuel economy standards" is defined, as is "fuel economy." An "average fuel economy standard" is defined as "a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year." 49 U.S.C. § 32901(a)(6). Yet Congress went beyond preemption of the standards applicable to a given manufacturer to also preempt "fuel economy standards," meaning *any* standard relating to "the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used," 49 U.S.C. § 32901(a)(6) (defining "fuel economy"). *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 100 (1992) (O'Connor, J., plurality opinion) (stating that that courts have the duty "to give effect, if possible, to every clause and word of a statute").

Finally, any argument that the regulation is not preempted because regulating taxis is traditionally a matter of state concern is without merit. In *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986), the Supreme Court held that the city was preempted by the National Labor Relations Act from conditioning the renewal of plaintiff's taxicab franchise license on the settlement of a labor dispute. In doing so, the Court stated: "And the fact that the city acted through franchise procedures rather than a court order or a general law also is irrelevant to our analysis." *Id.* at 615 n.5. And, as discussed above, the Court in *Engine*

*Mfrs.* listed local emission standards for private airport van operators as an example of a regulation clearly preempted. 541 U.S. at 258.

## b. Implied Preemption

Even if the EPCA lacked an express preemption provision, the regulations would nonetheless be impliedly preempted. The federal government has occupied the fuel economy field and these regulations conflict with the federal regulatory scheme. *See Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221 (2d Cir. 2008) (stating that "federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose") (internal citations omitted).

The TLC's 25/30 mpg Rule does not balance the goals of increased fuel economy against the economic consequences of regulation in the same way as the federal regulations. One reason why the U.S. Congress has long provided for national regulation of the automobile is to ensure that the nation as a whole shares in the burdens and costs of regulation. By contrast, the TLC's new rules single out taxicab drivers and owners in NYC for the sake of a symbolic effort to address global warming. As with the consideration of economic factors, the TLC's 25/30 mpg Rule does not respect the balance between fuel economy regulation and safety risks that has been struck by NHTSA.

Unlike NHTSA, the TLC decided to increase the fuel economy requirements for NYC taxicabs without any detailed consideration of the trade-offs between fuel economy, vehicle weight, and safety. The TLC's 25/30 mpg Rule, once implemented, will require the NYC taxicab industry to purchase a fleet of smaller, lighter-weight vehicles, which are less crashworthy than other vehicles that would be subject to the federal fuel economy standards but

not the TLC 25/30 mpg Rule. Ignoring the balance struck by the federal government is exactly what the implied preemption doctrine prohibits.

## B. THE TLC'S REGULATION IS ALSO PREEMPTED UNDER THE FEDERAL CLEAN AIR ACT

While the challenged regulation is drafted as a regulation controlling taxicabs' mpg rating, the TLC regulation is also preempted by a second federal statute, the Clean Air Act ("CAA"), because it is directly *connected with* the control of emissions and the *purpose and effect* of the TLC's regulation is to control emissions.

When defendant Bloomberg proposed the mpg standards implemented by the TLC, his press statements make it clear that his intent was to set emissions standards and to mandate that all taxis be hybrids by 2012. He stated that the purpose of this plan is to "implement *new emissions* and mileage standards for yellow taxicabs that will *lead to a fully hybrid fleet by 2012* - the largest, cleanest fleet of taxis on the planet. The new standards will be phased in over a four-year period and will *reduce the carbon emissions* of New York City's taxicab and for-hire vehicle fleet by 50% during the next decade." Mayoral Press Release, No. 156-07, May 22, 2007 (emphasis added), Ex. E.[12] The City also readily admitted that it knew that the only cars that met its 25/30 mpg Rule were hybrids. "Mayor Plans an All-Hybrid Taxi Fleet," N.Y. Times, May 23, 2007, Ex. G. The TLC repeatedly stated that the goal was "reducing carbon emissions and increasing air quality" and that "[t]his will result in an all-hybrid taxicab fleet by 2012." TLC Commissioner's Corner, June 2007, Ex. H; *see also* TLC Press Release, "TLC Unanimously Approves Regulations Leading to a Cleaner, Greener NY Taxi Fleet," Dec. 11, 2007 (new regulation will "result [in] an all hybrid taxicab fleet by 2012"), Ex. I.

---

[12] On "Today," defendant Bloomberg also stated: "We are going to have all of our cars be hybrid." He also stated that children would breathe better due to the plan. Defendant Bloomberg's statements on "Today" are available at: http://www.msnbc.msn.com/id/18816754/.

Indeed, as discussed in more detail in the complaint at ¶¶ 45-66 (Ex. A), all the prior City and TLC environmental regulations of taxis created incentives for taxi owners to purchase alternative fuel taxis or taxis that met strict emission controls (referred to as "clean air" taxis).[13]

Not only was the purpose of the 25/30 mpg Rule to regulate emissions, but it was also the effect. As defendants intended, the challenged regulation will result in a fleet of exclusively alternative fuel vehicles because the only cars approved by the TLC for use under the 25/30 mpg regulation are alternative fuel vehicles. Until very recently, the only approved vehicles were hybrids. Ex. J. Now one clean diesel vehicle is approved, but none are in use. Ex. K.

The challenged regulation is therefore also preempted by the CAA. Under Section 209 of the CAA, "exclusive control over 'standard[s] relating to the control of emissions from new motor vehicles' is vested in the federal government, and the states are preempted from regulating in the area." *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 198 (2d Cir. 1998). Section 209(a) states:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). This broad preemption provision is consistent with the CAA's division of federal and state responsibility: "In contrast to federally encouraged state control over stationary

---

[13] *See* N.Y.C. Admin. Code. § 19-532 (2003) (providing for the issuance of taxi licenses restricted to vehicles that are hybrid electrical vehicles or run on compressed natural gas); *Id.* § 19-533 (2004) (mandating that the TLC approve a hybrid vehicle for use as a taxi); *Id.* § 19-532(b) (2005) (mandating the issuance of 254 taxi licenses that require the owner to use an alternative fuel vehicle); *Id.* § 19-534 (requiring the TLC to "develop and approve a plan to significantly increase the number of clean air and accessible vehicles in New York City."); *Id.* at § 19-536 (mandating that "clean air" taxicabs display insignias showing that they are "clean air"); *Id.* at 19-535 (extending the retirement period for "clean air" taxicabs, meaning that clean air taxicabs could receive one or two year extensions).

sources, regulation of motor vehicle emissions had been a principally federal project." *Engine Mfrs. Ass'n v. U.S. E.P.A.*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). Congressional control avoids "the possibility of 50 different state regulatory regimes [which] raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers." *Id.* As the Second Circuit has held, preemption of state and city regulation is the "cornerstone," of Congressional regulation of vehicle emissions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dept. of Env't Conservation*, 17 F.3d 521, 525-26 (2d Cir. 1994). Not surprisingly, then, the legislative history of this provision "indicates that Congress intended to provide § 209(a) with a broad preemptive scope." *Am. Auto. Mfrs. Ass'n v. Mass. Dept. of Envtl. Prot.*, 998 F.Supp. 10, 17 (D.Mass. 1997) (quoting legislative history).

In *Engine Manf'r Assoc. v. South Coast Air Quality Manag.*, 541 U.S. 246 (2004), as described above, the Supreme Court held that the CAA preempts not only regulations targeted at the vehicles that manufacturers sell but also regulations targeted at the purchase of vehicles. As discussed above, the Supreme Court even listed regulations aimed at private airport-shuttle van operators as an example of a preempted regulation. *Id.* at 258.

The TLC's 25/30 mpg Rule is a "standard relating to the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a), and is therefore preempted by federal law. Courts have consistently held that preemption under a "related to" clause covers all state laws making "reference to" or having a "connection with" the preempted subject matter. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992); *California Division of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 324-25 (1997); *see also California Div. of Labor Standards*, 519 U.S. at 336

(Scalia, J., concurring) (stating that the "relates to" language serves the function of "identify[ing] the field in which ordinary field pre-emption applies"). Furthermore, the Second Circuit has held that preemption under § 209(a) of the CAA covers requirements that have "no *purpose* other than to effect a general reduction in emissions," or that amount to "a command having a direct *effect* on the level of emissions." *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196 (2d Cir. 1998); *see also Ass'n of Intern. Auto. Mfrs., Inc. v. Mass. Dept. of Envtl. Prot.*, 208 F.3d 1, 6 (1st Cir. 2000) (holding that the CAA's preemption provision reaches all state regulations "the purpose and effect of [which] is to effect a quantitative reduction in emissions").

      *Engine Mfrs.* reiterated that the CAA's preemption provision should be given a broad reading to ensure that "the end result [does not] undo Congress's carefully calibrated regulatory scheme." 541 U.S. at 255. The Court was wary of readings of the statute that would ultimately impede a "manufacturer's right to sell federally approved vehicles." *Id.* Holding that the CAA does not preempt the TLC's regulation at issue here would encourage style over substance: it would impede Congress's carefully calibrated regulatory scheme to protect air quality pursuant to the CAA as each state and city could issue unique requirements for the purchase of vehicles in their locality, so long as they styled those requirements as "alternative fuel" requirements or "minimum mile per gallon" requirements. *Engine Mfrs.* makes clear that the federal values would not be served by this result.

      Furthermore, certain Fleet Rules at issue in *Engine Mfrs.* required the purchase or lease of "alternative-fuel vehicles," and did not specify any emissions requirement. *Id.* at 251. Like the rule in *Engine Mfrs*, the TLC's 25/30 mpg Rule in practice requires the use of alternative fuel vehicles.[14] While *Engine Mfrs* did not explicitly resolve this issue, it is

---

[14] The only vehicles (other than accessible ones) approved for use by the TLC as of October 1, 2008 are alternative fuel. *See* September 9, 2008 printout from the TLC web site listing the approved vehicles, Ex. K.

noteworthy that not a single Justice (in the majority or dissent) – nor any of the lower court judges – indicated any concern that certain Fleet Rules might not be preempted because their language does not, *in haec verba,* mention "emissions."

It is particularly difficult to see how mandating an alternative fuel vehicle is different from mandating a "zero-emission vehicle," ("ZEV") which the Second Circuit has already held is preempted by the CAA:

> To be sure, the ZEV sales requirement does not impose precise overall quantitative limits on levels of emissions, as do the classification system and fleet averages. It mandates only that a specified percentage of the [vehicles] sold by a manufacturer in any model year be ZEVs. Nevertheless, the ZEV sales requirement must be considered a standard "relating to the control of emissions." ZEV, after all, stands for "zero-emission vehicle," and a requirement that a particular percentage of vehicle sales be ZEVs *has no purpose other than to effect a general reduction in emissions . . . . The ZEV sales requirement is, therefore, in the nature of a command having a direct effect on the level of emissions* . . . [T]he ZEV sales requirement is within the preemptive scope of Section 209 . . . .

152 F. 3d at 200 (emphasis added). Were it otherwise, any statutory prohibition could be side-stepped merely through semantics.

Nor does the "savings" clause of § 209(d), 42 U.S.C. § 7543(d), apply here. That section exempts from the preemptory reach of § 209(a) a state's or city's "right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." That carve-out is limited to regulations *subsequent* to the initial sale of the vehicle, consistent with § 209(a) which limits the preemption scope to "new motor vehicles" and bans states or cities from requiring any approval as a "condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle." *See Sims v. State of Fla., Dept. of Highway Safety and Motor Vehicles*, 862 F.2d 1449, 1455 (11th Cir. 1989). The CAA defines

"new motor vehicle" to mean "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser." EPA § 216(3), 42 U.S.C. § 7550(3).

Here, the TLC's 25/30 mpg Rule is clearly limited to new taxicabs whose title has "never been transferred to an ultimate purchaser."[15] CAA preemption would not bar the City from creating regulations unrelated to initial purchasing decisions; pursuant to § 209(d), 42 U.S.C. § 7543(d), the City could "adopt in-use regulations-such as carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles" which are not aimed at new car purchasers. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1094 (D.C. Cir.1996). But the City cannot regulate what types of cars can be purchased by individual owners.[16]

This is entirely consistent with *Allway Taxi, Inc. v. City of New York,* 340 F. Supp. 1120 (S.D.N.Y. 1972), *aff'd per curiam*, 468 F.2d 624 (2d Cir. 1972), which held that a City regulation requiring taxis to use only non-leaded gasoline and to be equipped with emission control devices was not preempted under the CAA. As the court explained, the CAA "preclude[s] states and localities from setting their own exhaust emission control standards only with respect to . . . . new automobiles," 340 F. Supp. at 1124, and does not limit a city's regulation unrelated to the purchase of new vehicles, such as a resale, registration, or licensing requirement. As the Court explained, the regulations only "insure the installation and upkeep of the federally required devices, since New York City has set no standards of its own. Such policing activity after a car has reached its ultimate purchaser is specifically left to the states and their localities." *Id.* at 1124 n.7. While *Allway* stated that a city is not preempted from "setting

---

[15] Pursuant to TLC Rule § 3-01(b), "a vehicle may be hacked-up [and put into service as a taxi] only if it is a *new vehicle* that meets all of the following requirements: (1) It is *purchased in the first sale* from a licensed dealer or a manufacturer. . . . [and] (3) The vehicle must have accumulated fewer than 500 miles traveled, at the time of hack-up." Ex. C (emphasis added).

[16] This analysis does not apply to plaintiffs' EPCA preemption argument because the EPCA does not limit its preemptive reach to "new" automobiles and does not have an "in-use" exception.

its own standards for the licensing of vehicles for commercial use within that locality," *id.* at 1124, such licensing can only regulate actions after the initial purchases. *Cf. id.* ("We do not say that a state or locality is free to impose its own emission control standards the moment after a new car is bought and registered. That would be an obvious circumvention of the Clean Air Act and would defeat the congressional purpose of preventing obstruction to interstate commerce.")[17]

Moreover, even in the absence of the express preemption provision, the 25/30 mpg Rule would be preempted because it interferes with the federal emissions regulation of vehicle emissions, as discussed above. The challenged regulation is therefore implicitly and expressly preempted by the CAA.

## II.    IRREPARABLE HARM

Plaintiffs will suffer irreparable financial and physical harm if the 25/30 mpg Rule is implemented. "To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of monetary damages.'" *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)).

Given the uncertainty of a damage remedy,[18] the severe financial harm plaintiffs will suffer cannot be remedied.[19] Moreover, the physical injury plaintiff drivers and passengers

---

[17] To the extent *Allway Taxi* goes further and implies that burdens on purchasers (as opposed to manufacturers) are not preempted by § 209, its reasoning has been implicitly overruled by the subsequent Supreme Court decision in *Engine Mfrs.,* 541 U.S. 246. *See Nicholas v. Goord*, 430 F.3d 652, 659 (2d Cir. 2005) (holding that despite past precedent, analysis of statutes must "take into account . . . significant intervening Supreme Court cases," as the court is only bound by its precedent "unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court"). The Supreme Court held that that the preemptive scope is not limited to "manufacturers and distributors," but also includes "individual owners." 541 U.S. at 255. It further clarified that the test is *not* whether a regulation has only "minimal interference with interstate commerce," as *Allway Taxi* stated, because any state regulation causes harm to the CAA's purposes: "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme," 541 U.S. at 255.

[18] In *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989), the Supreme Court held that not all preemption claims give rise to a right to damages under 42 U.S.C. § 1983. The Court explained, "In all cases, the availability of the § 1983 remedy turns on whether the statute, by its terms or as interpreted, creates obligations sufficiently specific and definite to be within the competence of the judiciary to enforce, is intended to benefit the

will suffer is irreparable as physical harm cannot be remedied by an award of money damages. *Id.*; *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (holding that physical injury is irreparable injury).

## A. Irreparable Financial Harm

The TLC-mandated hybrids will cause plaintiffs severe financial harm. Hybrid vehicles cost owners significantly more than the traditional Crown Victoria. Not only are the hybrids more expensive to purchase initially, but they are also more expensive to maintain and more difficult to replace. Strauel Decl. §§ 6-19; Rosenzweig §§ 4-11; Wanderman Decl. §§ 12-24; Sapone § 8; Sherman Decl. §§ 8-21; Rosenberg Decl. §§ 5-7.

Plaintiff fleet owners and operators typically keep large volumes of parts in stock to provide them with the ability to repair taxis quickly in-house with their own mechanics. The parts necessary to repair hybrids, however, are much more expensive than those for the Crown Victoria, and are often in short supply or on backorder. It is also much more time consuming to repair hybrids because the fleets' engineers often cannot repair the vehicles so they must be sent to the dealer for repair. As a result, hybrid taxicabs spend less time in service. Furthermore,

---

putative plaintiff, and is not foreclosed by express provision or other specific evidence from the statute itself." *Id.* at 107 (citations and internal quotation marks omitted). While it is possible that plaintiffs have a damages remedy (and plaintiffs have not waived this remedy), they will face severe obstacles in order to prove such. If defendants stipulate to plaintiffs' right to damages if the 25/30 mpg Rule is implemented and then later struck down, plaintiffs will withdraw the claim of irreparable financial harm. Such a stipulation, however, will not prevent plaintiff passengers and drivers from suffering physical harm.

[19] *See Harris County v. Gist*, 976 F.Supp. 601, 616 (S.D. Tex. 1996) (holding that plaintiff would suffer irreparable financial harm because "there would be no legal means by which the [plaintiff] could ever recapture the money"); *O'Brien v. Appomattox Co.*, 213 F.Supp.2d 627, 631-3 (W.D. Va. 2002) (finding irreparable harm because plaintiffs are unlikely to recover money damages through their § 1983 claims due to defendants' sovereign immunity); *Synagro-WWT, Inc. v. Louisa County*, No. 1-00060, 2001 WL 868638 (W.D. Va. 2001) (same); *Clark Constr. Co. v. Pena*, 895 F.Supp. 1483, 1493 (M.D. Al. 1995) (finding irreparable injury because "plaintiff lacks an adequate remedy at law. The plaintiff's only alternative to injunctive relief is an action for money damages in the United States Court of Claims," which is insufficient); *see also Rum Creek Coal Sales v. Caperton*, 926 F.2d 353, 360 (4th Cir. 1991) (even when the plaintiff has state law remedies against defendants, "the inability to obtain damages from the State in a § 1983 action reduces the showing necessary to establish irreparable harm"); *Alvenus Shipping Co. v. Delta Petroleum*, 876 F.Supp. 482, 487 (S.D.N.Y. 1994) (holding that if "a money judgment will go unsatisfied absent equitable relief" then irreparable harm is present even though plaintiff has a claim for only money damages).

because they are consumer (not commercial) vehicles, the hybrid models change significantly each year. As a result, the fleets' engineers must be retrained yearly and more parts must be stockpiled. Strauel Decl. §§ 6-11; Rosenzweig §§ 4-11; Wanderman Decl. §§ 12-24; Sherman Decl. §§ 8-21; Rosenberg Decl. §§ 5-7.

Because they are not as durable, they cannot be driven as many miles, resulting in significant lost income to both the driver and owner. Strauel Decl. § 10. It is also likely that they will need to be replaced more frequently. As discussed in more detail in the engineer's report (Ex. B), hybrid taxicabs suffer significantly more damage in accidents than Crown Victorias. *See also* Wanderman Decl. § 12; Rosenzweig § 7. Due to the short supply of hybrids, owners will not be able to immediately replace their hybrid vehicle if it is damaged or destroyed. Wanderman Decl. §§ 12, 21; Rosenzweig § 8. Currently owners can replace their Ford Crown Victoria in less than a day. The hybrids, in contrast, must be ordered four months ahead of time. Wanderman Decl. §§ 12-13; Sherman Decl. §§ 14, 19. An owner may therefore be left without a car for up to four months and a driver without an income from that period for that period of time. Passengers are also left without service. Wanderman Decl. §§ 12-24; Rosenzweig § 11.

Finally, due to safety problems with the hybrids, plaintiffs will face higher insurance costs and/or will be forced to pay more money to passengers and drivers due to injuries suffered in the hybrid taxis. Sherman Decl. § 20.

The costs that will be incurred if the 25/30 mpg Rule is not immediately enjoined will continue for years. Once a hybrid has been purchased, the owner will be forced to utilize that car (with the resulting increased maintenance expenses) for the next three to five years. *Id.* at §§ 9-12.

While the TLC has argued that these costs will be recoverable due to savings on the cost of fuel, this has not borne out in practice. The projected fuel savings do not compensate for the maintenance and replacement costs discussed above. Moreover, when the air conditioner is on, many of these hybrids get below 15 mpg when used as taxis, which is only slightly better than the Ford Crown Victoria, and worse than the anticipated Ford Transit Connect and Standard Taxi. Rosenzweig § 9.

Thus, for little environmental benefit, these TLC-mandated hybrids will cause drivers and owners severe and irreparable financial harm. Moreover, due to the extended time hybrids will be out of service due to delays in repairing and replacing them, the public will suffer a loss of service.

### B. Irreparable Physical Harm

Not only will the 25/30 mpg Rule cause irreparable financial harm, but it will also endanger drivers and passengers – including plaintiff drivers and passengers – because the vehicles mandated by the TLC are untested and have serious safety problems. The TLC-mandated hybrid vehicles were not built to withstand the rigorous demands of 24/7 usage, or allow for after-manufacturer modifications that the TLC mandates.

### 1. The TLC-mandated hybrid taxis are unsafe

Out of concern for the safety of passengers and drivers, MTBOT commissioned a study to determine whether hybrid vehicles could be safely used as NYC taxis. The report, by C. Bruce Gambardella – a professional engineer who has previously been hired by NYC and major automobile manufacturers – confirms the initial concerns of MTBOT fleets and several other industry and driver groups. *See* Engineer Report, Ex. B.

After inspecting and conducting extensive analysis of the Ford Crown Victoria Long Wheel Base ("LWB" or "stretch") – which has been the standard NYC taxi for years – and TLC-approved hybrid vehicles, Mr. Gambardella concluded that "the Ford Crown Victoria Long Wheel Base (LWB) is the safest taxicab available." *Id.* at 4 (emphasis removed). Mr. Gambardella explained that the "Crown Victoria is a big, heavy-duty commercial vehicle with a heavy-duty frame and heavy-duty parts. It is produced exclusively for the police and taxi markets." *Id.* at 4-5. As purpose-built taxis, Crown Victorias are engineered to withstand 24/7 commercial usage and serious collisions, "even with a full-width partition – a modification that requires adequate interior space to fully protect rear-seat occupants from impacts with the partition." *Id.*

In contrast, Mr. Gambardella found that: "The [TLC-mandated] hybrids – which were designed for private, non-commercial use and are significantly smaller than the Crown Victoria – are not nearly as safe as the Crown Victoria even without the modifications required by the TLC." *Id.* at 5. All other things being equal, in a crash, occupants in the lighter hybrids are more likely to be injured than occupants of the heavier Crown Victoria, in part, because they will experience a 40% greater g-load (force or acceleration). *Id.*

Moreover, Mr. Gambardella concluded that "**the modifications required by the TLC render these [TLC-mandated] hybrids <u>unsafe</u>**." *Id.* (emphasis in original). Some of Mr. Gambardella's key findings are outlined below:

a. Side curtain airbags will not properly deploy in hybrid taxis due to the partition (whether L-shaped or full-width) and other modifications required by the TLC;

b. Passengers will be seriously injured during accidents in hybrids because they will hit their faces on the hard partitions due to the reduced distance in hybrids between the backseat and the partition;

26

c. The L-shaped partition commonly used in hybrids is particularly dangerous and will result in serious injuries because, *inter alia*, it has sharp edges; and

d. The owners manuals for the TLC-approved hybrids warn against modifying the vehicles as required by the TLC because doing so can interfere with the deployment of the side air bags and cause other safety problems.

*Id.* at 2-11. The serious safety problems outlined-above are likely to cause physical injury to passengers and drivers if the challenged regulation is not enjoined.

### 2. Serious questions regarding the safety of the TLC-mandated hybrids remain because the TLC failed to conduct adequate testing

The serious safety questions discussed above remain because defendants abandoned decades of established piloting and testing procedures for taxis and replaced them with a mandate for new vehicles that have never been meaningfully tested and have no proven record of safety or reliability as 24/7 commercial vehicles. The TLC's longstanding procedures require that all new vehicle models are tested and piloted before they are approved for use as a taxi because NYC taxis are highly modified vehicles and many are run 24/7. For those reasons, the TLC has long recognized that simply meeting federal safety standards for private, passenger vehicles, while important, is not sufficient. As defendant TLC Chair Daus has repeatedly testified: "A successful pilot program is the first step in obtaining approval for new vehicles as taxicabs and could lead to modifications by manufacturers where issues surface during the testing phase." TLC Chair Daus, Written Testimony to the City Council, July 16, 2005, Ex. L.[20]

---

[20] The TLC's standard safety testing procedures, and a discussion of how these were not followed in the case of hybrids, are detailed in the complaint at §§ 38-77. The TLC Rules cited in those sections of the complaint are attached as Exs. C-D, and some of the testimony of TLC Chair and defendant Daus is attached as Exs. L-P. The relevant documents cited in this section of the complaint are available on defendants' web pages: (a) The TLC Rules are at http://www.nyc.gov/html/tlc/html/rules/rules.shtml; (b) The TLC Industry Notices cited are available at http://www.nyc.gov/html/tlc/html/news/ind_main.shtml; (c) The TLC's testimony at City Council hearings is available at http://www.nyc.gov/html/tlc/html/news/testimony_main.shtml; (d) Bloomberg's press releases are available at: http://www.nyc.gov by clicking on "News and Press Releases"; and (e) PlaNYC 2030 is available at: http://www.msnbc.msn.com/id/18816754/. Plaintiffs have not attached many of these documents as exhibits because they are not central to the two federal preemption claims and information is unlikely to be contested. Plaintiffs will provide any additional documents upon request.

In contravention of these standard procedures, defendants approved and then mandated hybrids without subjecting them to serious safety testing or conducting a pilot program. Defendants did so despite defendant and TLC Chair's repeated complaints that the hybrid vehicles had not been adequately tested. For example, as recently as March 26, 2007, defendant Daus testified that providing further incentives for the purchase of alternative fuel vehicles was dangerous because "doing so here may create safety-related problems which outweigh any minimal benefits gained." TLC Chair Daus, Written Testimony to the City Council at 4, March 26, 2007, Ex. N.[21]

Less than one month after defendant Daus questioned the safety of hybrids, on April 22, 2007, defendant Bloomberg announced his plan to convert the entire taxi fleet to more fuel-efficient vehicles in eight to ten years. Bloomberg acknowledged that "questions regarding [the hybrids'] durability as 24-hour, seven-day-a-week vehicles have yet to be fully answered." PlaNYC 2030, Ex. F. Just one month later, despite the lack of any new evidence to answer his and Daus's questions about the durability of hybrids, defendant Bloomberg accelerated the conversion of the taxi fleet to hybrids by many years. Ex. E.

In their testimony to the City Council on September 10, 2008, defendants assert that these hybrids have been tested because they "have logged more than 70 million miles of service." Ex. Y. Defendants overlook, however, that: (a) most of these taxis were operated without the dangerous partitions because that requirement was waived for hybrids until January 2008; (b) most of the hybrids were not double shifted; (c) not a single hybrid has completed its retirement cycle, which is three to five years depending upon its use; (d) the Ford Escape is the only hybrid with any experience, but only 50 of the 250 vehicles replaced each month will be

---

[21] Additional testimony by defendant Daus related to the need to adequately test hybrids is discussed in the complaint in §§ 51, 59-61 and attached as Exs. L-P.

Escapes due to availability concerns; and (e) the other available hybrids – the Nissan Altima and Chevy Malibu – have almost no track record as taxis as they were not put into service until October 2007 and July 2008, respectively. In any event, the experience to date with these hybrids has been poor. For example, the Ford Escape has needed more repairs, suffered more damage in accidents, and has rolled over in significant numbers. Strauel Decl. §§ 6-19; Wanderman Decl. §§ 12-24; Rosenzweig § 7; Rosenberg §§ 4-6.

### C. Any Delay Was Reasonable Under the Circumstances

Finally, defendants' argument that plaintiffs' delay demonstrates that they will not suffer irreparable harm is without merit. Defendants' decision to implement the mandate was not final until May 2008; and even after May, plaintiffs continued to work closely with the TLC, City Council, and Mayor's Office of Operations in order to delay implementation of the challenged regulation without resorting to a lawsuit. Indeed, the City Council held a hearing on the challenged regulation the day after plaintiffs informed the Court that they planned to file for a preliminary injunction. Sherman Decl. §§ 22-46. Any delay was therefore reasonable under the circumstances.

In *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995), the Second Circuit explained that the doctrine that delay negates a finding of irreparable harm applies primarily in "copyright and trademark cases where a presumption of irreparable harm arises once a plaintiff establishes likelihood of success on a claim" because "the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition." *Id.* at 39. The doctrine does not apply in cases, like this one, where the threatened harm is prospective. *See Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 340 (S.D.N.Y. 1998) (inference that delay

indicates a lack of urgency is reasonable where "the allegedly irreparable harm is being experienced during the period of delay" but not "where, as here, the harm largely is prospective and will arise from a discrete future event"). Moreover, delay is reasonable if, as here, the delay was caused by good faith efforts to investigate and/or settle a claim.[22]

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court grant our request for a preliminary injunction, or in the alternative a permanent injunction and/or summary declaratory judgment on the preemption claims.

Dated: September 17, 2008
      New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____
     Richard D. Emery (RE 5181)
     Matthew D. Brinckerhoff (MB 3552)
     Elizabeth S. Saylor (ESS 8091)

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000


*Attorneys for Plaintiffs*

---

[22] *See Tom Doherty Assoc., Inc.* 60 F.3d at 39 (delay caused by "a plaintiff's good faith efforts to investigate" is reasonable); *Million Youth March, Inc. v. Safir*, 18 F.Supp.2d at 340 (delay excusable when spent pursuing non-litigation alternatives); *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F.Supp. 119 (E.D.N.Y. 1997) (same; quoting *Playboy Enter. v. Chuckleberry Publ'g, Inc.*, 486 F.Supp. 414, 434-35 (S.D.N.Y. 1980) ("parties should not be encouraged to sue before the practical need to do so has been clearly demonstrated")); *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989) (same); *Porsche Cars North Am., Inc. v. Manny's Porshop, Inc.*, 972 F.Supp 1128, 1132 (N.D. Ill. 1997) (same); *Synagro-WWT, Inc. v. Louisa Co.*, No. 1-00060, 2001 WL 868638, at *5 (W.D. Va. 2001) (granting preliminary injunction even though motion filed after challenged ordinance went into effect because "delay, by itself, if insufficient to block relief under Rule 65. Rather, in order for such delay to be determinative, it must prejudice the defendant in some way") (citations omitted).