UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION BOARD OF
TRADE; MIDTOWN OPERATING CORP.; SWEET IRENE
TRANSPORTATION CO. INC., OSSMAN ALI; and KEVIN
HEALY,

                                                        Plaintiffs,

                        -against-

CITY OF NEW YORK; MICHAEL R. BLOOMBERG, in his
official capacity as Mayor of the City of New York; THE
NEW YORK CITY TAXI & LIMOUSINE COMMISSION
("TLC"); MATTHEW W. DAUS, in his official capacity as
Commissioner, Chair, and chief Executive Officer of the TLC;
PETER SCHENKMAN, in his official capacity as Assistant
Commissioner of the TLC for Safety & Emissions; and
ANDREW SALKIN, in his official capacity as first Deputy
Commissioner of the TLC,

                                                        Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY OR PERMANENT INJUNCTION OR A SUMMARY DECLARATORY JUDGMENT

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendants City of New York*
*100 Church Street, Room 6-145*
*New York, N.Y. 10007*

*Of Counsel: Scott Pasternack (SP3293)*
*Ramin Pejan (RP1977)*
*Tel: (212) 676-8517*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ......................................................................................... 4

ARGUMENT ............................................................................................. 8

POINT I      PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE
HARM ........................................................................................ 8

     A. Plaintiffs Have Other Options To Comply With The TLC Rule ...................... 8

     B. Owning And Operating 25 MPG Vehicles Will Not Result In Financial
Harm ................................................................................................ 9

     C. TLC Approved 25 MPG Vehicles Are Safe ................................................. 10

     D. Delay By Plaintiffs Militates Against A Preliminary Injunction ................... 12

     E. Plaintiffs Exaggerate The Legal Hurdles For Bringing A § 1983
Action ............................................................................................. 13

POINT II      PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON
THE MERITS ........................................................................... 14

     A. Because The TLC Rule Is Proprietary, The Preemption Doctrine Does
Not Apply ......................................................................................... 14

     B. The Presumption Against Preemption Applies ........................................... 18

         1. The Congressional Purpose Of EPCA And CAA Was To Ensure
Uniform Nationwide Fuel Economy And Air Emission Motor
Vehicle Manufacturing Standards .................................................. 18

         2. Plaintiffs Have Failed To Rebut The Presumption ............................... 21

         3. The Supreme Court's Decision In *Engine Mfrs.* Accords With This
Approach ............................................................................... 22

     C. There Is No Express Preemption Under EPCA 32919 ................................. 22

         1. Plaintiffs Have Failed To Prove That The TLC Rule Is "Related
To" Fuel Economy Standards ....................................................... 22

         2. Were EPCA 32919 To Preempt The TLC Rule, The City Is
Exempted By The "For Its Own Use" Exception In 49 USC §
32919(c) ................................................................................ 25

    D. There Is No Express Preemption Under CAA Section 209 ............................ 25

        1. Plaintiffs Cannot Prove That The TLC Rule Is A "Standard Relating To The Control Of Emissions From New Motor Vehicles" ......................................................................... 25

        2. Were CAA Section 209 To Preempt The TLC Rule, The "Exclusive Licensee" Category Set Forth In The *Engine Mfrs.'* Judgment Applies ................................................................ 26

    E. Neither EPCA 32919 Nor CAA Section 209 Impliedly Preempts The TLC Rule ........................................................................................ 27

    F. The Article 78 Claim Is Time-Barred ............................................ 28

    G. The Article 78 Claim Is Meritless ................................................ 29

POINT III     THE BALANCE OF THE EQUITIES WEIGHS AGAINST THE RELIEF PLAINTIFFS SEEK ....................................................................... 29

POINT IV      PLAINTIFFS' ALTERNATIVE REQUESTS FOR A PERMANENT INJUNCTION OR SUMMARY JUDGMENT SHOULD BE DENIED ............. 30

CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

## I. CASES

### A. FEDERAL COURTS

*Abdu-Brisson v. Delta Airlines, Inc.,*
128 F.3d 77 (2d Cir. 1997)....................................................................................24

*Affordable Hous. Found., Inc. v. Silva,*
469 F.3d 219, 241-42 (2d Cir. 2006) .....................................................................27

*Air Transp. Ass'n of Am. v. Cuomo,*
520 F.3d 218 (2d Cir. 2008).................................................................................23

*Allway Taxi, Inc. v. New York ,*
340 F. Supp. 1120 (S.D.N.Y. 1972)...............................................................19, 21

*Am. Auto Mfrs. Ass'n v. Cahill,*
152 F.3d 196 (2d Cir. 1998)................................................................................26

*Associated Gen. Contrs. of Am., v. Metropolitan Water Dist.,*
159 F.3d 1178 (9th Cir. 1998) .............................................................................15

*Bates v. Dow Agrosciences LLC,*
544 U.S. 431 (2005)..............................................................................................21

*Blessing v. Freestone,*
520 U.S. 329 (1997)..............................................................................................14

*Bonaby v. N.Y. City Taxi & Limousine Comm'n,*
2003 U.S. Dist. LEXIS 11864 (S.D.N.Y. July 10, 2003, Preska, J.)...................19

*Building Constr. Trades Council v. Associated Builders and Contractors,*
507 U.S. 218 (1993)........................................................................15, 16, 17, 18

*Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., Inc.,*
519 U.S. 316, 335 (1997).....................................................................................23

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,*
152 F.3d 1184 (9th Cir. 1998) .............................................................................24

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford,*
180 F.3d 686 (5th Cir. 1999) ...............................................................................17

*Cent. Valley Chrysler–Jeep, Inc. v. Goldstone,*
    529 F.Supp. 2d 1151 (E.D. Cal. 2007)........................................................................20, 22

*Chrysler Corp. v. Tofany,*
    419 F.2d 499 (2d Cir. 1969)........................................................................21

*Citibank, N.A. v. Citytrust,*
    756 F.2d 276 (2d Cir. 1985)........................................................................12

*De Buono v. NYSA ILA Med. & Clinical Servs. Fund,*
    520 U.S. 806 (1997)........................................................................23

*Egelhoff v. Egelhoff,*
    532 U.S. 141 (2001)........................................................................24

*Engine Mfrs. Ass'n. v. S. Coast Air Quality Mgmt. Dist.,*
    541 U.S. 246 (2004)........................................................................14, 15, 22

*Engine Mnfrs. Ass'n v. S. Coast Air Quality Management Dist.,*
    498 F.3d 1031 (9th Cir. 2007) ........................................................................15, 16, 17

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
    2005 U.S. Dist. LEXIS 45389 (C.D. Cal., May 5, 2005) ................................................15

*English v. General Elec. Co.,*
    46 U.S. 72 (1990)........................................................................27

*Envtl. Encapsulating Corp. v. City of N.Y.,*
    855 F.2d 48 (2d Cir. 1988)........................................................................18

*Florida Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132, 143 (1963)........................................................................27

*Golden State Transit Corp v. City of Los Angeles,*
    475 U.S. 608 (1986)........................................................................18

*Golden State Transit Corp. v. City of Los Angeles,*
    493 U.S. 103 (1989)........................................................................14

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
    508 F.Supp.2d 295 (D. Vt. 2007)........................................................................20, 21, 22, 25, 26

*Hughes v. Alexandria Scrap Corp.,*
    426 U.S. 794 (1976)........................................................................17

*Huron Portland Cement Co. v. Detroit,*
    362 U.S. 440 (1960)...............................................................................20

*In re Feit & Drexler, Inc.,*
    760 F.2d 406 (2d Cir. 1985)..................................................................13

*Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n,*
    427 U.S. 132 (1976).............................................................................18

*JSG Trading Corp. v. Tray-Wrap, Inc.*
    917 F.2d 75 (2d Cir. 1990)......................................................................8

*King v. Innovation Books,*
    976 F.2d 824 (2d Cir. 1992)..................................................................13

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..............................................................................13

*Massachusetts v. EPA,*
    549 U.S. 497, 127 S. Ct. 1438 (2007)...................................................26

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996)..............................................................................18

*Million Youth March, Inc. v. Safir,*
    18 F.Supp.2d 334 (S.D.N.Y. 1998) ................................................12, 13

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658, 690 (1978).......................................................................13

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992)..............................................................................23

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,*
    514 U.S. 645 (1995)..............................................................................23

*Nat'l Life Ins. Co. v. Solomon,*
    529 F.2d 59 (2d Cir. 1975)....................................................................30

*Raghavendra v. Trs. of Columbia Univ.,*
    2008 U.S. Dist. LEXIS 51995 (July 2, 2008) .......................................12

*Reuters Ltd. v. United Press Int'l., Inc.,*
    903 F.2d 904 (2d Cir. 1990)....................................................................8

Rowe v. N.H. Motor Transp. Ass'n,
    128 S. Ct. 989 (2008) ..............................................................................23

San Diego Bldg. Trades Council v. Garmon,
    359 U.S. 236 (1959)...............................................................................19

Savage v. Jones,
    225 U.S. 501 (1912)...............................................................................27

Sprint Spectrum L.P. v. Mills, et al.,
    283 F.3d 404 (2d Cir. 2002)..................................................................16

Tom Doherty Assocs. v. Saban Entm't, Inc.,
    60 F.3d 27 (2d Cir. 1995).......................................................................13

United States v. Salerno,
    481 U.S. 739 (1987)...............................................................................15

WPIX, Inc. v. League of Women Voters,
    595 F.Supp. 1484 (S.D.N.Y. 1984) ......................................................29

## B.    NEW YORK STATE COURTS

Best Payphones, Inc. v. DoITT,
    5 NY3d 30 (N.Y. 2005) ..........................................................................28

Matter of Coastal Communications Serv., Inc. v. New York City DoITT,
    44 A.D.3d 309, 843 N.Y.S.2d 23 (1st Dep't 2007) ..............................28

New York City Health & Hosps. Corp. v. McBarnette,
    84 N.Y.2d 194, 200-205 (N.Y. 1994)....................................................29

Sullivan Cty. Harness Racing Ass'n. v. Glasser,
    30 N.Y.2d 269 (N.Y. 1972) ...................................................................29

Wechsler v. State of New York,
    284 A.D.2d 707, 726 N.Y.S.2d 760 (3d Dep't. 2001).........................29

## II.   STATUTES AND STATUTORY MATERIALS

### A.   FEDERAL

42 U.S.C. § 6321(a) ...............................................................................19

42 U.S.C. § 7401(a)(3)...........................................................................20

42 U.S.C. § 7543(a) ("CAA Section 209")...................................... *passim*

49 U.S.C. §§ 32901 *et seq.*...............................................................19, 27

49 U.S.C. § 32901(a) .............................................................................25

49 U.S.C. § 32904 ..................................................................................24

49 U.S.C. § 32909 ..................................................................................25

49 U.S.C. § 32917(b) .............................................................................16

49 U.S.C. § 32919 ("EPCA 32919") .............................................. *passim*

49 U.S.C. § 32919(c) .............................................................................16

S. Rep. No. 403, 90th Cong., 1st Sess., 32 (1967)................................20

H. R. Rep. No. 728, 90th Cong., 1st Sess., 20 (1967) ......................20, 21

Hearings on S. 306 before a Special Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 89th Cong., 1st Sess. (1965)................................21

### B.   STATE OF NEW YORK

N.Y. C.P.L.R. § 217................................................................................28

### C.   CITY OF NEW YORK

N.Y.C. Charter § 1043 .........................................................................6, 28

N.Y.C. Charter, § 2300 ........................................................................4, 19

N.Y.C. Charter, § 2303 ........................................................................4, 19

N.Y.C. Admin. Code § 19-501 .............................................................4, 19

N.Y.C. Admin. Code § 19-503 .............................................................4, 19

N.Y.C. Admin. Code § 19-504 ..........................................................................4, 19

N.Y.C. Admin. Code § 19-505 ..........................................................................4, 19

N.Y.C. Admin. Code § 19-531 ..........................................................................4, 19

N.Y.C. Admin. Code § 19-532 ..........................................................................4, 19

## III.   RULES & REGULATIONS AND REGULATORY MATERIALS

### A.   FEDERAL

41 C.F.R. § 102-34.30..........................................................................................16

Fed. R. Civ. P. 3..................................................................................................28

U.S. National Highway Traffic Safety Administration, Average Fuel Economy
    Standards for Light Trucks Model Years, 2008-2011: Part II
    71 Fed. Reg. 17566 (April 6, 2006)..........................................................23, 24

### B.   CITY OF NEW YORK

TLC Rule § 3-03(c)(10) ................................................................................. *passim*

TLC Rule § 3-03(c)(11) ............................................................................................1

35 R.C.N.Y. § 14-02 ............................................................................................. 7

Defendants, the City of New York ("the City"), Michael R. Bloomberg, the New York City Taxi and Limousine Commission ("TLC"), Matthew W. Daus, Peter Schenkman, and Andrew Salkin (collectively "Defendants") respectfully submit this memorandum of law in opposition to plaintiffs' motion.

## PRELIMINARY STATEMENT

This motion concerns TLC Rule § 3-03(c)(10) (the "2008 TLC Rule" or "TLC Rule")[1] which took effect in January 2008 and requires that newly purchased replacement taxicabs, except those that are wheelchair accessible, put in service beginning on October 1, 2008, achieve a minimum city rating of at least 25 miles per gallon. Defendants' Exhibit ("Defs. Exh.") 25.[2] The TLC Rule was properly promulgated pursuant to the City Administrative Procedures Act ("CAPA") for the stated basis and purpose of taxi driver gas cost and passenger fare savings, is rationally based, and has provided taxicab medallion owners with nearly nine months to prepare. Plaintiffs could have spent these past nine months taking steps to comply, including training mechanics, arranging for future sale of stockpiled Crown Victoria parts to other markets, or raising cost and safety concerns in a state court Article 78 proceeding that now is time-barred.

---

[1] In addition to TLC Rule § 3-03(c)(10), TLC also has promulgated TLC Rule § 3-03(c)(11) which took effect in January 2008 and requires that newly purchased replacement taxicabs, except those that are wheelchair accessible, put in service beginning on October 1, 2009, achieve a minimum city rating of at least 30 miles per gallon ("2009 TLC Rule" and, together with the 2008 TLC Rule, the "TLC Rules"). *See* Defs. Exh. 25; http://www.nyc.gov/html/tlc/downloads/pdf/specrules.pdf. The 2009 TLC Rule is relevant only to plaintiffs' alternative motions for a permanent injunction or summary judgment, both of which the defendants contend are premature and not permitted at this time. *See* Point IV, *infra.* Consequently, reference to the TLC Rule in defendants' papers is to the 2008 TLC Rule, unless otherwise stated.

[2] As reflected in Attachment A of the Order, dated September 15, 2008, the parties agreed to modify the TLC Rule to allow for the current motion schedule. Despite the modifications, if a taxicab is scheduled for October retirement and the medallion owner wants to replace the vehicle, the replacement vehicles must comply with the TLC Rule. Thus, plaintiffs' statement that the TLC Rule "has been effectively extended by stipulation to November 1, 2008" is inaccurate. *See* Pls.' Mem. of Law at 1.

Instead, plaintiffs chose to file a federal court action only three weeks before the TLC Rule's compliance date and rest the merits of their case on two federal preemption provisions that Congress intended only to protect automobile manufacturers. Faced with overwhelming evidence of support for the TLC Rule from these manufacturers, plaintiffs threatened them with impleader tort actions. Moreover, plaintiffs were granted leave to file a motion for a preliminary injunction but have now -- in an effort to avoid meeting a burden of proof on factual issues and to deprive the City of a full opportunity to defend -- presented the Court with a motion for a permanent injunction or summary judgment. All of this is done at the expense of nearly 75% of the taxi industry that has used their nine months to properly prepare for the TLC Rule and is doing their part to conserve energy, as well as at the expense of their drivers who are looking to the TLC Rule to save on gas costs. The automobile manufacturers and local automobile dealers also have invested substantial expense to make qualifying vehicles ("25 MPG Vehicles")[3] available by the compliance date. This Court should reject plaintiffs' entitlement tactics and deny this motion.

Plaintiffs cannot show irreparable harm for several reasons: (1) as plaintiffs have admitted repeatedly, other options exist besides replacement of retiring vehicles with 25 MPG Vehicles to comply with the TLC Rule (such as wheelchair accessible vehicles); (2) ownership and operation of 25 MPG Vehicles provide enough overall savings to outweigh any initial costs to plaintiffs (which have been pled as lost profits, not lost revenues); (3) 25 MPG Vehicles are

---

[3] The following vehicles qualify as 25 MPG Vehicles: 2009 Chevrolet Malibu Hybrid, 2009 Volkswagen Jetta clean Diesel Sedan, 2008-09 Lexus RX400h, 2008-09 Toyota Camry Hybrid, 2008-09 Toyota Prius, 2008-09 Toyota Highlander Hybrid, 2008-09 Saturn Vue Hybrid, 2008-09 Nissan Altima Hybrid, 2008-09 Ford Escape Hybrid FWD and 4WD, and 2008-09 Mercury Mariner Hybrid, 2008-09 Mazda Tribute Hybrid, and 2008-09 Honda Civic Hybrid.

safe, as confirmed by TLC data showing an absence of any significant safety concerns following nearly three years of 25 MPG Vehicles traveling more than 70 million miles on City streets and by Ricardo Inc.'s rebuttal of plaintiffs' Gambardella Report, among other things; and (4) plaintiffs' delay in filing this action militates against finding irreparable harm.

Nor can plaintiffs establish a likelihood of success on the merits. With respect to the federal preemption claims based on the Energy Policy and Conservation Act -- 49 U.S.C. § 32919 ("EPCA 32919") -- and the Clean Air Act -- 42 U.S.C. § 7543(a) ("CAA Section 209") -- plaintiffs have failed to overcome the following: (1) that the TLC Rule is proprietary, so the market participant doctrine exempts the TLC Rule from preemption; (2) that the presumption against preemption applies because a local taxicab purchasing requirement will not have any effect either on (a) the uniformity of national motor vehicle fuel economy standards or (b) the uniformity of national air pollution control standards; (3) that neither EPCA 32919 nor CAA Section 209 expressly or impliedly preempts the TLC Rule because the scope of "related to" is limited to measures that are directly and inextricably linked to fuel economy or air pollution control standards, respectively; and (4) that the New York City taxi industry is part of the City's public transportation network so the "for its own use" and "exclusive licensee" preemption exceptions apply. Plaintiffs also fail to prove certain facts essential to their preemption claim. *See* Defendants' Rule 56.1 Response.[4] With respect to plaintiffs' state law claim, the Article 78 claim is time-barred and meritless.

Finally, the equities balance in favor of the City for the reasons stated below.

---

[4] Defendants' position is that summary judgment is premature. *See* Point IV *infra.* However, defendants have submitted a Rule 56.1 response should leave be granted in the course of deciding this motion.

# BACKGROUND

The October 3, 2008 declarations of Andrew Salkin, TLC First Deputy Commissioner, ("Salkin"), Peter Schenkman, TLC Assistant Commissioner for Safety & Emissions, ("Schenkman"), Evgeny Freidman ("Freidman"), and Ricardo, Inc. together set forth a full statement of the facts.[5]

## The TLC And The City's Taxicab Fleet As An Integral Part Of The City's Public Transportation System

As explained in the Declaration of Andrew Salkin, the Charter of the City of New York (the "Charter") and the Administrative Code of the City of New York (the "Code") provide the City with the power to limit the number of taxicabs through a sealed auctioning process and authorize the TLC to conduct the auctions, exclusively license the yellow cabs and drivers, and comprehensively regulate them. Salkin, ¶¶ 6-7; N.Y.C. Charter, §§ 2300, 2303; N.Y.C. Admin. Code §§ 19-501, 19-503, 19-504, 19-505, 19-531, 19-532.

The Charter and Code provisions cited above view yellow taxicabs as part of the City's public transportation network and mandate that the TLC develop and effectuate a broad public policy of transportation through the regulation of such vehicles. Salkin, ¶¶ 5-8; N.Y.C. Charter, §§ 2300, 2303; N.Y.C. Admin. Code §§ 19-501. The importance of the yellow taxi fleet to the City's public transportation network results from the tremendous need that New Yorkers have for taxis. Salkin, ¶ 9. Given that New Yorkers do not own cars at nearly the same rate as the rest of the nation, this is a major factor linked to higher demand for taxicabs. *Id.*, ¶¶ 9-11. In fact, evidence demonstrates that New Yorkers use taxicabs to fill a special public transportation niche that subways and buses cannot provide, including when people are in a hurry, there is a need to

transport luggage or large items, it is late at night, there is bad weather, and to reach destinations where subway and buses routes are unavailable or inconvenient. *Id.*, ¶ 10. In sum, the auctioning, licensing and regulatory process described above has proven the most effective way to provide taxicab service as part of the City's public transportation network.

## Hybrid Vehicles In The City's Yellow Taxi Fleet

Despite the Crown Victoria Long Wheel Base being the dominant new taxicab starting in 2001, the TLC has allowed hybrids to operate as taxicabs since October 2005. Salkin, ¶ 12. With 18 hybrid taxis on the road by November 2005, there were approximately 700 hybrid taxis on the City's streets by the end of November 2007, and nearly double that amount by mid-August 2008.[6] *Id.*, ¶ 13. The first 18 hybrid vehicles will have completed a full fleet cycles in November 2008, and many will have traveled nearly 300,000 miles – all with minimal maintenance issues and concerns. *Id.*; Schenkman, ¶ 27; Freidman, ¶¶ 1-7. These hybrid taxicabs have logged more than 70 million miles of service. Salkin, ¶ 13.

## TLC Rule Enactment And Post Enactment

As part of its continuing effort to fulfill its public transportation mandate under the City Charter and Administrative Code, including to reduce costs to drivers and fares to passengers, conserve fuel and increase the economic health of the taxicab industry, the TLC promulgated the TLC Rule in December 2007. *See* Defs. Exh. 25. The TLC estimates that "[w]hen fully phased in, the rule is expected to result in savings of more than $4,500 in gasoline costs per vehicle per year" and "industry-wide gasoline savings of approximately $60,000,000 per year." *Id.* The

---

[5] Exhibits cited in these declarations are attached to the Declaration of Ramin Pejan, dated October 6, 2008 ("Pejan") and referred to as Defendants' Exhibits or "Defs. Exh."

[6] Hybrid vehicles that are being used as taxicabs include the Ford Escape, the Saturn Vue, Lexus RX 400H (SUV), Mercury Mariner (SUV), and Toyota Camry, Toyota Highlander, and Toyota Prius.

TLC Rule is very narrow in scope and applies only to the City's taxicab industry, which purchases approximately 3,450 new taxis per year. Salkin, ¶ 17. This is a negligible amount of vehicles compared to the 7,667,066 retail automobile sales, not including SUVs and minivans, nationwide in 2005. Salkin, ¶ 17.

The TLC Rule was promulgated in conformance with CAPA. *See* City Charter, § 1043; Salkin ¶¶ 18-27. The TLC Commission voted on and passed the TLC Rule after its December 11, 2007 public hearing. It became final and binding 30 days after December 18, 2007, when it was published in the City Record. *See* City Charter, § 1043; Salkin, ¶ 24. The TLC Rule contains only a requirement referencing miles per gallon that is verified by viewing an EPA label on the vehicle. The requirement applies only to purchases by licensed medallions, not production or sales by manufacturers or dealers. *See* Defs. Exh. 25. The 25 MPG Vehicles provide taxi owners with a range of vehicle choice that includes hybrid and non-hybrid vehicles. *See* note 3, *supra*. Following enactment, the TLC held a hearing on May 8, 2008 that was promised at the December hearing. The purpose of the meeting was to discuss availability and any new safety issues to ensure compliance by October 1, 2008. Salkin, ¶ 33. No rulemaking action was taken at that time.

**Correspondence From Plaintiffs To Manufacturers**

In an effort to frustrate the TLC Rule, plaintiffs threatened with impleader tort suits those manufacturers that provided the City with written commitments to make certain quantities of 25 MPG Vehicles available on a monthly basis. Salkin, ¶ 35. Plaintiffs sent the TLC Commissioners copies of these letters. Defs. Exh. 31. To date, none of the manufacturers have withdrawn their commitments.

**Plaintiffs' Erroneous Allegations In The Complaint**

Plaintiffs rely on several erroneous allegations in their Complaint. First, with respect to the City's sustainability plan and accompanying report, collectively referred to as PlanNYC, the goal is not to begin the process of doubling the efficiency of new taxis *in* 2012, but *by* 2012. *Compare* PlaNYC 2030: A Greener, Greater New York, http://www.nyc.gov/html/planyc2030/downloads/pdf/report_air_quality.pdf at 124 *with* Compl. at ¶ 62. Second, the Taxi of Tomorrow project is not intended as a substitute for the TLC Rule.[7] Salkin, ¶¶ 36-37. Third, TLC is not mandated by its rules to conduct testing of hybrid vehicles and undertake a pilot program before a car model or a car modification is approved.[8] Finally, plaintiffs take out of context testimony provided by TLC Commissioner Matthew Daus with respect to the requirements of pilot testing for new cars and his concerns regarding hybrid safety and durability. Commissioner Daus gave that testimony to the New York City Council in June 2005, two months before the TLC approved the use of hybrid vehicles and before those vehicles safely logged more than 70,000,000 miles in New York City taxicab service. Schenkman, ¶ 27. Thus, the statements then that hybrid vehicle

---

[7] Plaintiffs allege that manufacturers already have cars in the late stage of development -- the Ford Transit Connect and the Standard Taxi -- that will be available for purchase next summer. The Ford Transit Connect and the Standard Taxi are not the Taxi of Tomorrow as no proposals have been submitted indicating what vehicles may become the Taxi of Tomorrow. In fact, a Request for Proposals has yet to be issued, and it is unlikely that a vehicle will be available from this project for the next two or three years. Salkin, ¶¶ 36-37. Moreover, there is no way to say with any certainty that these taxis will meet the requirements of the Taxi of Tomorrow or be available for production as early as next summer in North America. *Id.*

[8] To the extent plaintiffs may be referring to Chapter 14 of the TLC rules that govern Pilot Programs, those rules are not applicable here for two reasons. First, the purpose of Chapter 14 is to encourage innovation and experimentation in relation to type and design of equipment, modes of service and manner of operation. Chapter 14 is quite narrow in its scope and seeks to encourage any person or entity to propose a pilot program for the purposes of testing and evaluating a proposed innovation. *See* 35 R.C.N.Y. § 14-02. In other words, Chapter 14 applies to innovations proposed *to* TLC, not innovations proposed *by* TLC. Second, the enactment of Chapter 14 in 2006 antedates the arrival of the hybrid electric rules in 2005. Besides Chapter 14, there is no pilot program requirement in the TLC rules.

technology needed testing in actual New York City taxicab service are long since moot. In fact, Commissioner Daus acknowledged the exemplary track record during the December 11, 2007 hearing for the TLC Rule. *See* Defs. Exh. 23.

## ARGUMENT

### POINT I

#### PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM

Demonstrating irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d. 1990) (internal quotations and citations omitted). An irreparable harm is an injury that is actual and imminent, as opposed to remote and speculative, and so serious that it cannot later be fully remedied by a monetary award. *Id.* The movant is required to establish not a mere *possibility* of irreparable harm, but that it is *"likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)

### A. Plaintiffs Have Other Options To Comply With The TLC Rule

Prior to alleging concerns about suffering irreparable harm here, plaintiffs admitted in correspondence to the TLC that, among other things, they would be exercising their option to purchase non-25 MPG Vehicles in advance of the October 1, 2008 compliance date to extend by three to five years their ability to operate non-25 MPG Vehicles and avoid any alleged financial or safety harms. Salkin, ¶ 34; Defs. Exh. 29. However, plaintiffs delayed ordering the non-25 MPG Vehicles cars and created their own harm. Despite passage of the compliance date, plaintiffs still have the option of purchasing wheelchair accessible vehicles that are exempt from the TLC Rule. Such options may affect their profits, which are not irreparable, but they have brought this on themselves.

8

After all, none of nearly 75% of taxi owners that plan to fully comply with the rule have expressed any concerns of irreparable harm -- in fact, just the opposite, they love these vehicles as taxis, as do other cities. *See, e.g.,* Freidman, ¶¶ 1-7; Defs. Exh. 2 (other cities' letters and articles).

**B.      Owning And Operating 25 MPG Vehicles Will Not Result In Financial Harm**

Several reasons confirm why there is no irreparable financial harm. First, plaintiffs are not required to replace by October 1, 2008, all vehicles that do not comply with the TLC Rule. Instead, plaintiffs need only make vehicle replacements if and when the vehicle is required to be retired. Salkin, ¶ 31. Second, a comparison of major costs between 25 MPG Vehicles and Crown Victorias, coupled with the resale market for both vehicles, demonstrates that replacing a retired vehicle with a 25 MPG Vehicle will not result in an increase in costs to medallion owners and may provide financial benefits both to the owners and the drivers. Schenkman, ¶¶ 4-10. Third, regarding the inability to use stockpiled Crown Victoria parts, plaintiffs overlook that the stockpiles can still be used for over three years until fleet Crown Victorias are phased out, that numerous resale markets for such parts exist in North America, and that with time, plaintiffs will amass a similar 25 MPG Vehicle stockpile. *Id.*, ¶ 11. Although parts among 25 MPG Vehicles are not often interchangeable, parts are interchangeable on certain 25 MPG Vehicles with the models for certain years. *Id.*, ¶ 11. Fourth, having to send 25 MPG Vehicles to dealers for repairs because fleets do not have trained mechanics is overstated. It ignores that plaintiffs chose not to participate in free hybrid training provided by the TLC. *Id.*, ¶ 12. Fifth, an adequate supply of 25 MPG Vehicles exists to quickly replace damaged vehicles. Ford, Nissan, and General Motors ("GM"), as well as several dealers, have committed to providing substantial numbers of 25 MPG Vehicles above what they otherwise sell at retail locations. Salkin, ¶¶ 28-29; Defs. Exh. 10. These numbers exceed the rolling demand. In sum, while costs may be

incurred with 25 MPG Vehicles, plaintiffs will not be irreparably harmed, especially considering the savings that 25 MPG Vehicles provide. *See* Freidman, ¶¶ 5-7.

**C.     TLC Approved 25 MPG Vehicles Are Safe**

The 25 MPG Vehicles will not jeopardize taxi passenger safety in the ways that plaintiffs contend. For three years, TLC has monitored hybrid vehicle use as taxicabs, and has determined that these vehicles performed outstandingly. Schenkman, ¶ 27.

TLC is satisfied with the safety of 25 MPG Vehicles for use as taxicabs. First, all cars that get approved for taxi use must meet or exceed federal standards for safety administered by the U.S. Department of Transportation's National Highway Traffic Safety Administration ("NHTSA") and pass comprehensive TLC inspections. *Id.*, ¶¶ 15-17. Next, 25 MPG Vehicles contain an array of safety technologies that exceed those that exist in Crown Victorias and that will function regardless of whether the vehicle will be used as a taxi. *Id.*, ¶¶ 19-20. Moreover, the federal safety ratings issued by the NHTSA and the independent safety ratings published by the Insurance Institute of Highway Safety ("IIHS") are both excellent for 25 MPG Vehicles. *Id.*, ¶¶ 21-24. Furthermore, a comparison of inspection pass rates, when controlling for miles driven, between Crown Victorias and hybrid vehicles that are being used in the City's fleet reveals that both vehicles pass inspection with similar rates; however, the items that most commonly fail for Ford Crown Victorias are more serious components that may compromise safety compared to items typically failing inspection for those hybrid vehicles. *Id.*, ¶ 25. The TLC's comprehensive inspection regimen for yellow taxicabs includes over 250 different tests that cover safety, performance, and emission as a City taxicab. *Id.*, ¶ 16.

Perhaps most revealing are the written commitments from car manufacturers that supply their vehicles for use as taxicabs under the TLC Rule. Through these commitments, the manufacturers have supported (even staked their reputations on) the use of their vehicles as New

York City taxicabs. *Id.*, ¶ 26. Ford's June 20, 2008 letter to the TLC states that it "is highly confident in the safety and suitability of ... the ... Hybrid Escapes that we are providing the New York taxi fleet." Defs. Exh. 14.

In response to plaintiffs' report from Mr. C. Bruce Gambardella, the engineering firm of Ricardo, Inc. -- a leading provider of vehicle system and powertrain technology for automotive and heavy-duty manufacturers and suppliers -- has prepared a rebuttal. *See Declaration of Ricardo, Inc.*, dated October 3, 2008; Defs. Exh. 1 ("Ricardo Rebuttal"). According to the Ricardo Rebuttal's Executive Summary:

> The Ricardo, Inc. engineering team thoroughly reviewed the Gambardella report and appendices and found enough of the statements to be inconsistent with common automotive engineering practices to call into question the credibility of many of his conclusions:
>
> • The Gambardella report improperly generalizes crash data, and overlooks side impact date in the process of assessing overall vehicle safety.
>
> • With respect to overall occupant safety, the Gambardella report uses incorrect assumptions when drawing conclusions about rear occupants based on front occupant information for frontal impact.
>
> • The Gambardella report provides misleading information about fatality rates by comparing entire classes of vehicles without focusing on any 25 MPG Vehicles specifically.
>
> • The Gambardella report method for taking vehicle interior measurements is inconsistent with industry standards.
>
> • The Gambardella report inconsistently regards, and at times, misuses the NHTSA NCAP and IIHS ratings which serve as US consumer purchasing guides only and are different from the NHTSA's federal motor vehicle safety standards that guide TLC.
>
> • The Gambardella report method for estimating and downgrading NHTSA NCAP rollover ratings is inappropriate.

- The Gambardella report conclusion about side curtain airbag deployment with regard to partitions is not correct if TLC Rules are followed.

- The Gambardella report does not present adequate data to support his conclusion that the six inch increase in rear seat passenger space in the Crown Victoria does not represent a safety hazard to a belted occupant.

- The Gambardella report produces contradictory statements regarding the taxicab partition and NHTSA NCAP Star ratings when discussing the Ford Crown Victoria L[ong] W[heel] B[ase] and the 25 MPG Vehicles.

Defs. Exh. 1 at 3.

## D. Delay By Plaintiffs Militates Against A Preliminary Injunction

Plaintiffs' delay in seeking relief also contravenes their claim of irreparable injury. The Second Circuit has observed that delay in seeking enforcement of rights means that the drastic, speedy remedy of an expedited preliminary injunction is not at all appropriate. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Similarly, this Court recently held that "a plaintiff's failure to act promptly in seeking injunctive relief 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Raghavendra v. Trs. of Columbia Univ.*, 2008 U.S. Dist. LEXIS 51995, *37 (S.D.N.Y. July 2, 2008). Here, the TLC Rule was enacted in January 2008, but plaintiffs waited until three weeks before the October 1, 2008 compliance date to bring their lawsuit.

Relying on *Million Youth March, Inc. v. Safir*, plaintiffs incorrectly argue that the doctrine espoused in *Citibank* does not apply where the threatened harm is prospective and will arise from a discrete future event. 18 F.Supp.2d 334, 339-40 (S.D.N.Y. 1998) (uncertainty of future issuance of a march permit). However, the TLC Rule and any alleged harm from it are hardly prospective or uncertain. Enactment occurred in January 2008, preceded by rulemaking

pursuant to the CAPA process that included public notice and two opportunities to provide comments -- written comments prior to the public hearing, which no plaintiff provided, and oral comments at the December 11, 2007 hearing. Plaintiffs were aware that the TLC voted on and passed the TLC Rule nine months ago and that the compliance date would be October 1, 2008, a definitive date, not just a potential future event. Salkin, ¶¶ 18-27. Plaintiffs also overlook the prejudice to the City. *Compare* Point III *infra with Million Youth March*, 18 F.Supp.2d at 340 (prejudice considered in analysis).[9]

## E.    Plaintiffs Exaggerate The Legal Hurdles For Bringing A § 1983 Action

The Supreme Court established the availability of monetary damages in a § 1983 action against a municipality in *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978). If monetary damages are calculable, the damage is not irreparable. *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985). On the contrary, if the availability of compensatory damages is uncertain, it is only because plaintiffs are not the intended beneficiary of the federal preemption protection afforded by EPCA 32919 and CAA Section 209 -- the automobile industry is -- and therefore cannot point to an enforceable right.[10]    Where an enforceable right can be established, as in

---

[9] Similarly, reliance on *Tom Doherty Assocs. v. Saban Entm't, Inc.* is misplaced. 60 F.3d 27, 39 (2d Cir. 1995) (delay is reasonable if caused by good faith efforts to investigate a claim). That case simply recapped the holding from *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992), where the plaintiff spent eight months trying to obtain a copy of the infringing screenplay and movie to determine whether he had in fact suffered harm. Here, plaintiffs were aware of their alleged irreparable harm as early as when the proposed TLC Rule was published on October 22, 2007. Def. Exh. 21. *See* Salkin ¶¶ 18-27. They could have brought a rulemaking challenge in state court within four months of the January 17, 2008 effective date and raised their preemption claim, but failed to do so. As for plaintiffs' contention that they have been working closely with TLC and the City Council to avoid litigation, their complaints that TLC never answered their requests belies this point. Compl. at ¶¶ 73, 77.

[10] This raises the question of whether plaintiffs have satisfied the injury component for Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). ("First, the plaintiff must have suffered an 'injury in fact' -- an invasion of *a legally protected interest* which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical,'") (citations omitted) (emphasis added). If it is questionable whether EPCA 32919 or CAA Section 209 protect a legal interest Continued…

*Golden State Transit Corp. v. City of Los Angeles* ("*Golden State II*"), then § 1983 will be interpreted broadly to protect statutory as well as Constitutional rights, and allow for compensatory damages. *Golden State II*, 493 U.S. 103, 108-109 (1989). *See also Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) (Congress must have intended a statutory provision to benefit the plaintiff in order to create a federal right).

For these reasons, plaintiffs have failed to demonstrate irreparable harm.

## POINT II

### PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

**A.    Because The TLC Rule Is Proprietary, The Preemption Doctrine Does Not Apply**

In *Engine Mfrs. Ass'n. v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004) ("*Engine Mfrs.*") -- to which plaintiffs repeatedly refer as conclusive support for preemption -- the Supreme Court found that "[c]learly, Congress contemplated the enforcement of emission standards through purchase requirements" and that "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 254-55. However, the Court did not hold the fleet rules facially invalid. Instead, the Court said:

> It does not necessarily follow, however, that the Fleet Rules are pre-empted *in toto*. We have not addressed a number of issues that may affect the ultimate disposition of petitioners' suit, including the scope of petitioners' challenge, whether some of the Fleet Rules (or some applications of them) can be characterized as internal state purchase decisions (and, if so, whether a different standard for pre-emption applies), and whether §209(a) pre-empts the Fleet Rules even as applied beyond the purchase of new vehicles (*e.g.*, to lease arrangements or to the purchase of used vehicles). These questions were neither passed on below nor

---

of plaintiffs (as opposed to automobile manufacturers) for a § 1983 claim, then equally questionable is whether a legally protected interest exists for plaintiffs' standing.

> presented in the petition for certiorari. They are best addressed in
> the first instance by the lower courts in light of the principles
> articulated above.

541 U.S. at 258-59. This remand opened the door for the Ninth Circuit to extend the market

participant doctrine to the Clean Air Act and hold that many of the fleet rules were actually

proprietary, not regulatory, and, therefore, not preempted. *See Engine Mfrs. Ass'n. v. S. Coast

Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040-41 (9th Cir. 2007) ("Actions taken by a state or its

subdivisions as a market participant are generally protected from federal preemption.").[11] As

explained below, this Court should follow the same approach for both plaintiffs' EPCA 32919

claim and CAA Section 209 claims.

This Court can apply the market participant doctrine to plaintiffs' EPCA and CAA

preemption claims. *See Bldg. & Constr. Trades Council v. Associated Builders and Contrs.*

("*Boston Harbor*"), 507 U.S. 218, 226-27 (1993); *Engine Mfrs.*, 498 F.3d at 1048-49 (9th Cir.

2007); *Associated Gen. Contrs. of Am. v. Metropolitan Water Dist.*, 159 F.3d 1178, 1183 (9th

Cir. 1998). "In the absence of any express or implied indication by Congress that a State [or

---

[11] How the *Engine Mfrs.* litigation concluded is instructive here. Following the Supreme Court's remand, plaintiff filed a Motion for an Order Implementing the Supreme Court's Decision to preempt all the fleet purchasing rules in their entirety. Governed by the holding in *United States v. Salerno*, 481 U.S. 739, 745 (1987) that a facial challenge to a legislative enactment "is the most difficult challenge to mount successfully" and will be upheld only when the plaintiff can "establish that no set of circumstances exists under which the [enactment] would be valid," the district court held that the fleet rules applicable to state and local governments were proprietary, found that plaintiff's motion was a facial challenge to all the rules together, and then denied the motion. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 2005 U.S. Dist. LEXIS 45389 (C.D. Cal., May 5, 2005). On appeal, the Ninth Circuit affirmed as proprietary the fleet rules applicable to state and local governments and remanded the case back to the district court to determine whether fleet rules applicable to federal and private actors were preempted under the Supreme Court's and Ninth Circuit's decisions. On the third trip, the district court entered a judgment based on a settlement reached among the parties that "[the fleet rules] are *not preempted* by the Clean Air Act Section 209(a), 42 U.S.C. § 7543(a), in so far as they direct the purchasing, procuring, leasing, and contracting decision of state and local government entities, including the State of California, counties, cities, and special districts, and *private entities* under contract to, or *operating under an exclusive license* or a franchise *with*, state and *local government entities*." *See* Defs. Exh. 3 (emphasis added).

15

subdivision of a State] may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction." *Boston Harbor*, 507 U.S. at 231. *See also Sprint Spectrum L.P. v. Mills, et al.*, 283 F.3d 404 (2d Cir. 2002). With EPCA, not only is there no language impliedly or expressly restricting proprietary interests but also the savings clause within EPCA 32919 clearly evinces Congressional intent to allow for the market participant doctrine as an exception to preemption. *See* 49 U.S.C. § 32919(c) ("A State or a political subdivision of a State may prescribe requirements for fuel economy for automobiles obtained for its own use.").[12] As for the plaintiffs' Clean Air Act claim, the Ninth Circuit found that the Clean Air Act "contains no language impliedly or expressly limiting states' proprietary action, and we decline to infer such a limit for the reasons just stated regarding § 209(a)." 498 F.3d at 1043.

Given that the market participant doctrine should apply, the TLC Rule is proprietary because it satisfies both of these alternative tests:

> First, state action is proprietary if it "essentially reflect[s] the [governmental] entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances." In these circumstances, the market participant doctrine "protects comprehensive state polices with wide application from preemption, so long as the type of state action is essentially proprietary." Second, the state action is proprietary if "the narrow

---

[12] Without citing any support, plaintiffs contend that the "for its own use" exception could not have meant to include state or local purchasing measures because the term purchasing is not used in this provision, while in another section of EPCA, reference is made to vehicles bought by federal executive agencies having to achieve a fleet average fuel economy standard. Pls.' Mem. of Law at 13-14. First, as indicated by *Boston Harbor*, the absence of a restriction on purchasing in EPCA 32919 is enough to allow for it. Second, the federal fleet purchasing requirement in 49 U.S.C. § 32917(b) was added so that federally-owned vehicles operating in US states and localities (*e.g.* postal trucks) did their part to conserve energy, consistent with EPCA's overall purpose of creating federal government programs that foster local measures. *See* 41 C.F.R. § 102-34.30. It was not meant to limit references to state and local measures elsewhere in EPCA to only non-purchasing programs.

> scope of the challenged action defeat[s] an inference that its
> primary goal was to encourage a general policy rather than address
> a specific proprietary problem."

*Engine Mfrs.*, 498 F.3d at 1041 (quoting *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999).

The TLC Rule meets the first test. As discussed above, New York City yellow cabs are a much-needed, integral part of the City's public transportation network. Salkin, ¶¶ 9-11. In addition, having the TLC auction medallions, license yellow cabs, and comprehensively regulate the industry is the most effective way to provide this service. *Id.*,¶¶ 6-8. Furthermore, for the same cost-saving measures that is "typical behavior of private parties in similar circumstances[,]"[13] the TLC Rule is expected to result in significant industry-wide gasoline saving that will increase the economic health of the City's taxicab fleet. Schenkman, ¶ 9. Finally, with respect to the City's own interest in being a proprietor, the Mayor's Office of Operations and the TLC played a substantial role by obtaining supply commitments from manufacturers and dealers. Salkin, ¶¶ 28-29.[14]

The TLC Rule also satisfies the second market participant doctrine test. The TLC Rule is limited only to purchase of yellowcab replacement vehicles from among 25 MPG Vehicles already produced and sold by manufacturers. *See Boston Harbor*, 507 U.S. at 232.

---

[13] Examples of corporate practices to save costs by purchasing fleets with better gas mileage include Wal Mart, Coca-Cola, Enterprise, Hertz, United Parcel Service, and Federal Express. *See* Defs. Exh. 4.

[14] That the TLC Rule may provide energy consumption and environmental benefits to the City about which Mayor Bloomberg and Commissioner Daus commented publicly -- neither of which benefits are listed in the Statement of Basis and Purpose but to which plaintiffs' repeatedly point, *see* Pls.' Mem. of Law at 3-4, 16-17 -- does not preclude the application of the market participant doctrine. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809 (1976) (holding the state's subsidy program to be proprietary even though the program's purpose was to protect the state's environment); *Engine Mfrs.*, 498 F.2d. at 1046 ("[t]hat a state or local governmental entity may have policy goals that is seeks to further through its participation in the market does not preclude the doctrine's application.").

**B.     The Presumption Against Preemption Applies**

**1.     The Congressional Purpose Of EPCA And CAA Was To Ensure Uniform Nationwide Fuel Economy And Air Emission Motor Vehicle Manufacturing Standards**

Even if this Court did not find the TLC Rule to be proprietary, "[i]n all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation and internal quotation marks omitted). *See also Boston Harbor*, 507 U.S. at 224; *Envtl. Encapsulating Corp. v. City of N.Y.*, 855 F.2d 48, 58 (2d Cir. 1988). Congressional intent "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Medtronic* at 485 (quotation marks omitted) "Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but also through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* at 486 (quotation marks and citation omitted). Following this approach yields the result that the presumption applies here.

First, the field of taxi regulation has traditionally been occupied by state and local government.[15] Here, the following, taken together, indicate that setting purchasing requirements

---

[15] Plaintiffs cite *Golden State Transit Corp v. City of Los Angeles*, 475 U.S. 608 (1986) (Golden State I) for the proposition that regulating taxis is not traditionally a matter of state concern in the face of preemption. Pls.' Mem. of Law at 14. However, that holding is limited only to a particular strand of statutory express preemption under the rubric of *Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976). Such *Machinists* preemption concerns areas where Congress intended economic behavior -- in the case of Golden State I, it was a taxi worker strike -- to be left unregulated by both federal or local government. *See* Golden State I, 475 U.S. at 614. Here, by contrast, both EPCA 32919 and CAA Section 209 are part of a cooperative federal-state scheme
Continued...

for New York City taxis is an exclusive police power of the City: (1) New York City Charter provisions creating the TLC to oversee taxicabs a part of the City's public transportation network; (2) the New York City Administrative Code provisions authorizing the TLC to conduct medallion auctioning, exclusively license taxis and drivers, and comprehensively regulate every aspect of the industry; and (3) decisions from New York courts about the TLC. *See* N.Y.C. Charter, §§ 2300, 2303; N.Y.C. Admin. Code §§ 19-501, 19-503, 19-504, 19-505, 19-531, 19-532; *Bonaby v. N.Y. City Taxi & Limousine Comm'n*, 2003 U.S. Dist. LEXIS 11864 at *12 (S.D.N.Y. July 10, 2003, Preska, J.); *Allway Taxi,Inc. v. City of New York*, 340 F. Supp. 1120, 1124 (S.D.N.Y.), *aff'd*, 468 F.2d 624 (2d Cir. 1972); Salkin, ¶¶ 5-8.

Second, the Congressional intent of neither EPCA nor CAA indicates a clear and manifest purpose to displace New York City's traditional taxi police power. Turning first to EPCA, Congress intended it to allow for federal government energy conservation programs that would complement, not hinder, state and local initiatives.[16] One such program was the creation of national vehicular fuel economy standards imposed on automobile manufacturers and dealers. *See* 49 U.S.C. §§ 32901 *et seq.* Consistent with this purpose, the preemption provision

---

for protecting automobile manufacturers where there is room for certain regulation at both levels. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243-44 (1959).

[16] "The Congress finds that - (1) the development and implementation by States of laws, policies, programs, and procedures to conserve and to improve efficiency in the use of energy will have an immediate and substantial effect in reducing the rate of growth of energy demand and in minimizing the adverse social, economic, political, and environmental impacts of increasing energy consumption; (2) the development and implementation of energy conservation programs by States will most efficiently and effectively minimize any adverse economic or employment impacts of changing patterns of energy use and meet local economic, climatic, geographic, and other unique conditions and requirements of each State; and (3) the Federal Government has a responsibility to foster and promote comprehensive energy conservation programs and practices by establishing guidelines for such programs and providing overall coordination, technical assistance, and financial support for specific State initiatives in energy conservation." 42 U.S.C. § 6321(a)

accompanying the fuel economy standards program -- EPCA 32919 -- was intended only to assure national uniformity for automobile manufacturers in the federal government's setting of those standards.[17] *See Green Mtn. Chrysler Plymouth Dodge Jeep. v. Crombie,* 508 F.Supp.2d 295, 354 (D. Vt. 2007) ("*Green Mtn.*") (EPCA 32919 preempts only laws that control or supercede a core EPCA function such as *setting* fuel economy standards); *Cent. Valley Chrysler-- Jeep, Inc. v. Goldstone,* 529 F.Supp. 2d 1151, 1174-76 (E.D. Cal. 2007) ("*Central Valley*") (EPCA 32919 should be construed as narrowly as possible and limited only to measures *establishing* fuel economy standards).

Similarly, according to the Congressional findings for the CAA, "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). *See Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"); *see also Green Mtn.,* 508 F. Supp. 2d at 350 ("Congress acknowledged that the regulation of air pollution from mobile sources was traditionally a state responsibility."). Thus, like EPCA 32919, CAA Section 209 is intended only to assure national uniformity of standards for manufacturers – here, tailpipe emissions.[18]

---

[17] Plaintiffs contend that Congress also intended that the average fuel economy standards be carefully drafted to not unduly limit consumer choice. Pls.' Mem. of Law at 8. Prior to the TLC Rule, 18 replacement vehicle options existed; with the TLC Rule, 12 options remain, plus wheelchair accessible vehicles. Thus, the TLC Rule accords with that intent. Salkin, ¶ 30.

[18] During the hearings leading up to the 1967 amendments, "[t]he auto industry ... was adamant that the nature of their manufacturing mechanism required a single national standard in order to eliminate undue economic strain on the industry." S. Rep. No. 403, 90th Cong., 1st Sess., 32 (1967). Auto manufacturers sought to safeguard "[t]he ability of those engaged in the manufacture of automobiles to obtain clear and

Continued...

In sum, application of the presumption against preemption to EPCA 32919 and CAA Section 209 means that neither provision can invalidate the TLC Rule unless it can be shown how the TLC Rule disturbs national uniform fuel economy or air pollution control standards imposed on automobile manufacturers. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (between a pro-preemption interpretation of a statute and a plausible anti-preemption alternative, the Court has a duty to accept the reading that disfavors pre-emption."); *Chrysler Corp. v. Tofany*, 419 F.2d 499 (2d Cir. 1969).

## 2.     Plaintiffs Have Failed To Rebut The Presumption

Plaintiffs have not shown how the TLC Rule disturbs the uniformity of either national fuel economy standards or national air pollution control standards. They have not addressed how the mere requirement that New York City taxicab owners purchase currently manufactured 25 MPG Vehicles *establishes* a fuel economy or air pollution control standard and coerces manufacturers to produce to it. And they have given no indication of how they will do so. In *Green Mtn.*, a bench trial involving engineers, air scientists, and others was necessary to prove these facts – and even then, preemption was not found. *See, e.g.*, 508 F.Supp.2d at 350-55. Absent such proof, plaintiffs have not shown a likelihood of success on the merits.

In fact, plaintiffs cannot make this showing. First, New York City taxi vehicle replacement likely generates demand for only a *de minimus* portion of new vehicles sold in the

---

consistent answers concerning emission controls," and to prevent "a chaotic situation from developing in interstate commerce in new motor vehicles." H. R. Rep. No. 728, 90th Cong., 1st Sess., 20 (1967). *Cf.* Air Pollution Control, Hearings on S. 306 before a Special Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 89th Cong., 1st Sess., 91 (1965) (Sen. Muskie) ("Do you think a given manufacturer could produce automobiles meeting 50 standards?"). *See Allway Taxi*, 340 F. Supp. at 1124 (confirming that uniform standards were intended not to "hamstring localities in their fight against air pollution but to prevent the burden on interstate commerce" from varying state and local measures "for the manufacture and sale of new cars.")

New York City market and likely none for the national market -- hardly enough to disturb the uniform national standards to which manufacturers must comply. Salkin, ¶ 17. Second, the TLC Rule lists only a requirement of 25 miles per gallon that automobile manufacturers nationwide already meet. Third, the automobile manufacturers -- the industry for whose protection EPCA 32919 and CAA Section 209 exists -- fully support the TLC Rule as evidenced by their supply commitments. Salkin,¶¶ 28-29.

### 3. The Supreme Court's Decision In *Engine Mfrs.* Accords With This Approach

The Supreme Court's remand in *Engine Mfrs.* defers to the presumption against preemption by acknowledging that some local new vehicle purchasing rules are not preempted by CAA Section 209. *See* 541 U.S. at 258-59; *see also* 541 U.S. at 263 (Souter, J., dissenting) (concluding that "Congress's object in providing for preemption [in Section 209 of the CAA] . . . was to prevent the States from forcing manufacturers to produce engines with particular characteristics as a legal condition of sale.")

### C. There Is No Express Preemption Under EPCA 32919

Two courts have addressed EPCA 39219, doing so only in the context of whether state-level greenhouse gas standards applicable to new vehicle manufacturers were sufficiently related to fuel economy standards for EPCA to preempt them. In both cases, express and implied preemption were not found. *See Green Mtn.*, 508 F.Supp.2d 295 (Vermont's regulations); *Central Valley*, 529 F.Supp.2d 1151 (California's regulations).

### 1. Plaintiffs Have Failed To Prove That The TLC Rule Is "Related To" Fuel Economy Standards

For plaintiffs to demonstrate express preemption under EPCA, they must show how the TLC Rule is directly and inextricably linked to fuel economy standards and, thus, conflict with EPCA 32919 -- something they cannot do.

In interpreting similarly worded preemption provisions in other federal statutes, the Supreme Court has emphasized that the term "related to" should not be read too broadly and should be interpreted with sensitivity to statutory context. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.'" *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* 514 U.S. 645, 655 (1995) ("*Travelers*"); *see also De Buono v. NYSA ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 812-16 (1997). Thus, courts "must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the [applicable federal] statute as a guide to the scope of the state law that Congress understood would survive." *Travelers,* 514 U.S. at 656.[19]

NHTSA -- the federal agency that establishes fuel economy standards -- agrees, acknowledging that EPCA's preemption provision must be construed narrowly: "EPCA's express preemption provision cannot be interpreted as preempting all State laws relating to a fuel economy standard, no matter how tangential the relationship." *See* Average Fuel Economy

---

[19] Plaintiffs mistakenly rely on *Morales v. Trans World Airlines, Inc.* and *Shaw v. Delta Air Lines, Inc.* -- cases concerning preemption under the Airline Deregulation Act of 1978 and ERISA -- to invoke an erroneously broad reading of "relate to" that is inapplicable to EPCA. *See* Pls.' Mem. of Law at 18. The Supreme Court's interpretation of the 1978 Aviation Act in *Morales* relied on earlier Court decisions interpreting "related to" language under ERISA. 504 U.S. 374, 383-87 (1992). The Supreme Court later disavowed those ERISA decisions in *Travelers* and ensuing cases, adopting a narrower construction of the phrase "related to." *See, e.g., Travelers,* 514 U.S. at 656; *De Buono,* 520 U.S. at 813-14; *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 335 (1997) (Scalia concurring, in contrast to his *Engine Mfrs.* opinion, that "applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.") (citations omitted). Further confirming that the broad interpretation of "related to" in *Morales* and its progeny does not apply to EPCA, the Supreme Court appears to be saying in *Rowe v. N.H. Motor Transp. Ass'n,* 128 S. Ct. 989 (2008) -- a case concerning the ADA's successor Federal Aviation Administration Act of 1994 -- that it cannot revert the entire jurisprudence of "relate to" preemption back to the *Morales* doctrine, but must limit it only to the Federal Aviation Administration and Authorization Act of 1994. Similarly, the Second Circuit's recent decision in *Air Transp. Ass'n of Am. v. Cuomo,* 520 F.3d 218 (2d Cir. 2008), addresses the 1994 aviation act and thus does not apply here.

Standards for Light Trucks Model Years, 2008-2011: Part II, 71 Fed. Reg. 17566, 17670 (April 6, 2006). As a result, the NHTSA "does not interpret EPCA's express preemption provision [§ 32919(a)] as preempting State emissions standards that only incidentally or tangentially affect fuel economy." *Id.* at 17669. Instead, NHTSA has taken "related to" in EPCA 32919 to mean "directly and inextricably linked to," a level to which the TLC Rule clearly does not rise. *Id.*

The TLC Rule cannot be preempted as "related to" fuel economy standards unless it actually interferes with Congress's objectives in enacting EPCA. *See Abdu-Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 82 (2d Cir. 1997) ("'Related to' appears to be developing, to some degree, to mean whether state law actually 'interferes' with the purposes of the federal statute . . . ."); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998). In other words, "related to" does nothing more than codify ordinary principles of conflict preemption. *See also Egelhoff v. Egelhoff*, 532 U.S. 141, 152-54 (2001) (Scalia, J., joined by Ginsburg, J., concurring) (Breyer, J., joined by Stevens, J., dissenting) (all interpreting a "relate to" clause as merely codifying ordinary field and conflict preemption principles).

Reading "related to" in this manner requires plaintiffs to prove that the TLC Rule is directly and inextricably linked to the setting of fuel economy standards and conflicts with EPCA's object and purpose. Plaintiffs cannot do that. The TLC Rule does nothing more than require taxicab owners, when replacing a vehicle, to purchase 25 MPG Vehicles already commercially available. It does not apply to automobile manufacturers or dealers, and it does not dictate any production or selling requirements. It neither purports to be nor is required to be the result of the elaborate calculation of average fuel economy for new motor vehicles performed by the federal Environmental Protection Agency ("EPA") and National Highway Traffic Safety Administration ("NHTSA") and subject to judicial review. *See* 49 U.S.C. § 32904 (incorporated

by reference in the definition of "average fuel economy" and "fuel economy" in 49 U.S.C. § 32901(a)); 49 U.S.C. § 32909. The TLC Rule is not related to fuel economy standards.

For plaintiffs to prove otherwise requires expert analysis from engineers, among others, on how the TLC Rule has the effect of conflicting with the fuel economy standards imposed on automobile manufacturers and coerces them to produce to a more stringent standard. *See Green Mtn.*, 508 F.Supp.2d at 301 (parties admitting at oral argument on dispositive motions that significant material facts were in dispute and required a bench trial and expert testimony). Relying on only the TLC Rule's reference to miles per gallon -- which is all plaintiffs do -- is simply not enough to prove express preemption. Pls.' Mem. of Law at 11.

### 2. Were EPCA 32919 To Preempt The TLC Rule, The City Is Exempted By The "For Its Own Use" Exception In 49 USC § 32919(c)

The phrase "for its own use" in EPCA 32919 is a statutory inclusion of the market participant doctrine. New York City taxis are uniquely part of the City's public transportation network such that purchasing requirements imposed on the industry are proprietary and for the City's own use. Any express preemption found under EPCA 32919 should thus be set aside

### D. There Is No Express Preemption Under CAA Section 209

### 1. Plaintiffs Cannot Prove That The TLC Rule Is A "Standard Relating To The Control Of Emissions From New Motor Vehicles"

The same "relate to" analysis discussed above applies here. Plaintiffs have not met their burden of proving how the TLC Rule is a "standard" that is directly and inextricably linked to the control of emissions from new motor vehicles. They have proffered only public comments from Mayor Bloomberg and Commissioner Daus about the air emission benefits that may result from the use of vehicles compliant with the TLC Rule. *See* Pls.' Mem. of Law at 3, 16. Similar to fuel economy standards, plaintiffs must have an air emissions expert prove how a local taxicab

purchasing requirement that references 25 miles per gallon, but says nothing about automobile tailpipe emissions, is an air emissions control standard. *See Green Mtn., supra.*

Moreover, the outcome in *Green Mtn.* confirms the obvious -- that EPCA and the CAA may overlap in places but are separate statutes authorizing separate agencies -- NHTSA for EPCA and EPA for CAA -- to promulgate separate regulations to address separate issues (*i.e.* fuel economy of automobile engine versus air emissions from an automobile's tailpipe). *See Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438, 1461-62 (2007) (two statutory obligations "wholly independent"). The contention that the TLC Rule bridges such a gap so that CAA Section 209 can preempt it is not credible.[20]

### 2. Were CAA Section 209 To Preempt The TLC Rule, The "Exclusive Licensee" Category Set Forth In The *Engine Mfrs.'* Judgment Applies

As addressed in Note 11 *supra* of the discussion on the market participant doctrine, *Engine Mfrs.* eventually led to a judgment stating that among the categories of fleet rules not preempted were those applicable to private actors who were exclusive licensees of local government. *See* Defs. Exh. 3. The New York City taxicab industry is an exclusive licensee of the City. Thus, CAA Section 209 cannot preempt the TLC Rule.

---

[20] Plaintiffs mistakenly rely on *Am. Auto Mfrs. Ass'n v. Cahill*, 152 F.3d 196 (2d Cir. 1998) for the proposition that the TLC Rule's miles per gallon purchasing requirement imposed only on New York City taxicab owners is tantamount to the preempted zero-emission vehicle ("ZEV") sales requirement imposed on all automobile manufacturers in New York State. However, the Second Circuit only found preemption under CAA Section 209 because "ZEV, after all, stands for 'zero-emission vehicle' and a requirement that a particular percentage of vehicle sales be ZEVs has no purpose other than to effect a general reduction in emissions." *Id.* at 200. The Second Circuit was able to determine that an emission standard like ZEV related to the air emission control standards covered in CAA Section 209, regardless of the rule being a sales requirement instead of a purchasing requirement. By contrast, the TLC Rule is not based on emissions but only refers to miles per gallon. It is intended to address driver gas costs and is not a statewide sales requirement imposed on automobile dealers. For these reasons, *Cahill* is distinguishable.

**E.     Neither EPCA 32919 Nor CAA Section 209 Impliedly Preempts The TLC Rule**

Implied field preemption may occur when, absent explicit statutory language, Congress intended the federal government to occupy a field exclusively. *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990)  Such intent must be "clear and manifest," where the field "includes areas that have been traditionally occupied by the States." *Id.* (quotations and citation omitted).  It is neither clear nor manifest that the intent of Congress in EPCA 32919 and CAA Section 209 was to preempt anything more than those state and local measures that would significantly disturb national uniform fuel economy and air emission standards for new motor vehicles for the benefit of automobile manufacturers.  Plaintiffs field preemption claim fails.

Similarly, implied conflict preemption may occur because either compliance with both laws is physically impossible or because the local law stands as an obstacle to the full purposes and objectives of Congress. *English v. General Elec. Co.*, 496 U.S. at 78-79.  The local action "is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" *Affordable Hous. Found., Inc. v. Silva* 469 F.3d 219, 241-42 (2d Cir. 2006) (citations omitted).  Evidence of actual conflict must exist. *Savage v. Jones*, 225 U.S. 501, 533 (1912).

No physical impossibility exists here because there is no federal statute or regulation pertaining to either fuel economy standards under EPCA or air emission standards under CAA with which *plaintiffs* must comply to create impossibility. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143 (1963).  Only manufacturers of new motor vehicles are subject to these two regulatory schemes – not New York City taxicab medallion owners required to purchase new replacement vehicles. *See* 49 U.S.C. §§ 32901 *et seq.*  Plaintiffs have offered no legal authority or factual proof to the contrary.  Moreover, the TLC Rule hardly stands as an obstacle to either EPCA fuel economy standards or CAA air pollution standards that the

preemption provisions in each of these statutes is designed to protect. The TLC Rule neither requires the manufacture of any vehicle model that does not already exist nor prohibits the manufacture of any vehicle model that does now exist.

## F.    The Article 78 Claim Is Time-Barred

Plaintiffs' claim that the TLC Rule violates Article 78 of the New York Civil Practice Law and Rules ("C.P.L.R.") is untimely. "[A] proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner or the person whom he represents in law or in fact." N.Y. C.P.L.R. § 217. For CAPA rulemakings, the date on which the rule becomes final and binding is 30 days after the date that the rule is published in the City Record. Charter § 1043. *See New York City Health & Hosps. Corp. v. McBarnette*, 84 N.Y.2d 194, 200-205 (N.Y. 1994) (challenges to administrative regulations are subject to Article 78). Here, that publication date was December 18, 2008, so the rule became final and binding on January 17, 2008. Salkin, ¶ 26. Thus, the statute of limitations ended four months later on May 17, 2008. Plaintiffs did not commence their action until they filed their Complaint on September 8, 2008. *See* Compl.; Fed. R. Civ. P. 3. Consequently, plaintiffs' Article 78 claim is untimely.

Plaintiffs cannot "do an end-run around the statute of limitations by attacking [events at the May 8, 2008 TLC hearing] instead of the regulation itself." *Matter of Coastal Communications Serv., Inc. v. New York City DoITT*, 44 A.D.3d 309, 843 N.Y.S.2d 23 (1st Dep't 2007) (*citing Best Payphones, Inc. v. DoITT*, 5 NY3d 30, 34-35 (N.Y. 2005)). Plaintiffs mischaracterize the May 8, 2008 TLC hearing as constituting a separate rulemaking when, at most, the hearing was held to monitor the prospective impact of the previously enacted rule. *Compare* Compl., ¶¶ 70-73, 148 *with* Salkin, ¶ 33. The potential, not borne out in fact, that the TLC had the authority to reconsider does not extend the statute of limitations for a determination

that was otherwise final and binding. *See Wechsler v. State of New* York, 284 A.D.2d 707, 726 N.Y.S.2d 760 (3d Dep't. 2001).

**G.     The Article 78 Claim Is Meritless**

Judicial review ends when there is a rational basis for the administrative determination. *See Sullivan Cty. Harness Racing Ass'n. v. Glasser*, 30 N.Y.2d 269, 277-78 (N.Y. 1972). The discussion about financial costs and vehicle safety shows that TLC reasonably considered cost, safety, and availability when promulgating the TLC Rule. The TLC Rule is rationally based.

**POINT III**

**THE BALANCE OF THE EQUITIES WEIGHS
AGAINST THE RELIEF PLAINTIFFS SEEK**

The equities balance decidedly in TLC's favor to deny a preliminary injunction. Plaintiffs should not be rewarded for dilatorily filing a federal court action and the TLC Rule should remain in effect as originally promulgated. Plaintiffs' failed to bring a timely challenge in state court, which provides a complete remedy for CAPA rulemaking grievances. A preliminary injunction also prejudices the City by compromising the value of the CAPA public participation process, by undermining TLC rulemaking, by delaying gas cost relief to taxicab drivers, and by preventing the City from meeting the commitments that automobile manufacturers and dealers made in setting aside a number of 25 MPG Vehicles for this program. *See* Salkin. Moreover, any health and environmental benefits from the TLC Rule would be delayed.

In addition, granting preliminary relief will be entirely unfair to those fleet owners and taxi cab drivers who have or are in the process of diligently complying with the TLC Rule. *See WPIX, Inc. v. League of Women Voters*, 595 F.Supp. 1484, 1494 (S.D.N.Y. 1984) (injunction would be unfair to other media outlets who diligently negotiated in advance ability to cover

presidential debates hosted by defendants). *See also* Freidman. Plaintiffs represent *less than* 25 percent of the taxi fleet. Salkin, ¶ 4. For these reasons, the equities favor the City.

**POINT IV**

**PLAINTIFFS' ALTERNATIVE REQUESTS FOR A PERMANENT INJUNCTION OR SUMMARY JUDGMENT SHOULD BE DENIED.**

Plaintiffs have moved not only for the preliminary injunction originally sought from the Court but also for a permanent injunction and summary judgment. Plaintiffs did not seek leave for this relief. *See* Pls.' Ltr. to Court, dated Sept. 9, 2008; Order, dated Sept. 15, 2008. Several of plaintiffs' arguments raise genuine issues of material fact for which expert and fact discovery is necessary and confirm that plaintiffs are not likely to succeed on the merits. *See* Defendants' Rule 56.1 Response. Treating this motion as one for a permanent injunction or summary judgment deprives the Court of a fully developed factual record. *See Nat'l Life Ins. Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir. 1975).

**CONCLUSION**

For the reasons stated above, plaintiffs' motion should be denied in its entirety.

Dated:    New York, New York
          October 6, 2008

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 6-145
New York, New York 10007
(212) 676-8517

By:    _____
       SCOTT PASTERNACK (SP3293)
       spastern@law.nyc.gov
       RAMIN PEJAN (RP1977)
       rpejan@law.nyc.gov
       Assistant Corporation Counsels