RICHARD D. EMERY
ANDREW G. CELLI
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
ILANN M. MAAZEL
ERIC HECKER
MARIANN MEIER WANG
SARAH NETBURN
KATHERINE ROSENFELD
O. ANDREW F. WILSON
ELIZABETH S. SAYLOR
KENNISHA A. AUSTIN
DEBRA L. GREENBERGER
ELORA MUKHERJEE

# EMERY CELLI BRINCKERHOFF & ABADY LLP

ATTORNEYS AT LAW
75 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10019

TELEPHONE
(212) 763-5000
FACSIMILE
(212) 763-5001
WEB ADDRESS
www.ecbalaw.com

May 22, 2009

**By Email and ECF**
The Honorable Paul A. Crotty, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Metropolitan Taxicab Board of Trade et al. v. City of New York et al.,*
**08 Civ. 7837 (PAC)**

Dear Judge Crotty:

We represent plaintiffs in the above-referenced case. We write to provide this Court with a summary of the evidence presented at the May 20, 2009 evidentiary hearing.

This Court ordered an evidentiary hearing "on the issue of whether the new lease cap rules ["New Rules"] provide 'meaningful alternatives' to taxicab owners or whether the rules leave owners with only one 'rational choice.'" Order, May 11, 2009 (Dct. 86) (quoting *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 193-94 (4th Cir. 2007)). At the hearing, plaintiffs presented overwhelming evidence that the New Rules leave owners with no rational choice other than to purchase hybrids. Defendants did not present any contrary evidence. Indeed, defendants' expert Prof. Rachel Weinberger admitted that if the New Rules are implemented, rational owners will purchase hybrids.[1]

Instead of addressing the question posed by this Court, defendants argue that the central question is whether taxi owners will still make some profit if they purchase Crown Victorias. Strunk Report at 6, Ex. T. Under defendants' experts' theory, "any amount over zero is sufficient to demonstrate that there is an economic profit and, therefore is not a mandate." *Id*. at 117.[2] Accordingly, Mr. Strunk stated that to determine if there was a mandate he only needed to

---

[1] Prof. Weinberger explained that the "natural decision" under the New Rules would be to purchase a hybrid because "while you can make a good business profit running your Crown Vic, you can make a better one running your hybrid." Hr'g Tr. at 127-28. She claimed there was "no force," however, because the owners could still make a profit running Crown Victorias. *Id*. at 127.

[2] Prof. Weinberger similarly said a fleet has a choice as long as it can make "an economic rent greater than zero." *Id*. at 125. While this is the incorrect standard, it is worth noting that many fleets would not make any profit under the New Rules. Ronart, for example, would suffer a loss of $2,241 per vehicle per year if it continued to operate

examine the costs and revenues associated with operating Crown Victorias – not the costs and revenues associated with operating hybrids. Strunk Report at 6, Ex. T.

As plaintiffs' experts Profs. James Levinsohn and Dean Karlan explained, this is the wrong question both as a matter of logic and as a matter of "basic economics." *Id*. at 6.[3] To understand what choices people will make, one must look at both alternatives. *Id*. at 6, 72-74. In response to this Court's questions, Prof. Weinberger admitted as much. She stated that if she had to choose between one tenant who would pay $200 per month and another who would pay $100 per month, she as "a reasonable business person . . . would make a reasonable business decision" and choose the person willing to pay twice as much. *Id*. at 126-27.

To determine what choice fleet owners would make if the New Rules were implemented, Prof. Levinsohn compared the profits an owner would make operating a Crown Victoria with the profits an owner would make operating a hybrid. He determined that once the New Rules were fully implemented, owners would conservatively earn between $5500 and $6500 less per car per year if they operate Crown Victorias instead of hybrids. Ex. 31; Levinsohn Report at 7-9, Ex. 32; Hr'g Tr. at 8-9. To put that number in context, he then compared the penalty of $5500 to the profits associated with operating a Crown Victoria. Compared to the $8518 Gotham currently makes operating Crown Victorias, the penalty (or "hit") is a 65% to 75% decline in profits. Levinsohn Report at 11-14, Ex. 32; Ex. 31; Hr'g Tr. at 8-9.[4] According to Prof. Levinsohn, "that's an easy choice. That's a choice that every rational actor would make: Go with the hybrid." Hr'g Tr. at 9.[5] Defendants did not present any contrary evidence.[6]

---

Crown Victorias once the New Rules were fully implemented. Ex. 31. Most likely, many (if not most) others would suffer a loss. Prof. Levinsohn's analysis, which was extremely conservative, concludes that the "penalty comprises a very significant amount of profits." Levinsohn Report at 14, Ex. 32. A less conservative analysis might have concluded that the New Rules would leave fleet owners without any profit.

[3] This is also not the legal standard. In *Fielder*, the state determined that large employers like Wal-Mart provided their employees with a substandard level of health care benefits, forcing many of them to depend on state-subsidized healthcare programs. 475 F.3d at 183. To reduce dependence on state-funded healthcare programs, the state passed a law requiring employers with 10,000 or more employees to pay at least 8% of their total payroll in health care benefits or pay the amount their spending falls short to the state. *Id.* All money paid to the state would be used only to fund state healthcare programs. *Id.* at 185. Because Wal-Mart (the only employer impacted by the law) already paid approximately 7% to 8% of its payroll on healthcare, Wal-Mart was left with the choice between increasing its healthcare spending by less than 1% or paying the state that money. *Id.*

Wal-Mart submitted an affidavit stating, like "any reasonable employer," it would pay the money to its employees – not the state – because paying its employees would increase their overall compensation and therefore result in "improved retention and performance of present employees and the ability to attract more and better new employees." *Id.* at 193. Relying on defendant Wal-Mart's declaration and simple logic, the court granted summary judgment to Wal-Mart holding that the challenged law "effectively mandates" employers to alter their healthcare plans because the "only rational choice" is to increase healthcare spending. *Id.* There was no evidence that Wal-Mart would not make a reasonable profit if it spent up to 1% more on health insurance. Wal-Mart's choice was the fulcrum of the court's analysis.

[4] If the $581 Gotham would make when operating Crown Victorias if the New Rules are fully implemented is compared with the $7,099 it would make when operating hybrids, the differential is 12 or 13 times. Hr'g Tr. 9.

[5] Even in the first year, "any rational fleetowner would choose to purchase hybrids." Hr'g Tr. 58-59; Ex. 31.

Instead, defendants attempted to undermine plaintiffs' analysis by asserting it was unreliable because the profit data was from less than 20% of the affected vehicles.[7] Prof. Levinsohn explained that he was confident with his conclusions even though he did not have data from all the affected fleets because:

(1) He "consistently made choices so as to the err on the side of being conservative, which in this case means not finding a mandate." Hr'g Tr. at 10, 12-13, 38; Levinsohn Report at 9-11 (providing examples), Ex. 32;

(2) The largest cost – the opportunity cost of the medallion – does not vary across the fleets. Another large cost, the cost of the car, does not vary much across the fleets. Hr'g Tr. at 11;

(3) He was able to verify many of the costs through publicly available information. Hr'g Tr. at 12; Levinsohn Report n. 27, n. 28, n. 38, n. 50, App. C, App. E, Ex. 32; and

(4) "[T]he findings are very robust." He ran "lots of sensitivity analysis" such as "what if [m]edallions were a lot less expensive, what if costs were twice as much." Hr'g Tr. 44. His conclusion that this was a mandate would not even change if his "profit estimates were off by a factor of 2." *Id*. at 11.

Prof. Levinsohn explained: "This is a case where the decision is – is not close to the line." *Id*. at 44.

Defendants also claimed that plaintiffs did not have information concerning a number of important factors. *See* Strunk Report at 14-16, 20-21. They are wrong. Prof. Levinsohn's detailed analysis took into account many of those factors. The remaining are not relevant to the question at hand, or would only make plaintiffs' case stronger. Hr'g Tr. at 13-15. His analysis took into account capital and operating expenses, overhead costs reasonably attributable to Crown Victorias, the interest rate, the reasonable rate of return, and depreciation. Hr'g Tr. at 13-14; Levinsohn Report at 5-6, 12-14, n. 35, App. C, & App. E, Ex. 32. And, as Prof. Levinsohn explained, debt-equity levels, the amounts fleet owners paid for their medallions historically, tax rates, and the demand side of the market are "nonissue[s]." Hr'g Tr. at 13-14, 30-34; *see also id*. at 89.

---

[6] Nor could they without contradicting their prior sworn statements. TLC Assistant Commissioner Peter Schenkman stated in his October 2008 declaration that "the cost of owning and operating a 25 mpg vehicle is comparable to, if not less than, that of a Crown Victoria." Schenkman Decl. ¶¶ 4-14 (capitalization omitted), Ex. 29; *see also* Pls. Br. at 6 n. 8; Ex. 7 (estimating that operating hybrids cost only $2000 per year per vehicle more to operate). If Prof. Levinsohn had used the TLC's hybrid costs estimates, the penalty for operating a Crown Victoria would be twice as much – and the mandate therefore even clearer. Levinsohn Report at 11, Ex. 32.

[7] Defendants' expert Prof. Weinberger admitted, however, that Dr. Levinsohn "did a very nice piece of work in a very short amount of time." *Id*. at 123.

Defendants also contended that plaintiffs should not have considered the opportunity cost of the medallion when determining fleets' costs because that cost does not always show up on an accounting statement. This misses the point. When making decisions about future purchasing patterns, rational business persons must consider, among other things, the opportunity cost of the medallion – a figure that might be absent from an accounting statement, but which is critical to any rational fleet owners' decision making process. Hr'g Tr. at 24 (ignoring the opportunity cost of the medallion is like "[p]retending the medallions are free" and "makes no sense"); *id*. at 17 ("Economic profit [not accounting profit] is the basis on which one should make economic decisions."); *id*. at 65 ("Economic profit is the concept that accurately captures the foregone opportunities."). In any event, because many fleets lease their medallions (and again to be conservative), Prof. Levinsohn conducted his analysis using the lease costs instead of the medallion values. *Id*. at 12, 22-23; Levinsohn Report at 13, Ex. 32. The costs of leasing medallions would show up on any accounting statement. *Id*. at 64-65.

Defendants also questioned why fleet owners have purchased hybrids if, according to Prof. Levinsohn's analysis, they take a "hit" of approximately $3400 per vehicle per year by doing so. First, it is important to note that the four fleets that have purchased a significant number of hybrids, all did so only *after* obtaining a significant number of alternative-fuel medallions.[8] These fleets continued purchasing hybrids (and others purchased small numbers of them to test them) because after the mayor announced the hybrid mandate in April 2007, Ex. 18 at 3, they reasonably thought hybrids would soon be mandated. Wanderman Decl. ¶ 9, Dct. 65; Levine Decl. ¶ 11, Dct. 66; Rosenzweig Decl. ¶ 6, Dct. 67.[9] As Prof Levinsohn explained, it is rational to "incur the costs now and get a leg up, figure out how to maintain them, get some experience with them." *Id.* at 49; *accord id*. at 60-61.[10] Michael Wanderman explained that Gotham "has continued to run Escape Hybrids, despite their additional expenses, out of concern that the City is going to continue to take all necessary steps to mandate that taxi fleets convert to hybrids." Wanderman Decl. ¶ 9; *see also* Hr'g Tr. at 48, 61 (explaining that fleet owners

---

[8] The Weingerber Report, at 8, lists the four fleet owners who have purchased a substantial number of hybrids – Gotham, Downtown Taxi Management LLC, Tunnel Taxi Management, and Woodside Management Inc. Gotham operates 34 alternative-fuel restricted medallions. Wanderman Decl. ¶ 8, Dct. 65. A review of the TLC and Department of State web sites shows that the other three companies are operated by Evgeny Friedman, who operates 36 alternative-fuel restricted medallions. *See* Friedman Reply Decl. ¶ 2, Dct. 84; N.Y. Department of State web site, http://www.dos.state.ny.us/corp/ (showing all three companies have the address of record of 313 Tenth Avenue); TLC web site, http://www.nyc.gov/html/tlc/html/current/current_licensees.shtml (showing 28th Street Management, which is the agent for the three companies, is located at 313 Tenth Avenue).

[9] Some fleet owners also recently purchased hybrids because Crown Victorias were unavailable between approximately September 2008 and February 2009. Levine Decl. ¶ 11, Dct. 66.

[10] Prof. Karlan made the same point. He explained that some fleet owners may have bought hybrids to save on "research costs." Hr'g Tr. at 84-85. "This is someone who is basically looking down the path in anticipation of the regulatory changes, making the switch-over so he can get a step up in how to handle hybrids, how to maintain them and operate them, etc." *Id*; *accord id*. at 86-87. Those with hybrids due to alternative fuel medallions may also purchase more because there are savings due to "economies of scale." *Id*. at 84-85. Indeed, Michael Wanderman testified that Gotham's costs of operating hybrids have decreased as its "mechanics have gained more experience fixing the Escape Hybrids in-house." Wanderman Decl. ¶ 19, Dct. 65); *see also* Levine Decl. ¶ 23, Dct. 66; Friedman Decl. ¶ 5, Oct. 3, 2008 (submitted by the City), Ex. 30.

purchased "these hybrids fully expecting the rules to change" and continue to purchase them "because of the uncertainty in the regulatory market").[11]

Finally, defendants assert that the New Rules are not a mandate because they are intended to correct a distortion in the market. Weinberger Report at 5-7. Even if this were defendants' intent,[12] the New Rules would still be preempted because they effectively mandate the purchase of hybrids. In any event, defendants do not correct the market – they distort it. *See* Levinsohn Report at 20-24, Ex. 32; Mundy Report ¶¶ 37-44, Ex. 33; Pls. Reply Br. at 9-10.

The New Rules unfairly penalize fleet owners. *See* Levinsohn Report at 14-16, 20-24, Ex. 33; Mundy Report ¶¶ 33-36, Ex. 33. In 2004, after a careful analysis of owner costs and driver income, the lease caps were raised (modestly) in order to account for the increased costs associated with newly mandated technology and the more-expensive stretch Crown Victoria. Mundy Report ¶¶ 29-32, Ex. 33. They have not been raised since. *Id*. The current lease caps are therefore based on the costs (in 2004) of operating Crown Victorias; they do not take into account the increased costs associated with operating hybrids.[13] Even though the only evidence before the TLC showed that fleets' costs had increased since 2004, the TLC seeks to dramatically *decrease* the lease rate for Crown Victorias.[14] The TLC seeks to do so even though it admits it did not take costs into consideration. Oral Arg. Tr. at 31. Indeed, the TLC changed its rules so that it could make lease cap decisions based on "policy considerations" instead of costs. *Compare* TLC Rule § 1.78(e) *with* § 1.78.1(b), Ex. 2. As defendants' expert admitted, that is highly unusual. Hr'g Tr. at 120. He did not know of another regulated industry in the United States that did not take into account costs before setting rates. *Id*. at 121.[15]

---

[11] Defendants also continued to contend that the past purchasing patterns of drivers who own their own vehicles demonstrate that many fleet owners will purchase Crown Victorias under the New Rules. Weinberger Report at 7-8, Ex. U. Prof. Levinsohn's expert report explains in detail why this analogy is not useful. Levinsohn Report at 16-19, Ex. 32; *see also* Karlan Report at 6, Ex. 34; Pls. Reply Br. at 2-3.

[12] As plaintiffs explained in detail previously, the goal of removing a structural disincentive and equalizing driver income is a pretext. Pls. Br. at 7-10, 25-26; Pls. Reply Br. at 9-10. Irrespective of purpose, the New Rules are preempted because they effectively mandate the purchase of hybrids. Pls. Br. at 13-18, 20-23; Pls. Reply Br. at 10 & n.11; *see also Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 104-108 (1992) (holding that a statute with a dual purpose – one preempted, one not – is preempted if it has a substantial effect in the preempted area).

[13] In addition to attempting to lower the lease caps by $12 for Crown Victorias, on March 26, 2009, the TLC also effectively lowered the lease caps by $3 per shift for all vehicles because it prohibited fleet owners from charging drivers sales and car rental tax (which is approximately $3 per shift) over and above the lease cap. TLC Rule § 1.78(a)(4), Ex.2; Mundy Report ¶ 38, Ex. 33; Levinsohn Report at 13, n.41 & App. D, Ex. 32. Fleet owners operating hybrids therefore did not see their lease income increase due to the $3 hybrid incentive; the $3 hybrid incentive simply returned hybrid operators to the status quo. The $3 incentive and $12 disincentive is for all practical purposes a $15 disincentive once the tax change is taken into account.

[14] Indeed, the $12 reduction per shift is approximately the average amount the lease caps have been raised since 1997. *See* Mundy Report ¶¶ 25-32, Ex. 33.

[15] He said, however, that rate making in Canada is done without a consideration of costs. *Id*. But while Canada does take into account policy considerations, it also considers costs when setting rates. Canada's Energy and Utilities Board Act provides that it may set rates "without regard to methods based strictly upon the cost of service, rate base and rate of return." It may look at other factors, such as profitability, alternative forms of regulation, or other methodologies that deviate from a strict cost-based analysis. And it may issue an order that it considers

As set forth above, plaintiffs have presented (materially uncontested) evidence that overwhelming demonstrates that the New Rules will leave fleet owners with no rational choice other than to purchase hybrids.  They therefore have more than met their burden of showing that it is more likely than not that the New Rules effectively mandate the purchase of hybrids.

Respectfully submitted,

/s/

Richard D. Emery

c. Ramin Pejan (by email and ECF)

---

"necessary in the public interest."  *See* Energy and Utilities Board Act §§ 66-67 (available at http://www.gnb.ca/0062/PDF-acts/e-09-18.pdf ).