USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 22, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X

METROPOLITAN TAXICAB BOARD OF TRADE;       :
MIDTOWN CAR LEASING CORP.; BATH CAB CORP.;
RONART LEASING CORP.; GEID CAB CORP.;       :
LINDEN MAINTENANCE CORP.; and ANN TAXI INC,
                                             :

        Plaintiffs,                          :          08 Civ. 7837 (PAC)

                                             :
        -against-
                                             :          OPINION & ORDER

CITY OF NEW YORK; MICHAEL R. BLOOMBERG,
in his official capacity as Mayor of the City of New York;       :
THE NEW YORK CITY TAXICAB & LIMOUSINE
COMMISSION ("TLC"); MATTHEW W. DAUS, in his       :
official Capacity as Commissioner, Chair, and Chief
Executive Officer of the TLC; PETER SCHENKMAN,       :
in his official capacity as Assistant Commissioner for Safety
& Emissions of the TLC; and ANDREW SALKIN, in his       :
official capacity as First Deputy Commissioner of the TLC,
                                             :

        Defendants.
                                             :
------------------------------------------------------------------------------X

        HONORABLE PAUL A. CROTTY, United States District Judge:

        This case involves a dispute between New York City taxicab fleet owners and the City's

Taxicab & Limousine Commission ("TLC"), relating to new TLC regulations that promote the

purchase of hybrid taxicabs by reducing the rates at which taxicab owners may lease their

vehicles to taxi drivers—thus reducing the owners' overall profit—if the vehicle does not have a

hybrid or clean-diesel engine.  The questions in this case are whether the TLC's new rules are a

mandate to taxicab owners to purchase only hybrid or clean-diesel vehicles, and whether such a

mandate is preempted by federal law.

        The history of this case is relevant: on October 31, 2008, the Court preliminarily enjoined

New York City's requirement that all new taxicabs meet a specific miles-per-gallon ("mpg")

rating.  The mpg regulation required taxicab owners in New York City to purchase vehicles with

hybrid or clean-diesel engines, or wheelchair-accessible vehicles.  The Court found that the

federal Energy Policy and Conservation Act ("EPCA") preempted the local imposition of mpg

standards.  The City immediately announced it would pursue an alternative strategy.  Mayor

Bloomberg stated that, "The courts are not the only way we can reach our goal of a cleaner fleet

of taxi cabs.  Greening the taxi fleet is a major priority, and we are going to use every

mechanism at our disposal to make New York a cleaner, healthier city."[1]

The City pursued a regulatory framework that would encourage taxicab fleet owners to

buy hybrid taxicabs in increasing numbers and discourage them from purchasing long bodied,

conventionally powered taxicabs, which the City had approved for use in 2001.  Under the City's

new rules, if an owner purchases a taxicab with a hybrid or clean-diesel engine (hereinafter,

"hybrid"), the rate at which the vehicle can be leased to a driver for a 12-hour shift is increased

by $3.  By contrast, if an owner leases out a non-hybrid, non-wheelchair accessible vehicle (i.e. a

Crown Victoria), the maximum lease rate an owner may charge a driver is reduced by $4

immediately, $8 in May 2010, and $12 in May 2011.  The new rules substantially reduce profits

for the owner who continues to choose non-hybrid taxicabs, and Plaintiffs challenge the

disincentive aspect of the new regulations.

The City explained its desire for the new regulation:

> Last month, we hit a speed bump in our efforts to turn New York City's
> yellow cabs green when the courts upheld an archaic law, preventing us
> from reducing greenhouse gases and improving air quality . . . By offering
> incentives that will encourage more taxi fleet owners to purchase hybrids,
> we have found another avenue to reach our goal of greening our yellow
> cabs, improving our air quality, and reducing our carbon emissions.

---

[1]    Bill Sanderson, Fed Red Light on Mike in "Green Cab" Fight, N.Y. Post, Nov. 1, 2008, at 2.

<u>See</u> Press Release, Office of the Mayor, Mayor Bloomberg Announces New

Incentive/Disincentive Program to Reach Goal of Green Taxi Fleet (Nov. 14, 2008).  The same

press release quoted TLC Commissioner Matthew Daus as stating:

> Our goal from the beginning was to get fuel efficient taxis on the road
> using whatever appropriate methods required to achieve our goal.  The
> new program will incentivize the purchase of cleaner vehicles, while
> ensuring taxi drivers are not penalized because a taxicab owner is reluctant
> to make the wiser purchase of a hybrid vehicle.  The 1,551 hybrid taxicabs
> already on the road have saved their drivers lots of money, while
> contributing to cleaner air.  This incentive package will help us take these
> advances to the next level, and help our city become a cleaner, healthier
> place.

<u>Id.</u>

After several months of study, the TLC promulgated the new regulations.  The

regulations: (1) eliminated the prior requirement that determination of lease rates and changes

thereof be based on costs, and substituted policy concerns as the key criterion for determining

lease rates; (2) described the incentives for hybrids (higher lease rate) and the disincentives for

conventionally powered taxicabs (lower lease rates, in increasing amounts over the next two

years); and (3) did not grandfather taxis purchased by owners subsequent to 2001, when the City

began mandating taxicabs with Crown Victoria dimensions.

The City states that the new regulations correct a structural disincentive that prevented

many taxicab owners from switching their fleets to hybrid vehicles, while also meeting the goal

of improving taxicab fuel efficiency and minimizing the effect of taxicab emissions on the

environment.

The Mayor announced the new regulations:

> We have never let roadblocks prevent us from achieving our goals.  So
> when the courts prohibited New York City from taking forward-looking
> actions that would create cleaner air and a healthier place to live, we said
> we would find another way to continue to green the City's yellow cabs –

> and we have.  Today's actions by the Taxi and Limousine Commission
> provide financial incentives for the purchase of fuel efficient taxis and will
> speed up the phase-out of older, inefficient vehicles.  Taxi fleet owners
> will have more reason to purchase cleaner vehicles and taxi drivers will be
> held financially harmless for the vehicle purchase decisions of fleet
> owners.  The result will be more clean taxis on City streets.  Turning
> yellow cabs green will be another step towards improving our air quality,
> reducing the use of fossil fuels and lowering our carbon emissions.

<u>See</u> Press Release, Office of the Mayor, Statement of Mayor Bloomberg on Passage of Green

Taxi Incentives by the Taxi and Limousine Commission Board of Commissioners (Mar. 26,

2009).

The TLC Commissioner echoed and amplified the Mayor's remarks:

> It is good public policy to incentivize the purchase of vehicles that will
> help us to clean our environment, while equalizing the playing field for
> drivers who have no say in the kinds of vehicles they drive, and how big a
> role fuel costs play in their income.  With more than 15% of the city's taxi
> fleet already clean-fueled, this was the right thing to do, and it was the
> right time to do it.

<u>See</u> Press Release, TLC, NYC Taxi and Limousine Commission Approves Hybrid Incentive Plan

(Mar. 26, 2009).

Plaintiffs filed an Amended Complaint challenging the City's revised regulations and

now bring a motion for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of

Civil Procedure, to enjoin the City's enforcement of the rules.

At the beginning it is appropriate to point out what this case is not about.  No one

questions the desirability of fuel efficient and environmentally "clean" vehicles; all parties agree

that the City's pursuit of these goals is laudable.  Nor is there a question whether New York City

can incentivize the purchase of certain types of taxicabs.  Several years ago the City issued new

taxi medallions which were limited to hybrid vehicles. <u>See</u> N.Y. City Administrative Code § 19-

532(b) (2003).  There was no challenge to the incentive.  Recently the City extended the service

life of hybrid vehicles from three to five years. Id. § 19-535(b) (2006).  Again, there was no challenge to this incentive.  Similarly, in the present case, Plaintiffs do not challenge the $3 per shift "incentive" increase in lease rates for hybrid taxicabs.

On the other hand, there is no doubt that the City could not demand that new motor vehicles purchased, sold, or operated in New York City meet certain mileage or emission standards.  The City does not contend otherwise.  The issue in this case is more limited and the question is more focused: do the new lease cap regulations have the preempted effect of mandating that taxicab owners purchase only taxicabs with hybrid or clean diesel engines.

The Court's purpose is not to interfere with government officials taking actions in the public interest.  Increasing the number of hybrid taxicabs is an appropriate and important governmental priority.  Congress, however, has exercised its powers and imposed both national fuel efficiency and engine emissions standards.  Congress also directed that the federal standards controlled and preempted state and local governments from acting where Congress has already spoken.  If the new rules are in fact a mandate, the Court must determine whether the City's program interferes with the Congressional intent to preserve exclusive jurisdiction.  This involves two questions.

The Court first must determine whether the City's new lease cap regulations are a mandate to purchase hybrid vehicles.  Plaintiff taxi owners say that they have no real choice under the proposed rules; they will be forced to buy only hybrid vehicles to sustain economic viability.  The City maintains that the new lease cap rules permit owners to continue to make a profit, and, therefore, taxicab owners still have a choice.  Second, the Court must determine whether the new rules, if they are in fact a mandate, are "related to" mileage or emission standards so that the City's law is preempted by federal law governing those two issues.

The Court finds that Congress intended to retain control over those two federal interests. The effect of the new regulations is to mandate taxicab owners to buy only hybrid vehicles. The requirement is preempted in the same way as the City's earlier attempt to impose mpg requirements. Plaintiffs have demonstrated a likelihood of success in showing that: (1) the new regulations are preempted by federal law because they are a de facto mandate to purchase hybrid taxicabs; and (2) these requirements are related to fuel economy standards under the EPCA and the control of emissions under the federal Clean Air Act ("CAA"). Accordingly, the Plaintiffs' motion for a preliminary injunction is GRANTED.

## BACKGROUND

### I. The Court's Prior Decision

In September 2008 the Plaintiffs[2] moved to enjoin TLC Rule § 3.03(c)(10)-(11), which required all new taxicabs in New York City to be either wheelchair accessible or to have a minimum city rating of 25 mpg by October 1, 2008,[3] and a minimum city rating of 30 mpg by October 1, 2009 (hereinafter, the "25/30 Rules"). (See Declaration of Elizabeth Saylor ("Saylor Decl.") Ex. 1 (containing enjoined TLC Rule § 3-03(c)(10)-(11)).) The only vehicles that met the 25/30 Rules contained hybrid or clean-diesel engines. Plaintiffs argued that the 25/30 Rules were preempted by the EPCA and the CAA.[4] Plaintiffs claimed irreparable injury because the EPCA and CAA provided no private right of action, and accordingly they would be unable to recover their financial damages under 42 U.S.C. § 1983, unless the Court issued an injunction.

---

[2]    The Plaintiffs in the original action are not the same Plaintiffs in this action, although there is some overlap.
[3]    The City suspended implementation of the prior rules until November 1, 2008, so that the parties and the Court could properly brief and consider the dispute.
[4]    The EPCA preemption clause says that a state or political subdivision of a state may not "adopt or enforce a law or regulation related to fuel economy standards . . . ." 49 U.S.C. § 32919(a). The CAA preemption clause says that no state or political subdivision of a state "shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines . . . ." 42 U.S.C. § 7543(a).

On October 31, 2008, the Court found that the EPCA preempted the 25/30 Rules because the rules, by their own language, clearly related to fuel economy standards by setting fuel economy standards for taxicabs. See Metro. Taxicab Bd. of Trade v. City of New York, No. 08 Civ. 7837 (PAC), 2008 WL 4866021, at *9 (S.D.N.Y. Oct. 31, 2008). The Court rejected the City's argument that the 25/30 Rules were not preempted because they did not actually interfere with the goals of the EPCA. The Court, relying on Engine Manufacturers Association v. South Coast Air Quality, 541 U.S. 246 (2004), found that allowing one municipality to affect fuel economy standards could have an unwanted aggregate affect, if other states or municipalities followed suit. See Metro. Taxicab, 2008 WL 4866021, at *10 (citing Engine Mfrs., 541 U.S. at 255.) The Court found that the CAA did not preempt the 25/30 Rules, however, because the rules were silent concerning emissions. The Court examined two cases that discussed the interplay between the EPCA and the CAA, and determined that even if emissions reduction was a secondary consequence of the rules, it did not follow that the rules were automatically preempted. Id. at *13-14 (analyzing Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie, 508 F. Supp. 2d 295 (D. Vt. 2007), and Central Valley Chrysler-Jeep, Inc. v. Goldstene, 529 F. Supp. 2d 1151 (E.D. Cal. 2007)). Because the EPCA preempted the 25/30 Rules and Plaintiffs would suffer irreparable harm, the Court issued a preliminary injunction.

## II.  The New Regulations

On March 26, 2009, the TLC repealed the 25/30 Rules and enacted new regulations. The new regulations, TLC Rule § 1-78(a)(3), created incentives to increase taxi owners' use of hybrid vehicles and disincentives to decrease their use of Crown Victoria model taxicabs. When fully implemented the regulations weighted the disincentives four times greater than the incentive. The Crown Victoria Long Wheel Base model ("Crown Victoria") has been the dominant model

for New York City taxicabs since the TLC approved it for use in 2001.  From 2001 to 2005, it was the sole vehicle that complied with TLC specifications for taxicabs.  (See Declaration of Andrew Salkin ("Salkin Decl.") ¶ 5.)  Of the more than 13,000 yellow taxicabs, approximately 2,060 (16%) are either hybrid or clean-diesel vehicles, while the balance of the remainder are Crown Victorias. (Id. ¶¶ 4, 8.)

The new regulations affect the maximum lease rate that vehicle owners may charge drivers leasing a taxicab per 12-hour shift.  The prior rules set a maximum lease rate of: $105 for all day shifts; $115 for the night shift on Sunday, Monday, and Tuesday; $120 for the night shift on Wednesday; and $129 for the night shifts on Thursday, Friday, and Saturday. See TLC Rule § 1-78(a)(1).  The standard lease cap for one shift for a week period is a maximum of $666. Id. § 1-78(a)(2).

The challenged regulation, TLC Rule § 1-78(a)(3)(ii) (hereinafter, "Lease Cap Rules" or "Rules"), reduces the maximum lease cap for all taxis not hybrid or clean diesel, or wheelchair accessible.[5]  The first reduction of $4 per shift was to go into effect on May 1, 2009.[6]  The reduction is increased to $8 per shift on May 1, 2010; and to $12 per shift on May 1, 2011. Id. § 1-78(a)(3)(ii).  The Rules also reward use of hybrid vehicles by increasing the maximum lease cap for hybrid taxicabs by $3 per shift. Id. § 1-78(a)(3)(i).  As indicated, Plaintiffs do not challenge the incentive aspect of the Lease Cap Rules, which have taken effect.

The new Rules provide that taxi owners receive the $3 lease cap upward adjustment if they "hack up," or transform, their taxicab pursuant to the specifications in TLC Rule § 3-03.1, which describes hybrid electric taxicab specifications.  The Rules define a hybrid vehicle as a

---

[5]     As previously stated, the Court uses the phrase "hybrid" to include all taxis with hybrid or clean diesel engines.  The lease rates for wheelchair-accessible vehicles are unchanged under the Lease Cap Rules. (See TLC "Statement of Basis and Purpose.")

[6]     Upon the Court's Order, the City suspended implementation of § 1-78(a)(3)(ii) until July 1, 2009.

"commercially available mass production vehicle originally equipped by the manufacturer with a combustion engine system together with an electric propulsion system that operates in an integrated manner." Id. § 3-03.1(b).  The only vehicles that meet the new requirement are in fact the same hybrid vehicles that met the City's now abandoned 25/30 Rules.  The City recognizes that its new regulatory mechanism "operates within the same universe of approved vehicles." (See Defendants' Letter Brief of May 22, 2009 ("Def. May 22, 2009 Letter") 5.)

### III. Promulgation and Stated Purpose of the Lease Cap Rules

At the same time that it enacted the Lease Cap Rules, the TLC also rescinded a rule, in place since 1997, prohibiting the TLC from reducing the maximum lease rate unless the TLC found "substantial evidence of reduced operating expenses of the affected medallion owners." Id. § 1-78(e).[7]  After eliminating the requirement for a cost-based rate determination, the TLC substituted "the Commission's assessment of appropriate policy considerations" for determining lease rates. Id. § 1-78.1(b).  These two rule changes rescinded the TLC's longstanding "cost-based" approach for enacting lease cap adjustments and permitted a "policy-based" approach.

---

[7]    The full text of the rescinded § 1-78(e) is:

> The Commission shall not lower any upper limitation of lease rates established in Rule 1-78 herein, unless in the view of the Commission, the record before the Commission includes substantial evidence of reduced operating expenses of the affected medallion owners.  The Commission shall not raise any upper limitation of lease rates established in Rule 1-78 herein, unless in the view of the Commission, the record before the Commission includes substantial evidence of increased operating expenses of the affected medallion owners.  The factors to be reviewed in consideration of any proposed increase in the upper limitation of lease rates shall also include, but not limited to [sic], the effects on driver earnings and the retention of experienced drivers.

TLC Rule § 1-78(e) (emphasis added).

As anticipated by the City's press releases of November 2008 and March 2009,[8] the TLC's "Statement of Basis and Purpose" for the new Lease Cap Rules is to replace the enjoined rules in order to "create incentives for taxicab owners to buy cleaner vehicles." (See Declaration of Ramin Pejan ("Pejan Decl.") Ex. J.)  The statement continues by noting that the Rules "are intended to place gasoline costs on the owner who chooses the vehicle," rather than on the driver, who pays gasoline costs but "may have no voice in the owner's choice of vehicles." Id.  Under the new Rules the costs to the driver will be roughly equal between driving a hybrid and non-hybrid vehicle, while the lease income to owners of non-hybrid taxis will be reduced, according to the TLC.[9] Id.

The Lease Cap Rules create a $15 spread by 2011 between what owners of hybrid taxicabs and owners of Crown Victorias may charge in maximum lease rates per vehicle per shift.  The City states that the Lease Cap Rules correct a structural disincentive in the current rules that prevented many taxi owners from transitioning to hybrid vehicles. (See Salkin Decl. ¶ 32.)  This disincentive existed because taxi drivers, not owners, pay for gasoline, and it costs more to transform a hybrid vehicle into a taxi.  Accordingly, because the gas costs are irrelevant to taxi owners, many owners choose the cheaper and time-tested option of hacking up Crown Victorias.

The TLC determined that the incentive rate for hybrids should be based on Plaintiffs' representations in the prior Metropolitan Taxicab case that it costs approximately $6,000 more to

---

[8]    The Court, in its prior decision in this case, "limited its review to the stated purpose of the [25/30 Rules], as published in the City Record." See Metro. Taxicab, 2008 WL 4866021, at *14.  The City Record specified fuel efficiency standards which were clearly related to federal requirements.  Here, however, the regulations refer to "hybrids" and are silent on their "relatedness" to either fuel economy or emissions.  That silence does not end the inquiry and the Court will examine the full record, including public statements, to determine the meaning of the new rules.

[9]    The City's sensitivity to the impact of fuel costs on taxicab drivers' income does not appear to be consistent with the TLC's denial last year of the New York Taxi Workers Alliance's request for a fuel surcharge to offset the impact of rising gasoline costs.  The TLC found that even with the higher gasoline costs, taxicab drivers made a living wage. (See Salkin Decl. ¶ 15; Pejan Decl. Ex. I.)

purchase and hack up a hybrid vehicle as compared to a Crown Victoria. (Salkin Decl. ¶ 26.) Dividing $6,000 by three years, the statutory life of a taxicab, is $2,000.  That figure divided by the maximum number of shifts per year, 730, equals approximately $2.75 per shift, which the TLC rounded up to $3. (Id.)  By allowing hybrid taxi owners to charge this extra $3 per shift, those owners would recoup the additional cost of changing to hybrid cars, according to the TLC. (Id.)[10]

To calculate the $12 reduction in lease rates, the TLC shifted from the capital cost of "hacking up" a vehicle to the cost of gasoline in New York City during a two-year period from December 11, 2006, to December 8, 2008, which was $3.05 a gallon.  The TLC then compared the expected costs of gasoline per shift for a Crown Victoria and for the Ford Escape, the most popular brand of hybrid taxicab.  Based on averages of 15 miles per gallon and driving 135 miles per shift, the costs in gasoline per shift would be $27.45 for the Crown Victoria.  In the Ford Escape, which averages 34 miles per gallon, the gasoline cost is $12.11 per shift.  The TLC rounded the price differential to $15, and then offset the $15 from the $3 incentive, resulting in a $12 downward adjustment. (Id. ¶¶ 28-29.)

Under the new regulations, the TLC did not consider the operating costs of the medallion owners.  Instead, the TLC calibrated a cost which the owner had never borne and reduced the lease rate by that calculated value.  The TLC's justification for this new regulation: to "green" the taxi fleet with cleaner and more efficient taxicabs.  The new lease cap regulations would not have been possible under the prior regulatory framework.

The TLC considered other regulatory options before enacting the Lease Cap Rules.  The TLC considered requiring taxicab owners who lease their vehicles to pay for the cost of fuel,

---

[10]      The City's calculation seems to ignore the fact that the statutory life of a hybrid vehicle is five years, not three.  Using the City's methodology, the proper incentive for a taxicab with a five-year life cycle would appear to be $1.64 per shift.

either through direct reimbursement of gas costs to drivers or by requiring Fleet Owners to deliver a vehicle with a full tank of gas at the start of each shift. (Id. ¶ 33.)  The TLC states that it did not promulgate this rule because it was "logistically infeasible" and difficult to enforce. (Id.)

## IV. Procedural History

### a.  The Parties

The Amended Complaint, filed on April 17, 2009, alleges that the Lease Cap Rules are preempted by the EPCA and the CAA because the Rules are essentially a mandate to purchase vehicles with a certain mpg or emissions rating.

The Plaintiffs are operators of taxicab fleets (hereinafter, "Fleet Owners") and a trade association for fleet operators.  The Fleet Owners regularly lease their vehicles to drivers, and the majority of the vehicles are Crown Victorias.  Together, Plaintiffs control more than 25% of the taxicabs in New York City. (See Am. Compl. ¶¶ 7-11.)  Industry-wide, fleet owners, the group presumptively benefitting from the current structural disincentive to purchase hybrids, control approximately 35% of all taxicab medallions. (See Salkin Decl. ¶ 32; May 7, 2009 Oral Argument Transcript ("Oral Arg. Tr.") 36:09-14.)

Defendants are New York City; the TLC, which is the City's regulatory agency for the taxicab industry; Mayor Michael Bloomberg, in his official capacity; TLC Commissioner, Chair, and Chief Executive Officer Matthew Daus, in his official capacity; TLC Assistant Commissioner for Safety & Emissions Peter Schenkman, in his official capacity; and TLC First Deputy Commissioner Andrew Salkin, in his official capacity.

### b.  The Evidentiary Hearing

The Court held oral argument on Plaintiffs' motion on May 7, 2009.  Following oral argument the Court held an evidentiary hearing on May 20, 2009, to determine the effect of the

Lease Cap Rules on Fleet Owners and whether the Rules force Fleet Owners to switch to hybrid vehicles.

Plaintiffs presented three experts at the May 20, 2009 hearing: James Levinsohn, an economist teaching at the University of Michigan, who presented a detailed estimation of the profit differential between Crown Victoria and hybrid owners under the status quo lease caps and under each of the first three years of the Lease Cap Rules; Ray Mundy, a transportation and logistics specialist teaching at the University of Missouri, who discussed the history of lease caps in New York City and how tying lease caps to the use of hybrid vehicles would affect the purchasing decisions of Fleet Owners; and Dean Karlan, an economist teaching at Yale University, who testified about brand loyalty and why businesses make certain economic decisions.

Defendants presented two experts: Kurt Strunk, a senior consultant at National Economic Research Associates ("NERA"), who testified about errors in Dr. Levinsohn's economic study and concluded that so long as Fleet Owners made more than $1 in profits under the Lease Cap Rules, the new Rules would not "force" them to switch to hybrids; and Rachel Weinberger, a transportation planning specialist teaching at the University of Pennsylvania, who testified that the prior lease cap rules presented a structural disincentive for Fleet Owners to switch to hybrid taxicabs, but that even under the new Lease Cap Rules not all Fleet Owners would behave in the most efficient economic manner and switch to hybrid vehicles.

## DISCUSSION

### I.  Preliminary Injunction Standard

A preliminary injunction may be granted upon a showing of irreparable harm, and because this matter involves a challenge to a New York City statutory or regulatory scheme,

Plaintiffs must also demonstrate a likelihood of success on the merits.  Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996).  For the reasons given in the previous decision, Plaintiffs have shown that they will suffer irreparable harm without an injunction.  See Metro. Taxicab, 2008 WL 4866021, at *5-7 (finding that Plaintiffs would have no private right of recovery under the EPCA).  The issue for this preliminary injunction motion is whether Plaintiffs have shown a likelihood of success of the merits.

## II.  Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits because the Lease Cap Rules are preempted by federal law.  Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, "state laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are invalid." Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604 (1991) (internal quotations and citation omitted).  The Supremacy Clause "may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law." N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 654 (1995); see also Mortier, 501 U.S. at 604-05 ("Congress' intent to supplant state authority in a particular field may be express in the terms of the statute.").

Even without express preemptive language, courts may infer Congress' intent to preempt state action where "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  Where a party claims that federal law preempts state action in a field traditionally occupied by state regulation, courts must "start with the assumption that the historic police powers of the States were not to be superseded by the

Federal Act unless that was the clear and manifest purpose of Congress." <u>Rice</u>, 331 U.S. at 230.

In every preemption analysis, courts must look to Congress' intent to determine the scope of the

preemption. <u>See</u> <u>Wyeth v. Levine</u>, 129 S. Ct. 1187, 1194 (2009) ("[T]he purpose of Congress is

the ultimate touchstone in every pre-emption case.") (quoting <u>Medtronic, Inc. v. Lohr</u>, 518 U.S.

470, 485 (1996)).

      Before analyzing Congress' intent in enacting the EPCA and the CAA and whether those

federal statutes preempt the Lease Cap Rules, the Court must determine whether the new rules

are a <u>de</u> <u>facto</u> mandate to Fleet Owners to purchase hybrid taxicabs.  If the Lease Cap Rules

present only a single "real" option for Fleet Owners, then the Rules are a mandate and the Court

will then determine if that single option is preempted. <u>See</u>, <u>e.g.</u>, <u>Travelers Ins.</u>, 514 U.S. at 668

("We acknowledge that a state law might produce such acute, albeit indirect, economic benefits,

by intent or otherwise, as to force an ERISA plan to adopt a certain scheme . . . and that such a

state law might indeed be preempted . . . ."); <u>Retail Indus. Leaders Ass'n v. Fielder</u>, 475 F.3d

180, 193 (4th Cir. 2007); <u>Retail Indus. Leaders Ass'n v. Suffolk County</u>, 497 F. Supp. 2d 403,

417 (E.D.N.Y. 2007).  If the Lease Cap Rules present viable options to Fleet Owners to either

purchase a Crown Victoria or a hybrid, then the Rules are not a mandate.  A preemption analysis

would then be irrelevant since the City is not forcing the Fleet Owners to take any new action—

much less a potentially preempted action. <u>See</u> <u>Travelers Ins.</u>, 514 U.S. at 659 (noting that where

a state law with some economic impact did not bind the affected parties to "any particular

choice," the state law did not function as a regulation of a preempted area of law).

**a. Are the Lease Cap Rules a Mandate?**

**i. Legal Precedent**

There are no controlling cases that deal with whether the Lease Cap Rules are a mandate, and, if so, whether the Rules are preempted. Both parties cite to cases involving the Employee Retirement Income Security Act of 1974 ("ERISA"), in which the Supreme Court and lower courts have addressed the issue of preemption where a state law, while seemingly presenting choices, essentially mandates an outcome that is preempted by federal law.

In New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645 (1995), a New York state statute required hospitals to collect surcharges from patients covered by a commercial insurer, but exempted patients insured by Blue Cross/Blue Shield. Id. at 649. The effect of the law was to make "the Blues" a cheaper and more attractive option for administrators of employee benefit plans that fell under ERISA. The plaintiffs, who were other health-care insurers, argued that the law was preempted by language in the ERISA statute stating that ERISA superseded all state laws insofar as they "relate to" an employee benefit plan. The Court determined that the only way to understand the term "relate to" was to examine the objectives of the ERISA statute and then compare "the purpose and the effects" of the New York statute to see if they conflict. Id. at 656-59. The Court noted that the intent of the ERISA preemption provision was to ensure that plan administrators would work with a uniform body of law, so as to minimize the administrative and financial burden of complying with many different state directives. Id. at 657-58.

Examining the New York statute, the Court noted that the law created an "indirect economic effect" on plan administrators' choices, but that "[a]n indirect economic influence, however, does not bind plan administrators to any particular choice and thus function as a

regulation of an ERISA plan itself." <u>Id.</u> at 659-60. The Court found that the statute's indirect influence affected a plan administrator's decisions about which plan to use, "but it does not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges." <u>Id.</u> at 660. In analyzing how the state law fit with Congress' intent to preempt state regulation of ERISA plans, the Court held that "cost uniformity was almost certainly not an object of pre-emption, just as laws with only an indirect economic effect on the relative costs of various health insurance packages . . . are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans." <u>Id.</u> at 662. The law was not preempted because: (1) it did not force only one, preempted, choice; and (2) the manner in which the law indirectly affected ERISA plan decisions was not part of Congress' preemptive object.

Significantly, however, the Court left open an unresolved question:

> [W]e do not hold today that ERISA pre-empts only direct regulation of ERISA plans, nor could we do that with fidelity to the views expressed in our prior opinions on the matter. We acknowledge that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted . . . .

<u>Id.</u> at 668 (internal citations omitted). While this observation is dicta, the Supreme Court clearly recognized that the indirect economic pressures of a state law could force a party to adopt a scheme that would be preempted, even if the Court did not find such pressures in <u>Travelers Insurance</u>.

The Supreme Court analyzed the potentially preemptive impact of a state law operating as a <u>de facto</u> mandate in <u>California Division of Labor Standards Enforcement v. Dillingham Construction</u>, 519 U.S. 316 (1997). There, a California law allowed contractors to pay lower wages to workers from state-certified apprenticeship programs when working on public works

projects. Id. at 319-20.  At issue was whether the California law affected the apprentice

programs' ERISA plans by essentially forcing them to obtain a state certification, which

arguably was preempted because it "relate[d] to" ERISA.  The Court held that the law was not

preempted by the ERISA statute because the wage law was "quite remote from the areas with

which ERISA is expressly concerned—'reporting, disclosure, fiduciary responsibility, and the

like.'" Id. at 330 (quoting Travelers Ins., 514 U.S. at 661).  The Court also analogized the case to

Travelers Insurance and found that the added inducement from the lower wage paid for state-

approved apprentices was not "tantamount to a compulsion upon apprenticeship programs." Id.

at 333.  The Court noted that the wage statute "alters the incentives, but does not dictate the

choices, facing ERISA plans." Id. at 334.

        The Fourth Circuit distinguished Travelers Insurance and Dillingham Construction in

Retail Industry Leaders Association v. Fielder, 475 F.3d 180 (4th Cir. 2007), another ERISA

case.  In that case Maryland passed a law that targeted Wal-Mart and forced the company—and,

by specifically excluding other employers who might fall within the statute, only that company—

to either spend at least 8% of its total payroll on health insurance for its employees or pay the

shortfall to the state. Id. at 183.  The Fourth Circuit examined how the Maryland regulation

conflicted with the purpose of the ERISA statute, which was to permit ease of nationwide plan

administration.  The court held that "the only rational choice employers have under the

[Maryland act] is to structure their ERISA healthcare benefit plans so as to meet the minimum

spending threshold," because no reasonable employer would pay money to the state that it could

instead spend on its employees. Id. at 193.  The court looked at the Maryland legislature's intent

in passing the so-called Fair Share Act and found that the intent and effect were to create a "fee

or a penalty" that gave Wal-Mart "an irresistible incentive" to increase health benefits. Id. at 194

("The Maryland General Assembly intended the Act to have precisely this effect.").

The Fourth Circuit distinguished the Wal-Mart case from Travelers Insurance and

Dillingham Construction for several reasons.  First, it said that the Maryland law directly

regulated ERISA plan structuring, whereas Travelers Insurance and Dillingham Construction

involved indirect regulations, so the Maryland law had a "tighter causal link between the

regulation and employers' ERISA plans," making it more analogous to cases where ERISA

regulation was preempted. Id. at 195-96.  Second, the court found that the law allowed for no

meaningful alternatives to increasing the payment for health insurance, and that even if those

alternatives did exist, they would still affect plan decisions in a preempted manner. Id. at 196-97.

Retail Industry Leaders Association v. Suffolk County, 497 F. Supp. 2d 403 (E.D.N.Y.

2007), dealt with facts nearly identical to Fielder.  In Suffolk County, the local legislature

targeted Wal-Mart to make health care expenditures of at least $3 per employee work-hour or

pay the shortfall and civil penalties to the county. 496 F. Supp. 2d at 406.  The court looked at

the legislative history of the local act and found that "Suffolk County enacted it in order to

mandate that covered employers and, specifically, Wal-Mart, increase spending on healthcare

coverage." Id. at 417.  Citing to Fielder, the court also found that "the alternative options for

compliance with the Act are unrealistic." Id. at 418.  Since it was a mandate, the act was

preempted under ERISA because it "would disrupt uniform plan administration." Id.

The rule derived from these cases is that a local law is preempted if it directly regulates

within a field preempted by Congress, or if it indirectly regulates within a preempted field in

such a way that effectively mandates a specific, preempted outcome.  This Court's initial ruling

in Metropolitan Taxicab was an example of a local law directly regulating within a preempted

field. <u>See</u> 2008 WL 4866021, at *9. <u>Fielder</u> is an example of a case involving an effective mandate of a preempted outcome. <u>See</u> 475 F.3d at 193-96. Conversely, a local law is not preempted when it only indirectly regulates parties within a preempted field and presents regulated parties with viable, non-preempted options, as held in <u>Travelers Insurance</u> and <u>Dillingham Construction</u>.

### ii.  Application to the Facts

The Lease Cap Rules at issue control the maximum lease rates which taxicab owners may charge. They allow a higher rate for hybrids and much lower rates for Crown Victorias. While silent on mileage and emission standards, the Rules were expressly adopted to encourage the purchase of hybrid vehicles which meet the City's mileage goals and desired emission standards.

The Court must look to the effect of the Lease Cap Rules on Fleet Owners to determine if they are a <u>de facto</u> mandate to purchase hybrid vehicles. Plaintiffs bear the burden to persuade the Court that the Rules constitute a mandate "by a clear showing." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (citation omitted). While <u>Travelers Insurance</u>, <u>Dillingham Construction</u>, <u>Fielder</u>, and <u>Suffolk County</u> describe how a court should analyze the interplay between an effective mandate and preemption, they provide little guidance on how a court should determine whether specified economic incentives actually create a mandate. For this reason the Court asked the parties to present expert evidence on the effect of the Lease Cap Rules.

In his written declaration of May 18, 2009, and at the May 20, 2009 evidentiary hearing, Plaintiffs' expert economist, Dr. Levinsohn, estimated the expected impact of the Lease Cap Rules on Fleet Owners by using financial data supplied by the Plaintiffs. Dr. Levinsohn calculated the difference in profit for Fleet Owners if they used entirely Ford Escape Hybrids compared to Crown Victorias, factoring in the comparative revenue from lease charges; the

comparative cost of purchasing and hacking up a taxicab; medallion costs; the comparative

operating cost; and other general administrative costs.

If the lease cap rates had remained unchanged, Dr. Levinsohn estimated that Fleet

Owners using Crown Victorias made approximately $8,500 per year in profits, while those using

hybrids earned only $5,100 in profits, meaning that hybrid profit was $3,400 less per vehicle per

year. (See Declaration of James Levinsohn ("Levinsohn Decl.") 8-9; see also Plaintiffs' Ex. 31

from May 20, 2009 Evidentiary Hearing ("Pl. Hr'g Ex.").)

A chart that Plaintiffs presented at the May 20, 2009 hearing illustrates Dr. Levinsohn's

findings from his analysis of two Fleet Owner operations, Gotham Yellow LLC ("Gotham") and

Ronart Leasing Corp. ("Ronart"):

## Profits Per Car Per Year

### Gotham Data

| | Under current lease rates, for car purchased today | Under challenged lease rates, for car purchased in: | | |
|---|---|---|---|---|
| | | May 2009 | May 2010 | May 2011 |
| Crown Vics | $8,518 | $3,327 | $1,511 | $581 |
| Hybrid | $5,103 | $7,099 | $7,099 | $7,099 |
| Penalty (Difference in profits) | **-$3,415** | **$3,772** | **$5,588** | **$6,518** |

### Ronart Data

| | Under current lease rates, for car purchased today | Under challenged lease rates, for car purchased in: | | |
|---|---|---|---|---|
| | | May 2009 | May 2010 | May 2011 |
| Crown Vics | $4,962 | $363 | -$1,348 | -$2,241 |
| Hybrid | $1,617 | $3,258 | $3,258 | $3,258 |
| Penalty (Difference in profits) | **-$3,345** | **$2,895** | **$4,606** | **$5,499** |

See Pl. Hr'g Ex. 31.

The Lease Cap Rules immediately increase the lease cap for hybrid taxicabs by $3, but reduce the lease cap rates for Crown Victorias by $4. The impact of this is that the profitability of using hybrid taxicabs is increased and Crown Victoria profitability is decreased. The current $3,415 disadvantage for hybrids changes to a $3,772 advantage for hybrids, under the figures for Gotham, representing a swing of close to $7,200. (Id.) The swing under Ronart's data for the same period is nearly $6,250. (Id.) One year later, in May 2010, when the maximum lease rate for Crown Victorias is reduced by $8, the profits for Crown Victoria owners are reduced to approximately $1,500 under Gotham's data, and the hybrid advantage increases to nearly $5,600. (Id.) Finally, in May 2011, when the Lease Cap Rules reduce the rates for Crown Victorias by $12 per shift, the profits from Crown Victoria taxicabs are reduced to $581 and the hybrid advantage increases to approximately $6,500. (Id.) Under Ronart's data Crown Victoria owners operate at a loss in the second and third years of the Lease Cap Rules. (Id.)

In Dr. Levinsohn's opinion, the size of the profit disparity between hybrids and Crown Victorias is so great that no rational taxicab owner would choose to take such a loss in profit when the available alternative is so much more profitable.

Plaintiffs' expert on the taxicab industry, Ray Mundy, submitted a written declaration and testified that the TLC first regulated lease rates in 1996 and first set lease caps in 1997. (See Declaration of Ray Mundy ("Mundy Decl.") ¶¶ 26-27.) Dr. Mundy explained the detailed, cost-based analysis of changes in fleet owner profit that the TLC undertook in 2004 when implementing new lease caps and fare increases. (Id. ¶¶ 30-32.) Dr. Mundy also stated that in his experience in the taxi industry nationwide, he has never encountered an example of a regulatory agency decreasing a lease rate for a vehicle that was formerly approved. (Id. ¶ 34.) Had the prior regulations stayed in place, the City could not have made the cost changes it enacted. The Lease

Cap Rules reduced revenues for certain types of vehicles, without regard to cost, in order to implement the City's policy choice: taxi owners should buy hybrids.

Defendants' consultant Kurt Strunk framed the "mandate" question differently than Dr. Levinsohn.  According to Mr. Strunk, the Lease Cap Rules are not a mandate so long as Crown Victoria operators continue to earn any profit. (See Declaration of Kurt Strunk ("Strunk Decl.") 6; see also May 20, 2009 Evidentiary Hearing Transcript ("Hr'g Tr.") 117:04-07.)  There is no reason to compare costs and revenues associated with purchasing a hybrid, he said, because the relevant data point is that Crown Victoria operators will continue to make some profit under the Lease Cap Rules.  In Mr. Strunk's opinion, any amount over zero is sufficient to demonstrate that there is an economic profit and, therefore, there is no mandate. (Hr'g Tr. 117:04-07.)

Mr. Strunk admitted that it was unusual for a regulatory agency to determine ratemaking changes based on policy, rather than on a cost analysis.  "Ratemaking based on cost is more common," he said; Mr. Strunk was unaware of any agencies in the United States that regulated on anything other than costs. (See id. 120:11-121:09.)

Defendants' transportation expert Rachel Weinberger echoed Mr. Strunk's analysis: Fleet Owners had a reasonable choice, even under the Lease Cap Rules, because Fleet Owners could make "a reasonable return on [their] investment, which would be an economic rent greater than zero." (Id. 125:02-03.)  Dr. Weinberger was not as critical of Dr. Levinsohn's analysis as Mr. Strunk was. ("But I do, actually, want to applaud Dr. Levinsohn.  I thought he did a very nice piece of work in a very short amount of time from an academic perspective." Id. 123:09-11.) Nonetheless she adhered to Mr. Strunk's point: economic rents above zero cannot constitute a mandate. (Id. 123:12-15.)  Dr. Weinberger compared the Fleet Owners' situation to her own status as a property owner; she chooses not to maximize her profits and raise the rent on her

tenants because they are a known quantity and she makes an acceptable profit. (Id. 126:11-21.)

Upon questioning by the Court, however, Dr. Weinberger acknowledged that if given an empty

apartment and the choice between a tenant paying $100 rent and a tenant paying $200 rent, she

would "[o]f course" choose the $200 tenant because she is a reasonable business person. (Id.

126:22-127:08.)  Since Fleet Owners must purchase vehicles every year as prior purchases age

out of the fleet, it would seem that the renting of the empty apartment would be the more apt

analogy.

In addition to Dr. Weinberger's and Mr. Strunk's testimony that the Lease Cap Rules are

not a mandate, the City contrasts data from the purchasing decisions of Fleet Owners against

individual owners who drive their own taxicabs.  Individual owners already pay for their own gas

and thus have an incentive to purchase hybrids.  The City classifies two types of owners who

drive their own vehicles: (1) those who own the vehicles but lease their medallions ("DOVs");

and (2) those who own medallions and their own vehicle and may or may not lease out the

vehicle, but who also drive several shifts a year ("non-affiliation owners"). (See Salkin Decl. ¶

30-31.)

The City states that DOVs account for approximately 7,000 taxicabs, more than 50% of

all cabs.  Non-affiliation owners account for 3,000 taxicabs. (Id. ¶ 31.)  In the 16-month period

from January 2008 to April 2009, vehicles purchased by DOVs were split 55% Crown Victoria

and 40% hybrid or clean diesel.[11]  Vehicles purchased by non-affiliation owners during that time

were 47% Crown Victoria and 47% hybrid or clean diesel.  Fleet Owners purchased 70% Crown

Victorias and 28% hybrid or clean diesel. (See Pejan Decl. Ex. K.)

---

[11]    The Court assumes that the remaining 5% of vehicles were wheelchair-accessible, the third category of
permissible taxicabs.

The City argues that since DOVs and non-affiliation owners—the parties with a greater economic incentive to purchase hybrids due to high gas prices—continued to purchase Crown Victorias even after the economic incentive to purchase hybrids existed, it proves that taxi owners will still choose to buy Crown Victorias even when confronted by a substantial economic incentive not to do so. (See Salkin Decl. ¶ 37; Pejan Decl. Ex. K.)  This argument is a surmise because the existing buying pattern does not reflect the $12 per-shift disincentive the City adopted for the express policy purpose of putting more hybrid taxicabs on the street.

Based on the foregoing evidence from the testimony at the hearing and the written declarations of the parties, there is one clear conclusion to be drawn from the Lease Cap Rules, the manner in which they were adopted, and the methodology of the new regulatory architecture. The Lease Cap Rules' purpose is to incentivize the purchase of hybrids, while at the same time provide a very meaningful disincentive to the continuing use of conventionally powered vehicles.  The combined effect of the lease cap changes, and even the disincentive alone, constitutes an offer which can not, in practical effect, be refused.

The City argues that the Fleet Owners cannot show irreparable harm based on the initial $4 reduction.  But if the Fleet Owners waited for the $12 disincentive to take effect in 2011, the City would surely argue that the Fleet Owners were too late.  The Court need not wait, however. By creating the $12 disincentive, the City clearly intended to send an obvious signal as to the economic consequences for continuing to stay with Crown Victorias.  While the City might have addressed the structural disincentive in other ways—perhaps a larger incentive for hybrid taxi owners—it chose a $12 disincentive for conventional vehicles, at a weight four times the incentive for hybrids.  The disincentive reduces income without any consideration of Fleet

Owner costs and imposes an immediate penalty for continuing to use the same vehicle that the
City mandated within this decade.

Any doubt about the City's intent in enacting the Lease Cap Rules is dispelled by looking
at how the City changed the rules. TLC Rule § 1-78(e) required the TLC to find "substantial
evidence of reduced operating expenses of the affected medallion owners" before it reduced
maximum lease cap rates. Such a study would have taken some time, and almost certainly would
not have found any evidence that operating expenses declined in the five years between 2004 and
2009. Rather than dealing with costs, which had been the guide for over a decade, the TLC
changed the rules so that it "may initiate lease cap changes at any time, based on the
Commission's assessment of appropriate policy considerations." See TLC Rule § 1-78.1(b).
Using only a policy analysis, the TLC could quickly change the maximum lease caps to create a
penalty for Crown Victoria operators and a benefit for drivers, regardless of any changes to Fleet
Owners' operating expenses. Defendants' own expert, Mr. Strunk, acknowledged that he had
never seen such a policy-based approach to ratemaking regulation in the United States. The only
reasonable inference that can be drawn from the TLC's procedural maneuvering is that it
intended that the substantially reduced lease cap rates for Crown Victoria owners would
convince the owners to transfer to hybrid vehicles.

There is one final piece of evidence in the question of whether Fleet Owners are
effectively forced to switch to hybrid taxicabs under the new rules. Based on Dr. Levinsohn's
economic analysis—to which the City presents no competing analysis, only a critique of his
methodology—the Lease Cap Rules, when fully phased in, provide an economic incentive of
approximately $5,500 to $6,500 per vehicle to switch to hybrids. Dr. Levinsohn calculated that
profits for Crown Victoria owners are currently $8,500 per vehicle per year. Under the new

Lease Cap Rules, Fleet Owners who continue to use Crown Victorias would forgo a profit margin up to 76% of their current profit. (See Levinsohn Decl. 11-12; Pl. Hr'g Ex. 31.)  A sensible business person faced with such a profit reduction would choose to avoid that loss and, in this case, favor the more profitable hybrid taxicab option. See Fielder, 475 F.3d at 193 (discussing the "only rational choice" that an employer could make when faced with supposed options under Maryland's Fair Share Act).  The City's expert, Dr. Weinberger, acknowledged as much when discussing her hypothetical economic decisions as a landlord; when faced with the option of taking substantially higher profits in rent, she "of course" would take the money. (Hr'g Tr. 126:22-127:08.)

The Court cannot accept the City's argument that any rate structure that yields more than $1 in profit does not "compel" or mandate a result.  The taxicab industry, as much as any other industry, is profit oriented and business owners try to maximize profits.  Even a first-grader who has nothing recognizes that getting $100 is much better than getting $1, even though the first-grader is better off with $1 than with $0.  Given a choice, the first-grader will always take $100, just as the Fleet Owners will always take a profit of $7,100 (hybrids) over a profit of $580 (Crown Victorias), the expected differential in May 2011 under Dr. Levinsohn's analysis. (See Pl. Hr'g Ex. 31, supra P. 21.)

The City's presentation of recent purchasing patterns of DOVs and non-affiliation owners is not convincing.  The economic position of DOVs and non-affiliation owners is not comparable to the Fleet Owners' position.  While Fleet Owners lease their vehicles out two shifts a day, every day, the TLC prohibits drivers from operating their taxicabs more than 12 consecutive hours. See TLC Rule § 2-23.  Accordingly, DOVs and non-affiliated owners do not have as strong an incentive as the City suggests to currently switch to hybrid taxicabs because DOVs and

non-affiliation owners only pay for their own gas a maximum of half of the shifts.  This could explain why many DOVs and non-affiliation owners continue to buy Crown Victorias; due to the cost of purchasing and hacking up hybrid taxicabs, it may still be in their economic benefit to drive Crown Victorias.  The purchasing patterns that the City presents are not strong arguments that Fleet Owners will act against their economic interests and buy Crown Victorias once the Lease Cap Rules are in effect.  Far stronger evidence of likely future purchasing performance is the sharp reduction in profits directly associated with the ownership of a Crown Victoria once the Lease Cap Rules are in place.

Looking at all the evidence, it is clear to the Court that the Lease Cap Rules do not present viable options for Fleet Owners and instead operate as an effective mandate to switch to hybrid vehicles.  Having decided that the Lease Cap Rules constitute a mandate, the Court turns to the issue of preemption.

### b.  Preemption Under the EPCA

Preemption claims turn on Congress' intent, so the Court must review Congress' goals in enacting the EPCA and the relevant text of the provision in question.  See Wyeth v. Levine, 129 S. Ct. at 1194; Travelers Ins., 514 U.S. at 655.  The Court reviewed this same issue in the previous case involving these parties.  See Metro. Taxicab, 2008 WL 4866021, at *8.

Congress enacted the EPCA to address the energy crisis resulting from the 1973 Mideast oil embargo.  See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1182 (9th Cir. 2008) (citing H.R. Rep. No. 94-340 at 1-3 (1975), as reprinted in 1975 U.S.C.C.A.N. 1762, 1763-65).  The goals of the EPCA are to improve motor vehicle efficiency and to "decrease dependence on foreign [oil] imports, enhance national security, achieve the efficient utilization of scarce resources, and guarantee the availability of domestic energy

supplies at prices consumers can afford." Id. (quoting S. Rep. No. 94-516 (1975) (Conf. Rep.), as reprinted in 1975 U.S.C.C.A.N. 1956, 1957); see also Green Mountain, 508 F. Supp. 2d at 305-06.  The Department of Transportation ("DOT") is charged with establishing federal fuel economy standards on a fleet-wide basis. See 49 U.S.C. §§ 32902(a), 32902(c).  These average standards are known as "corporate average fuel economy" or "CAFE" standards.  The CAFE standard is "a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year." Id. § 32901(a)(6).

The EPCA contains an express preemption clause:

> When an average fuel economy standard prescribed under this chapter . . . is in effect, a State or political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919(a) (emphasis added).  This language is quite clear: "Congress's undoubted intent was to make the setting of fuel economy standards exclusively a federal concern." Green Mountain, 508 F. Supp. 2d at 354.

The DOT delegates the responsibility for setting fuel economy standards to the National Highway Traffic Safety Administration ("NHTSA"). 49 C.F.R. § 1.50(f).  The NHTSA must weigh four factors when setting standards: "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f).  The NHTSA has interpreted "economic practicability" to include consideration of consumer choice, economic hardship for the auto industry, and vehicle safety. Green Mountain, 508 F. Supp. 2d at 307.  The NHTSA balances the goals of improving fuel economy with maintaining consumer choice and avoiding adverse economic effects on auto manufacturers.  As a California district court described it:

> NHTSA must set fuel economy at the maximum feasible level while
> avoiding serious adverse economic effects on manufacturers and
> maintaining a reasonable amount of consumer choice among a broad
> variety of vehicles. Accordingly, Congress carefully drafted the CAFE
> program to require fuel economy restrictions that do not have the effect of
> either imposing impossible burdens or unduly limiting consumer choice as
> to capacity and performance of motor vehicles.

Central Valley Chrysler-Jeep v. Witherspoon, 456 F. Supp. 2d 1160, 1169 (E.D. Calif. 2006)

(internal citations and quotations omitted).

A manufacturer's fleet of new passenger vehicles currently must average at least 27.5

miles per gallon. See 49 U.S.C. § 32902(b).  By 2020 that minimum fleet average rises to 35

miles per gallon. Id.  Less than a month ago President Obama proposed new CAFE standards

that would require a fleet average of 35.5 miles per gallon by 2016. See Press Release, The

White House, President Obama Announces National Fuel Efficiency Policy (May 19, 2009).

There is no question that the federal government is actively pursuing regulation that would affect

national fuel efficiency standards.

The City acknowledges that the prior 25/30 Rules are preempted under the EPCA

because they "related to fuel economy standards." (See Oral Arg. Tr. 16:13-15.)  Defendants

now argue that the Lease Cap Rules, even if they are a mandate, are not preempted under the

EPCA because they simply designate hybrid vehicles as required taxicabs and do not require

vehicles with a certain mpg rating.  The City argues that the term "related to" should be

construed narrowly, so that a de facto requirement to purchase hybrid taxicabs does not "relate

to" fuel economy standards under 49 U.S.C. § 32919(a).

A constricted interpretation of the term "related to" is not appropriate.  The Supreme

Court just recently referred to that term as "expansive." In Travelers Indemnity Co. v. Bailey,

Nos. 08-295, 08-307, __ S. Ct. __, 2009 WL 1685625 (June 18, 2009), a case dealing with the

enforceability of a Bankruptcy Court order enjoining related state court lawsuits, the Supreme Court stated unequivocally that "[i]n a statute, '[t]he phrase 'in relation to' is expansive.'" 2009 WL 1685625, at *8 (quoting <u>Smith v. United States</u>, 508 U.S. 223, 237 (1993)). Although the Court noted that at some point the term "relate to" loses any meaning because "'everything is related to everything else,'" <u>id.</u> (quoting <u>Dillingham Constr.</u>, 519 U.S. at 335), the Court found that the state claims at issue "clearly" related to the Bankruptcy Court's injunction and so there was no need to "stake out the ultimate bounds" of the connection. <u>Id.</u>

In this case, while it is true that the Lease Cap Rules do not require a specific mpg rating, the effect of the rules is to force taxicab owners to meet an mpg threshold determined by the mileage rating of the TLC's approved hybrid or clean diesel vehicles. All of the TLC-approved hybrids or clean diesel vehicles are rated 25 mpg or higher. (<u>See</u> Saylor Decl. Ex. 14.) These are the same vehicles that the TLC approved under the preempted 25/30 Rules. (<u>Compare</u> Saylor Decl. Ex. 4 <u>with</u> Saylor Decl. Ex. 14.) The Lease Cap Rules are essentially a command to taxicab owners to meet that higher mpg standard. <u>See</u> <u>Am. Auto. Mfrs. Ass'n v. Cahill</u>, 152 F.3d 196, 200 (2d Cir. 1998) (finding that while a New York law requiring that a percentage of vehicle sales be "zero emission vehicles" did not "impose precise quantitative limits on levels of emissions," the CAA nevertheless preempted the sales requirement because the law was "in the nature of a command having a direct effect on the level of emissions").

The City's purpose in enacting the Lease Cap Rules also sheds light on the issue of preemption. <u>See</u> <u>Travelers Ins.</u>, 514 U.S. at 658 (looking at the "purpose and the effects" of the New York law); <u>Fielder</u>, 475 F.3d at 190 (examining the "nature and effect" of Maryland's Fair Share Act to determine preemption). While consideration of the purpose of the local regulation is not the end-all to the Court's preemption review, that does not mean it should be ignored. It is

fair to consider purpose in conjunction with the law's effects. See Gade v. Nat'l Solid Wastes

Mgmt. Ass'n, 505 U.S. 88, 105 (1992) ("In assessing the impact of a state law on the federal

scheme, we have refused to rely solely on the legislature's professed purpose and have looked as

well to the effects of the law."). Here, one of the City's stated purposes in enacting the Lease

Cap Rules was to allow taxi owners who choose "a fuel efficient" vehicle to realize a greater

lease income than owners who choose "a less efficient vehicle." (See Pejan Decl. Ex. J.)  The

City's discussion of "efficient" vehicles relates to how many miles per gallon a vehicle travels.

Indeed, the exact amount of the disincentive is based on a calculation of miles per gallon. (See

Salkin Decl. ¶ 29.)  Looking beyond the reasons stated in the City Record, TLC Commissioner

Daus, in announcing the Lease Cap Rules, stated that, "Our goal from the beginning was to get

fuel efficient taxis on the road using whatever appropriate methods required to achieve our goal."

(See Saylor Decl. Ex. 8 (emphasis added).)

        Focusing on the effect and purpose of the Lease Cap Rules, it is clear that the rules

"relate to" fuel economy standards, as contemplated in 49 U.S.C. § 32919(a), the EPCA

preemption clause.  The 25/30 Rules specifically referred to mpg standards, but creative drafting

and the absence of specific reference to mileage do not make the effect—or the purpose—of the

Lease Cap Rules any different than the prior preempted regulations.  The Lease Cap Rules

effectively mandate the use of taxicabs with a certain mpg rating. See Cent. Valley, 529 F. Supp.

2d at 1175 ("The narrowest interpretation consistent with the plain language of EPCA's

preemptive provision is that it encompasses only those state regulations that are explicitly aimed

at the establishment of fuel economy standards, or that are the de facto equivalent of mileage

regulation . . . .").  The express language of the EPCA preemption clause and the clear message

from the White House that the federal government is active within the preempted field of fuel

economy standards lead to one conclusion: fuel economy standards are a federal matter and the

EPCA preempts local laws, such as the Lease Cap Rules, that infringe upon the federal

prerogative.

Further, the City cannot argue that the Lease Cap Rules do not "relate to" fuel economy

standards because the rules burden only a small percentage of taxicab owners and only

insignificantly affect the EPCA's objectives.  As discussed in the previous litigation in this case,

the Supreme Court foreclosed such an argument in Engine Manufacturers.  The Court found that

the aggregate effect of allowing every state or political subdivision to enact seemingly harmless

rules would create an "end result [that] would undo Congress's carefully calibrated regulatory

scheme." Engine Mfrs., 541 U.S. at 255.

The purpose and effect of the Lease Cap Rules is to force Fleet Owners to purchase

taxicabs with a certain mpg rating.  Reading the language of the EPCA preemption statute, 49

U.S.C. § 32919(a), it is clear that the Plaintiffs are likely to succeed in showing that the Lease

Cap Rules are "related to" fuel economy standards and are preempted under the Supremacy

Clause.

### c.  Preemption Under the CAA

The Clean Air Act empowers the Environmental Protection Agency ("EPA") to

promulgate regulations necessary to prevent deterioration of air quality. 42 U.S.C. § 7601(a);

Cent. Valley, 529 F. Supp. 2d at 1156.  Part of the EPA's mandate under the CAA is to set

standards relating to emissions from new vehicles. 42 U.S.C. § 7521(a)(1); Motor & Equip.

Mfrs. Ass'n v. Nichols, 142 F.3d 449, 452 (D.C. Cir. 1998) ("Subchapter II of the [CAA] vests

in the federal government the almost exclusive responsibility for establishing automobile

emission standards for new cars.").  The CAA contains a preemption provision at § 209(a):

> No State or any political subdivision thereof shall adopt or attempt to enforce <u>any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines</u> . . . No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling . . . or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a) (emphasis added).

Congress preempted states—and their political subdivisions—from creating their own emissions standards for new vehicles because Congress was concerned about the possibility of 50 different standards applying to one vehicle that so easily moves across state lines. <u>See</u> <u>Engine Mfrs. Ass'n ex rel. Certain of its Members v. EPA</u>, 88 F.3d 1075, 1079 (D.C. Cir. 1996) ("Congress had another reason for asserting federal control in this area: the possibility of 50 different state regulatory regimes 'raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.'") (quoting <u>Motor & Equip. Mfrs. Ass'n, Inc. v. EPA</u>, 627 F.2d 1095, 1109 (D.C. Cir. 1979)).[12]

The question for the Court is whether the Lease Cap Rules, which effectively mandate the purchase of hybrid taxicabs, relate to the control of emissions.  In the prior litigation the Court found that the 25/30 Rules did not relate to emissions standards because those rules specifically targeted fuel economy but were silent as to emissions. <u>Metro. Taxicab</u>, 2008 WL 4866021, at *14.  This case is different.  One of the stated purposes of the Lease Cap Rules is to "create incentives for taxicab owners to buy cleaner vehicles." (<u>See</u> Pejan Decl. Ex. J.)

---

[12]     Congress granted California an exception from preemption because "Congress recognized that California was already the leader in the establishment of standards for regulation of automotive pollutant emissions at a time when the federal government had yet to promulgate any regulations of its own." <u>Engine Mfrs. Ass'n ex rel. Certain of its Members</u>, 88 F.3d at 1079 (internal quotation and citation omitted).  Congress later permitted other states to adopt California's standards, if the EPA granted California a waiver. <u>See</u> <u>Am. Auto. Mfrs. Ass'n</u>, 152 F.3d at 198 (describing regulatory history); <u>Green Mountain</u>, 508 F. Supp. 2d at 304 (same).  The case in front of this Court does not deal with any exceptions to § 209(a) preemption.

Additionally, the rules reduce the maximum lease cap for "owners of less clean taxicabs." (Id.)

While the enjoined 25/30 Rules specifically did not target emissions, it is clear that one purpose

of the Lease Cap Rules is to affect taxicab emissions by mandating the purchase of "cleaner

vehicles."

As discussed earlier in the section on EPCA preemption, see Discussion Section II(b),

supra pp. 31-32, the purpose of a regulation alone is not enough to create preemption; courts

must also examine the effect of a local rule when conducting a preemption analysis. See

Travelers Ins., 514 U.S. at 658 (examining "purpose and the effects"); Fielder, 475 F.3d at 190

(examining the "nature and effect").  In American Automobile Manufacturers Association v.

Cahill, the Second Circuit discussed a New York law requiring that a percentage of cars sold be

"zero emission vehicles," or "ZEVs." 152 F.3d at 197.  The court looked at the regulation's

purpose and effect, and found that even though the ZEV requirement did not impose a precise

limit on emissions levels, the sales regulation was preempted because it had the purpose of

"effect[ing] a general reduction in emissions" and was "in the nature of a command having a

direct effect on the level of emissions." Id. at 200.

The case here is not unlike American Automobile Manufacturers Association.  The Lease

Cap Rules have a purpose of reducing emissions from taxicabs.  The Court has already found

that the rules are effectively a mandate requiring the purchase of hybrid taxicabs.  Similar to

what the Second Circuit reasoned when looking at the ZEV sales requirement, a requirement to

purchase hybrid taxicabs is also a command that would directly affect the level of emissions.

This is certainly the City's goal in enacting the Lease Cap Rules, and reducing emissions would

be its result.  Section 209(a), the CAA preemption provision, specifically reserves emissions

regulation for new vehicles to the federal government.  As discussed earlier, even though the

effect of the Lease Cap Rules on nationwide regulation and vehicle production will be minor, the aggregate effect of permitting such local regulation would create an "end result [that] would undo Congress's carefully calibrated regulatory scheme." Engine Mfrs., 541 U.S. at 255.

Engine Manufacturers is instructive in another aspect. The Court there held that the CAA preempted local rules requiring fleet operators to use "alternative-fuel vehicles" or vehicles that met certain emission specifications. Id. at 259. With almost no discussion, the Court assumed that regulations requiring "alternative-fuel vehicles" related to the control of emissions under the CAA's preemption statute. Id. at 249-52. The only issue before the Court was whether preemption under the CAA applied equally to laws addressing purchasers of vehicles as well as manufacturers or dealers. Id. at 248-49. The Court did not specify why a mandate to use "alternative-fuel vehicles" meant that the vehicles were of a type that related to emissions control. In two footnotes, the Court defined "alternative-fuel vehicles" as, essentially, vehicles not powered by gasoline or diesel fuel. See id. at 249-50 n.1, 2.

Here, § 3-03.1 of the TLC Rules defines a hybrid vehicle as a "commercially available mass production vehicle originally equipped by the manufacturer with a combustion engine system together with an electric propulsion system that operates in an integrated manner." The City argues that the definitions for "alternative-fuel vehicles" that the Court in Engine Manufacturers assumed without discussion were related to emissions standards are unlike the definition for hybrid vehicles in the City's rules. Exact parity between the two definitions, however, is not required. It is a matter of common sense that a rule with the stated purpose of increasing the number of "cleaner vehicles" and with the effect of requiring the purchase of hybrid taxicabs is a rule "relating to the control of emissions." 42 U.S.C. § 7543(a). The Supreme Court in Engine Manufacturers did not need testimony from scientific experts to

explain the connection between "alternative-fuel vehicles" and emissions regulation. Neither does this Court need further testimony to understand the close relation between hybrid vehicles and emissions.

The Lease Cap Rules effectively force Fleet Owners to purchase hybrid taxicabs, and the purpose and effect of the rules is to reduce emissions.[13]  CAA § 209(a) preempts New York City from enacting regulations related to emissions control, and the Plaintiffs have demonstrated a likelihood of success in proving such preemption.

## CONCLUSION

For the reasons previously stated, the Court finds that the Lease Cap Rules are a de facto mandate upon the Plaintiffs to purchase hybrid vehicles. The Court further finds that the Plaintiffs have demonstrated irreparable harm and a likelihood of success in showing that such a mandate is preempted by the EPCA and the CAA. The Lease Cap Rules relate to fuel economy and emissions regulation, which are substantially federal concerns. Accordingly, the Plaintiffs' motion for a preliminary injunction is GRANTED.

Dated: New York, New York
       June 22, 2009

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[13]    The Court also noted earlier in this Opinion & Order that the purpose and effect of the Lease Cap Rules is to establish minimum mpg standards for taxicabs. See generally Discussion Section II(b). There is no logical problem in finding that the Lease Cap Rules have the purpose and effect of promoting both mpg and emissions standards. Even a casual reading of the City's public pronouncements and the regulatory record demonstrates that the City had both goals in mind.